## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DORRET FRANCIS, ANTHONY KENNEDY, and CHRISTINE PEARCE on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>APEX USA, INC.; HOTELMACHER, LLC, dba HOLIDAY INN EXPRESS; SONTAG, INC. dba HAMPTON INN CLINTON; STEAKMACHER, LLC, dba MONTANA MIKE'S STEAKHOUSE; SCHUMACHER INVESTMENTS, LLC, dba WATER ZOO INDOOR WATER PARK; WALTER SCHUMACHER; and CAROLYN SCHUMACHER,<br><br>    Defendants. | Case No.: CIV-18-583-HE<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

1.     Plaintiffs Dorret Francis, Anthony Kennedy and Christine Pearce

(collectively, "Plaintiffs") bring this action on behalf of themselves and all others

similarly situated, against Defendants APEX USA, Inc.; Hotelmacher, LLC, dba Holiday

Inn Express; Sontag, Inc., dba Hampton Inn Clinton; Steakmacher, LLC, dba Montana

Mike's Steakhouse; Schumacher Investments, LLC, dba Water Zoo Indoor Water Park;

Walter Schumacher; and Carolyn Schumacher (collectively, "Defendants"), alleging

violations of the Trafficking Victims Protection Reauthorization Act.

## INTRODUCTION

2.      This is an action brought by survivors of human trafficking.  Defendants

Walter and Carolyn Schumacher own and operate hospitality businesses in Clinton,

Oklahoma, including two hotels, a large restaurant, and a waterpark.  To obtain cheap and

easily exploitable labor for these businesses, Defendants engaged directly in a recruitment

scheme overseas whereby they induced foreign nationals to pay hefty fees to work under the

J-1 work- and study-based exchange visitor visa program through Defendant APEX USA,

Inc. ("APEX"), the J-1 sponsor agency they controlled and operated.  Plaintiffs and putative

class members were promised full time work with good pay, affordable housing, food,

transportation, and the possibility of obtaining additional jobs from other employers in the

area.  These promises were never fulfilled: instead, Plaintiffs were forced to work under

conditions that bore little resemblance to those to which they had agreed.

3.      Defendants' scheme to use American visa programs to recruit foreign

workers abroad and employ those workers as a pool of disposable and malleable labor at

Defendants' businesses was part of a larger pattern and practice.  Defendants exploited

the role of APEX as a sponsor in the J-1 program to recruit and obtain the services of

workers from abroad until December 31, 2013, after which time they continued to traffic

CLASS ACTION COMPLAINT

workers through the H-2B visa program.  *See Casilao, et al. v. Hotelmacher, LLC, et al.*,

Case No. 17-cv-800-SLP (W.D. Okla.).

4.     Defendants' overseas recruiting agents defrauded Plaintiffs and other putative

class members throughout the recruitment process, inducing them to pay substantial fees for

recruitment, immigration processing, and travel with promises of full-time, good-paying

jobs and suitable housing.  After Plaintiffs and the putative class members arrived in

Oklahoma, Defendants caused them to believe that if they did not work exclusively for

Defendants, they would suffer abuse of the legal process and/or serious financial and/or

reputational harms.  Defendants' scheme was designed to make Plaintiffs and other putative

class members afraid, intimidated, and powerless to leave Defendants' employment.

5.     Upon Plaintiffs' and the putative class members' arrival in the United States,

Defendants blatantly disregarded the terms of employment they had promised and required

Plaintiffs and the putative class members to labor under Defendants' imposed terms and

conditions.  Specifically, Plaintiffs' and the putative class members' hourly wage rates were

significantly reduced from what they had been promised and agreed to, Defendants failed to

provide full-time employment as promised, and/or conspired to prevent Plaintiffs and

putative class members from obtaining additional work from other employers.  Further,

Defendants failed to provide Plaintiffs and the putative class members with affordable and

suitable housing, but instead charged them significant fees for overcrowded, decrepit

company-owned housing and/or referred them to overcrowded and costly motel-room accommodations.

6.      Defendants intentionally created a situation where Plaintiffs and the putative class members were working few hours for little pay and barely earning enough to survive, let alone to leave Clinton and return home or to repay the loans they had taken to cover the thousands of dollars' worth of recruitment fees and travel expenses that they had been induced to pay.  This left Plaintiffs and the putative class members with no choice but to labor for Defendants on Defendants' terms.

7.      Plaintiffs Dorret Francis, Anthony Kennedy and Christine Pearce bring this action to recover damages on behalf of themselves and similarly situated "exchange visitors" from abroad who worked for Defendants in Oklahoma between May 29, 2008, and December 31, 2013 (the "Relevant Time Period").  Plaintiffs and the putative class members were low-wage workers whom Defendants brought to the United States on work- and study-based exchange visitor visas.

8.      Plaintiffs assert class action claims for damages against Defendants arising from violations of their rights under the Trafficking Victims Protection Reauthorization Act.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 18 U.S.C. § 1595(a) (civil trafficking).

CLASS ACTION COMPLAINT

10.     Venue in the Western District of Oklahoma is proper under 28 U.S.C.

§ 1391 in that various Defendants and/or agents of Defendants reside and/or may be

found in this District, and a substantial portion of the communications, transactions,

events or omissions underlying Plaintiffs' claims occurred in this District.

## PARTIES

**A.     Plaintiffs.**

11.     Plaintiff Dorret Francis is an individual who was recruited in 2008 from

Jamaica for work in the United States pursuant to the J-1 visa program.  After arriving in

the United States in June 2008, Plaintiff Francis worked at Montana Mike's Steakhouse in

Clinton, Oklahoma.

12.     Plaintiff Anthony Kennedy is an individual who was recruited in 2012 from

Jamaica for work in the United States pursuant to the J-1 visa program.  After arriving in

the United States in June 2012, Plaintiff Kennedy worked at Hampton Inn Clinton and the

Holiday Inn Express in Clinton, Oklahoma.

13.     Plaintiff Christine Pearce is an individual who was recruited in 2011 from

Jamaica for work in the United States pursuant to the J-1 visa program.  After arriving in

the United States in May 2011, Plaintiff Pearce worked at Montana Mike's Steakhouse and

Water Zoo Indoor Water Park in Clinton, Oklahoma.

CLASS ACTION COMPLAINT

**B.**      **Defendants.**

14.      Defendant APEX USA, Inc. ("APEX") is a not-for-profit corporation organized under the laws of Oklahoma and headquartered in Clinton, Oklahoma.  Until December 31, 2013, APEX was a J-1 visa sponsor agency.  As a J-1 sponsor agency, Defendant APEX engaged in the business of recruiting and providing foreign students and workers to United States companies, including for the other Defendants.  On information and belief, APEX functioned as the human resources department for the other Defendants.

15.      Defendant Hotelmacher, LLC is a limited liability company organized under the laws of Oklahoma, doing business as the Holiday Inn Express in Clinton, Oklahoma. Defendants Walter Schumacher and Carolyn Schumacher are members of Defendant Hotelmacher, LLC.

16.      Defendant Sontag, Inc. is a corporation organized under the laws of Oklahoma, doing business as the Hampton Inn Clinton in Clinton, Oklahoma.  Upon information and belief, Defendant Walter Schumacher is the CEO of Defendant Sontag, Inc., and has been since July 1977.

17.      Defendant Steakmacher, LLC is a limited liability company organized under the laws of Oklahoma, doing business as Montana Mike's Steakhouse in Clinton, Oklahoma.  Defendants Walter Schumacher and Carolyn Schumacher are members of Defendant Steakmacher, LLC.

18.     Defendant Schumacher Investments, LLC is a limited liability company organized under the laws of Oklahoma, doing business as Water Zoo Indoor Water Park in Clinton, Oklahoma. Defendants Walter Schumacher and Carolyn Schumacher are members of Defendant Schumacher Investments, LLC.

19.     Upon information and belief, Defendant Walter Schumacher ("W. Schumacher") is an individual who resides in Clinton, Oklahoma.  On information and belief, at all times relevant to this action, Defendant W. Schumacher was the President and registered agent of APEX, as well as a member of its board of directors.  In addition, Defendant W. Schumacher owns and operates Defendants Hotelmacher, LLC, Sontag, Inc., Steakmacher LLC, and Schumacher Investments, LLC, together with his wife Carolyn Schumacher.

20.     Upon information and belief, Defendant Carolyn Schumacher ("C. Schumacher") is an individual who resides in Clinton, Oklahoma.  Upon information and belief, at all times relevant to this action, Defendant C. Schumacher was the Internship/Trainee Program Coordinator and Work Travel Program Coordinator of APEX, as well as a member of its board of directors.  In addition, Defendant C. Schumacher owns and operates Defendants Hotelmacher, LLC, Sontag, Inc., Steakmacher LLC, and Schumacher Investments, LLC, together with her husband W. Schumacher.

CLASS ACTION COMPLAINT

21.     All Defendants listed above are referred to collectively herein as "Defendants."  Individually and through their agents, associates, attorneys, and/or employees, all Defendants have significant contacts with Clinton, Oklahoma.

22.     Plaintiffs are informed and believe and thereon allege that each of the Defendants acted in concert with each and every other Defendant, intended to and did participate in the events, acts, practices, and courses of conduct alleged herein, and was a proximate cause of damage and injury thereby to Plaintiffs as alleged herein.  Each of the Defendants is jointly and severally liable to Plaintiffs and to the putative class members.

## RELEVANT NON-PARTIES

23.     Defendants employed agents, associates, representatives and/or recruiters in Europe, Asia, and the Caribbean, including, without limitation, Judith Henry and Courtney Holness in Kingston, Jamaica, to engage in direct recruitment of J-1 visa candidates on their behalf.  Such individuals are referred to herein as the "Recruiters."  The Recruiters were and held themselves out to be direct agents and representatives of APEX.

## STATEMENT OF FACTS

**A.     The Global Human Trafficking Epidemic.**

24.     Plaintiffs and putative class members are foreign nationals who were trafficked to the United States by Defendants at various times beginning in 2008.

25.     Trafficking in human persons is a growing scourge around the world.  The United States government estimates that there are currently more than 20 million victims of human trafficking.[1]

26.     Human traffickers prey on the most vulnerable members of society. Traffickers often trick, coerce, or win the confidence of their victims through promises of a better life,[2] frequently using "bait-and-switch scenarios."[3]

27.     Human trafficking is a profitable and prolific clandestine criminal enterprise operating underground in every country across the globe, producing an estimated $150 billion in profits each year for traffickers.[4]

28.     In an early effort to combat human trafficking domestically and abroad, Congress passed and repeatedly reauthorized the Trafficking Victims Protection Act of 2003.

29.     The Trafficking Victims Protection Reauthorization Act authorizes victims of human trafficking to file a civil action against any perpetrator or whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which

---

[1] U.S. Dep't of State, Trafficking in Persons Report 7 (2013) (hereinafter "TIP 2013") (reporting that social scientists estimate that as many as 27 million persons are trafficking victims at any given time); U.S. Dep't of State, Trafficking in Persons Report 45 (2012) (hereinafter "TIP 2012") (estimate of modern slavery worldwide increased from 12.3 million victims in 2005 to 20.9 million victims in 2012).

[2] U.S. Dep't of State, Trafficking in Persons Report 8 (2009) (hereinafter "TIP 2009").

[3] U.S. Dep't of State, Trafficking in Persons Report 27 (2011) (hereinafter "TIP 2011").

[4] INT'L LABOUR ORG. (ILO), PROFITS AND POVERTY: THE ECONOMICS OF FORCED LABOR 22 (2014), *available at* http://www.ilo.org/wcmsp5/groups/public/---ed_norm/---

CLASS ACTION COMPLAINT

that person knew or should have known was engaged in slavery, peonage, forced labor,

involuntary servitude, unlawful conduct with respect to documents, and human trafficking.

The United States' commitment to prioritize anti-trafficking efforts is also manifest in its

decision to become party to the United Nations' Protocol to Prevent, Suppress and Punish

Trafficking in Persons, along with 163 other nations.

**B.    Human Trafficking Is Prevalent in the U.S. Hospitality Industry.**

30.    The hospitality industry in the U.S. is consistently recognized as one of the

common industries vulnerable to trafficking.[5]

31.    A 2004 report by the University of California, Berkeley and Free the Slaves

found, "Forced labor occurs in poorly regulated industries with a high demand for cheap

labor- sweatshops, restaurants and hotels, in addition to agriculture and domestic work.  A

lack of official monitoring in these areas means unscrupulous employers and criminal

networks can gain complete control over workers."[6]

32.    Human trafficking can manifest in the hotel industry in a variety of ways,

including "[s]taff, especially those recruited or subcontracted via unscrupulous agencies,

being victims of forced or bonded labour. . . . The risk is higher in properties where there

---

declaration/documents/publication/wcms_243391.pdf.

[5]  Schwartz, Karen, "New Report Details Exploitation of Hotel Industry Workers," The New York Times,  (Apr. 10, 2017), *available at* https://www.nytimes.com/2017/04/10/travel/new-report-human-trafficking-exploitation-of-hotel-industry-workers.html.

[6] University of California, Berkeley, "Modern slavery thriving in the U.S" [Press Release] (Sept. 23, 2004), *available at* http://www.berkeley.edu/news/media/releases/2004/09/23_16691.shtml.

CLASS ACTION COMPLAINT

is sub-contracted staff, hiring of migrant workers, lack of policy and enforcement and lack of awareness in staff."[7]

33.    An analysis by Polaris reported that victims of labor trafficking have been found in restaurant and hospitality businesses, where many enter the job with a J-1 visa.[8] The methods of control used by the traffickers, which may include restaurant and hotel management or labor recruiters, include immigration threats, economic abuse, and altered or fake contracts.[9]

### C.    Laws Regulating the Recruitment of Foreign Nationals for J-1 Employment in the U.S.

34.    The Exchange Visitor Program was created by Congress in 1961 to encourage diplomacy and to "strengthen the ties which unite us with other nations" through cultural exchange.  22 U.S.C. § 2451.  Among the Exchange Visitor Program's fourteen categories of visitors, two have been particularly susceptible to exploitation: the Summer Work Travel Program, which promises college students an opportunity to work and travel in the United States during their summer break,[10] and the Trainee and Intern

---

[7] Tuppen, Holly, "Addressing Human Trafficking in the Hospitality Industry," GREEN HOTELIER, (July 18, 2013), *available at* http://www.greenhotelier.org/know-how-guides/addressing-human-trafficking-in-the-hospitality-industry/.

[8] *The Typology of Modern Slavery: Defining Sex and Labor Trafficking in the United States*, POLARIS, 30, 45 (Mar. 2017), *available at* https://polarisproject.org/sites/default/files/Polaris-Typology-of-Modern-Slavery.pdf.
[9] *Id.*

[10] 22 C.F.R. § 62.32(b) ("The purpose of this program is to provide foreign college and university students with opportunities to interact with U.S. citizens, experience U.S. culture while sharing their own cultures with Americans they meet, travel in the United States, and work in jobs that require minimal training and are seasonal or temporary in order to earn funds to help defray a portion of their expenses.").

CLASS ACTION COMPLAINT

Program, which promises students and recent graduates an opportunity "to enhance [their] skills and expertise . . . in their academic or occupational fields."[11]  Provisions related to the administration of the Summer Work Travel Program are found at 22 C.F.R. § 62.32, and provisions related to the administration of the Trainee and Intern Program are found at 22 C.F.R. § 62.22.  Participants in both programs enter the country on J-1 nonimmigrant visas, and are commonly referred to as "J-1 workers."

35.     The United States Department of State facilitates the Exchange Visitor Program by designating entities as "sponsors."  *See* 22 C.F.R. § 62.2.  These sponsors are responsible for screening Summer Work Travel and Trainee and Intern Programs applicants; placing program participants with host employers; monitoring visitors during their stays; and vetting third parties that assist in the conduct of the programs.  22 C.F.R. §§ 62.22(f)-(g), 62.32(d)-(n).

36.     The Department of State only regulates sponsors; the Department claims that it has no authority to regulate or sanction employers who use the Summer Work Travel Program or Trainee and Intern Program.  Instead, sponsors are responsible for ensuring that that host employers meet their obligations to visitors under the regulations. 22 C.F.R. §§ 62.22(h), 62.32(o).

37.     Under the terms of the J-1 visa and the program's regulations, J-1 workers are permitted to transfer from one employer to another, and "[s]ponsors must not pose

---

[11] 22 C.F.R. § 62.22(b).

CLASS ACTION COMPLAINT

obstacles to job changes." 22 C.F.R. § 62.32(g)(3).  However, sponsors are responsible for facilitating transfers, and "the process for switching employers can be cumbersome and confusing for victims seeking to leave abusive employers."[12]

38.     The Department of State regulations do not require employers or sponsor to provide housing or transportation to J-1 workers.  After 2012, however, sponsors "must consider the availability of suitable, affordable housing (e.g., that meets local codes and ordinances) and reliable, affordable, and convenient transportation to and from work when making job placements." 22 C.F.R. § 62.32(g)(9).  Moreover, if an employer of a Summer Work Travel Program participant does not offer affordable housing and transportation to and from work, the sponsor is required to "actively and immediately assist participants with arranging appropriate housing and transportation." *Id.* at § 62.32(g)(9)(i).  If the employer does provide housing and/or transportation, the job offers must include the cost to participants, whether such costs will be deducted from participants' wages, and, if they are considered part of the compensation packages, the market value of housing and/or transportation. *Id.* at § 62.32(g)(9)(ii).

   **D.     Defendants Exploited APEX's Role as a J-1 Sponsor to Recruit
          Workers Abroad.**

39.     Defendants' scheme to use American visa programs to recruit foreign workers abroad and employ them as a pool of disposable and malleable labor at

---

[12] POLARIS, *supra* n.8, at 69.

CLASS ACTION COMPLAINT

Defendants' businesses was an ongoing practice.  *See Casilao, et al. v. Hotelmacher,*

*LLC, et al.*, Case No. 17-cv-800-SLP (W.D. Okla.).

40.    Throughout the Relevant Time Period, APEX was designated as a J-1

sponsor by the State Department.  In that role, APEX recruited college students and

recent graduates from abroad for the Summer Work Travel Program and/or Trainee and

Intern Program and placed them with employers in the United States, including the other

Defendants.

41.    As a J-1 sponsor, APEX was responsible for addressing J-1 workers'

complaints regarding their employer or living conditions and for ensuring that the

employers at which it placed J-1 workers were in compliance with the program

requirements.  *See* 22 C.F.R. §§ 62.10(d), 62.32(i)(3), (j).  The J-1 workers placed at the

other Defendants, however, had no meaningful way to voice any complaints about their

employers, because APEX was controlled and operated by W. Schumacher and C.

Schumacher, the same individuals who owned their employers.

**E.    Defendants Recruited Plaintiffs and Putative Class Members
        Abroad under Fraudulent Terms to Work in Oklahoma.**

42.    During the Relevant Time Period, Defendants hired Recruiters who used

various methods to recruit workers abroad, including advertisements on websites, word of

mouth, and referrals.

43.    Upon information and belief, Defendants W. Schumacher and C.

Schumacher directed the Recruiters in their recruitment efforts, including through

CLASS ACTION COMPLAINT

communications via mail, fax, e-mail and/or telephone communications; Defendant W. Schumacher travelled abroad periodically in furtherance of Defendants' operations and coordinated with the Recruiters in person, including by interviewing interested candidates for positions at the Defendants.

44.     Recruiters such as Judith Henry would conduct informational sessions advertised at local colleges and universities that described the Exchange Visitor Program as an opportunity to experience the culture and lifestyles of the United States and gain work experience while making sufficient money to save for school fees and expenses. Recruiters and/or Defendant W. Schumacher would then interview candidates, either individually or in groups.

45.     In general, upon receiving an application from an interested candidate, including payment of a program or recruitment fee, the Recruiters supplied the candidate with further information including an offer of employment letter (hereinafter "Offer Letter").  The Offer Letter included general employment terms such as the job location, dates of employment, basic pay, housing, and job description.  Candidates were required to sign and return the Offer Letter to the Recruiters in order to receive more information about the positions.  The basic pay rates in the Offer Letter were at least equal to, and often well above, the federal minimum wage.

46.     In approximately June 2008, the Recruiters informed Plaintiff Francis of a server position with Montana Mike's Steakhouse that paid $ 2.13-$7.00 per hour and sent

CLASS ACTION COMPLAINT

her the corresponding Offer Letter.  The Offer Letter promised that the typical work week would include 40-60 hours per week, and at a job fair held by APEX in Jamaica, Defendant W. Schumacher promised Plaintiff Francis that she would be able to work multiple jobs if she wanted, so that she would be able to earn enough money over the summer to pay for her school fees.  The Offer Letter further stated that multi-student housing had been reserved for her and that $60 per week would be deducted from her paycheck to pay for housing, even if she chose not to live in the provided housing.

47.     In spring 2011, Recruiter Henry informed Plaintiff Pearce of a housekeeping position with the Hampton Inn Clinton and coordinated a job interview with Defendant W. Schumacher.  Defendant W. Schumacher explained that the position paid $7.25 per hour and that it was a full-time position.  Defendant W. Schumacher further promised Plaintiff Pearce that affordable, employer-owned housing would be provided to her upon arrival in Oklahoma.  Immediately after the interview Recruiter Henry sent Plaintiff Pearce an Offer Letter that confirmed the terms of employment promised verbally by Defendant W. Schumacher.

48.     In spring 2012, the Recruiters informed Plaintiff Kennedy of a front desk and housekeeping position with the Holiday Inn Express that paid $7.25 per hour for a minimum of 36 hours of work a week and up to 50 hours per week, and sent him the corresponding Offer Letter.  The Offer Letter stated that housing would be available at one of three local motels/hotels within walking distance of the Hampton Inn.

CLASS ACTION COMPLAINT

49.     Upon information and belief, other putative class members contacted or were contacted by the Recruiters regarding positions with Defendants through the J-1 programs.  In emails, Offer Letters, and other documents and communications, the Recruiters promised putative class members full-time jobs with hourly pay rates of at least the U.S. minimum wage and affordable and suitable housing.

50.     Upon information and belief, Defendants coordinated with the Recruiters to offer these promises and signed Offer Letters, in order to induce Plaintiffs and putative class members to pursue the work opportunities with Defendants and pay the recruitment fees.  However, Defendants flagrantly misrepresented the terms of employment and accommodations offered, and did not have any intention of complying with the promises made abroad to Plaintiffs and putative class members.

### F.     Defendants Hid the Extent of Recruitment and Travel Fees from Putative Class Members

51.     In reasonable reliance on promises made by Defendants, Plaintiffs and putative class members invested their time and significant financial resources, involving taking out large loans, to secure what were represented to be desirable positions.

52.     Throughout the recruitment process, the Recruiters demanded and collected various fees from Plaintiffs and the putative class members.  The extent of the required fees was not disclosed at the outset of the recruitment process.  Instead, the extent of the fees was intentionally hidden and payment was staggered throughout the process so that

CLASS ACTION COMPLAINT

Plaintiffs and the putative class members felt compelled to continue paying the required fees, in fear of losing the previously paid fees.

53.     Throughout the recruitment process, the Recruiters charged Plaintiffs and putative class members various types of fees, including, but not limited to, the following: application fees, airfare and travel expenses, consular fees, and U.S. embassy interview fees.  Additionally, upon information and belief, the Recruiters also charged Plaintiffs and putative class members recruiter fees, or charged inflated processing fees in excess of the actual costs of the services.

54.     The total out-of-pocket expense to pay these fees and airfare typically totaled between approximately $2,000 and $3,000 USD.  This was a significant amount of money in Plaintiffs and putative class members' countries.  For example, in Jamaica, the minimum wage in 2010 for a 40 hour workweek was $4,070 Jamaican Dollars, or roughly $32 USD.[13]

55.     To pay these fees, Plaintiffs and putative class members used their savings and borrowed staggering sums of money from family members, friends, and banks.

56.     For example, Plaintiff Pearce borrowed approximately $2,500 from friends to pay for program, recruitment, and consular fees and one-way airfare to the United States.  Plaintiff Pearce had earned so little throughout her employment for Defendants

---

[13] *Increase in Minimum Wage Takes Effect Today*, Jamaican Info. Serv., Sept. 3, 2012, jis.gov.jm/ increase-in-minimum-wage-takes-effect-today/ (converting from JMD to USD using 1 : 0.0079 ratio).

CLASS ACTION COMPLAINT

that she struggled to afford airfare back to Jamaica at the end of her stay and was unable to repay her debt until three years later.

57.     Similarly, Plaintiff Kennedy borrowed more than $2,200 from family and friends to pay for program, recruitment, and consular fees and airfare.  Plaintiff Kennedy has been unable to fully repay these loans to this day.

58.     Further, Plaintiff Francis borrowed approximately $2,000 from family, friends and a bank, through a co-signer relative, to pay for program and consular fees and airfare.  When she returned to Jamaica after completing her Summer Work Travel Program, she had no funds with which to repay the loan, and in fact needed to take out additional funds to pay for her school fees for the next semester.

59.     Upon information and belief, Defendants were aware that Plaintiffs and putative class members had to pay recruitment fees in order to secure their positions.

60.     Plaintiffs and putative class members paid the foregoing fees in reasonable reliance on the terms of their contracts with Defendants and would not have paid the extraordinary fees charged by the Recruiters for travel, visas, and work opportunities had they known that Defendants' promises and representations were false.

61.     As a direct result of Defendants' intentional and fraudulent misrepresentations of Plaintiffs' and putative members' hourly wage rates, hours of employment, and the availability of adequate, affordable housing, Plaintiffs and putative class members paid considerable sums in recruitment costs, often taking on substantial

debt.  Both the Recruiters and Defendants represented to Plaintiffs and putative class members that those recruitment costs could be repaid in the time for which their J-1 visas were valid under the terms originally promised.  Instead, under the actual terms of employment, it would take Plaintiffs and putative class members months or years beyond the end of their employment at Defendants to repay the recruitment costs.

### G.   Plaintiffs and Putative Class Members Were Forced to Labor for Defendants in Oklahoma under Terms and Conditions Substantially Worse Than Those Promised.

62.     Once Plaintiffs and putative class members arrived in Oklahoma, Defendants openly and consistently disregarded the employment terms contained in the Offer Letters between Plaintiffs and other putative class members on the one hand and Defendants on the other and otherwise promised to Plaintiffs and other putative class members.

63.     Upon arrival to the United States, Plaintiffs and putative class members were directed to report to the office of Defendant APEX to commence work.  APEX employees informed Plaintiffs and putative class members that they would be working for a certain Defendant or certain Defendants, regardless of whether that Defendant was the party named in the putative class members' Offer Letter.

64.     For their own benefit, Defendants ignored their representations in the Offer Letters given to workers regarding which Defendant would employ each worker and in which position the worker would work at each Defendant.  Instead, Defendants treated Plaintiffs and the putative class workers as a disposable and malleable pool of labor that

could be utilized by any of the Defendants for any purpose, under any employment terms Defendants were inclined to offer.

65.     For example, Plaintiff Pearce was recruited and offered a housekeeping position at the Hampton Inn Clinton, at an hourly wage rate of $7.25, with the possibility of bonuses.  However, upon arrival, Plaintiff Pearce was paid just over $2.00 per hour to work as a server at Montana Mike's Steakhouse, and between $5.00 and $7.25 per hour to clean a construction site at the Water Zoo Indoor Water Park.

66.     Similarly, Plaintiff Kennedy was originally offered a front desk or housekeeping position at the Holiday Inn Express, which paid an hourly rate of $7.25 per hour.  Upon arrival in Clinton, however, he was assigned to a front desk position at the Hampton Inn Clinton.  He was soon moved to a housekeeping position at the same hotel, which paid approximately $4.00 per room he cleaned, and not the hourly wage he was promised, before being transferred again to work at the front desk at the Holiday Inn Express.

67.     Defendants took advantage of the J-1 status of Plaintiffs and putative class members, which tied their immigration status to their sponsor agency, APEX, to mistreat Plaintiffs and putative class members—knowing that it would be difficult for them to legally leave Defendants' employ.

68.     Most critically, Defendants systematically paid Plaintiffs and putative class members significantly less than what was promised and what federal law mandated.  For

CLASS ACTION COMPLAINT

example, Plaintiffs and putative class members working as housekeepers at Holiday Inn

Express or the Hampton Inn Clinton were paid between $4.00 and $4.25 per room

cleaned.  Because full-time work was not provided, and the room cleaning was time-

intensive and only a small number of rooms could be cleaned each day, this piece rate

scheme did not satisfy Defendants' contractual promises or minimum wage

requirements.[14]  Similarly, Plaintiffs and putative class members working as servers at

Montana Mike's Steakhouse were paid just over $2.00 per hour plus tips, which was

frequently insufficient to satisfy the requirements of federal wage and hour law.

69.     Defendants also failed to provide Plaintiffs and putative class members with

the full-time work that was promised.  Defendants modified the schedules of Plaintiffs

and other putative class members arbitrarily based on their business needs.  Plaintiffs and

putative class members only worked a few hours per day, three to four days per week.

Due to their sparse and fluctuating work hours, Plaintiffs and other putative class

members were barely able to earn enough to pay for their living expenses in Oklahoma,

and were not able to send money home to repay any debts they had incurred to obtain the

J-1 visas.

---

[14] This was also in violation of the Summer Work Travel regulations after 2011.  22 C.F.R. §§ 62.32(i)(2)(ii) Under the regulations implemented in 2012, if an employer compensates participants on a "piece" basis (e.g., number of rooms cleaned), any participant whose earnings under the piece rate do not equal at least the amount the participant would have earned had the participant been paid the predominant local wage must have his or her earnings supplemented to meet the prevailing local wage.  *Id.*

CLASS ACTION COMPLAINT

70.    Defendants failed to provide Plaintiffs and putative class members suitable and affordable housing.  Instead, Plaintiffs and other putative class members were each required to pay up to $100 per week—even if they shared a room with several others—to live in crowded, inadequate housing owned by Defendant W. Schumacher or at a local motel referred to them by APEX.  For example, some Plaintiffs and other putative class members were housed in three bedroom houses owned by Defendant W. Schumacher along with up to 15 other class members.

71.    Plaintiffs and putative class members complained to Defendants about Defendants' numerous breaches of their promises, which Defendants ignored.

72.    Defendant APEX, as the program sponsor, was responsible under the J-1 regulations for monitoring Plaintiffs' and putative class members' employment and assisting visa holders with job changes.  Instead of fulfilling these responsibilities, it took advantage of its position as sponsor to coerce Plaintiffs and putative class members into continuing to working for Defendants.

73.    Through excessive living expenses, low pay, and arbitrarily-cut work hours, Defendants created a scheme whereby Plaintiffs and putative class members felt powerless and financially vulnerable, and they feared the further serious financial harm they would face if they attempted to leave Defendants' employ.

**H.    Defendants' Ongoing Methods of Intimidation and Manipulation.**

74.    Because they had paid massive recruitment fees, often taking on significant amounts of debt abroad, and were struggling to make ends meet in an isolated area of

CLASS ACTION COMPLAINT

Oklahoma, Plaintiffs and putative class members had no choice but to continue working for Defendants.

75.     Defendants refused to pay for Plaintiffs' and putative class members' return travel to Jamaica, and Plaintiffs and putative class members could not afford to pay for the costly return travel on their own.

76.     Further, Plaintiffs and putative class members could not return home because they faced serious financial harm due to the substantial debt they had incurred to pay for the recruitment fees and other program expenses in order to work for Defendants. Plaintiffs and putative class members could not have left Defendants' employ without first earning enough to repay those debts, which became impossible once Defendants deliberately reduced Plaintiffs' and putative class members' working hours and wage rates and imposed unexpected living expenses.

77.     Plaintiffs and putative class members further felt as though they had no other choice but to continue working for Defendants because their immigration status was linked to Defendants and because of their unfamiliarity with the American legal system. This vulnerability was exasperated by the fact that APEX, the entity that was supposed to guide them through the J-1 program, was run by the same individuals who controlled their employment.  Further, there was no significant international community in Clinton, Oklahoma, to assist Plaintiffs and putative class members with their situation.

CLASS ACTION COMPLAINT

78.     Plaintiffs and putative class members were also subjected to threats of implied physical harm from Defendant W. Schumacher.  For example, Defendant W. Schumacher threatened Plaintiffs and putative class members by telling them that he carried a firearm in his car.  Defendant W. Schumacher further made it widely known to Plaintiffs and putative class members that he was a current and/or former police sheriff, suggesting his close ties with law enforcement.  Defendant W. Schumacher and other supervisors threatened Plaintiffs and putative class members with deportation when they complained about wages and working conditions.

79.     When Plaintiffs and other putative class members complained and attempted to obtain additional employment locally to supplement their low wages, they were told that they could only work for Defendants and were subjected to further financial harm.  Specifically, Plaintiff Kennedy and other putative class members were told by Defendant W. Schumacher that they would not get hired anywhere in Clinton. Similarly, Plaintiff Francis attempted to secure a second job in Clinton, Oklahoma for an employer not controlled by Defendants; immediately upon learning about Plaintiff Francis' efforts, Defendants retaliated against Plaintiff Francis by changing her work schedule so that maintaining a second job for a non-Defendant employer was impossible. Furthermore, Plaintiff Pearce was denied a position at a local K-Mart, and the reason provided was that she worked for Defendants.

CLASS ACTION COMPLAINT

80.     Deeply fearful, isolated, disoriented, in debt, and unfamiliar with their rights, Plaintiffs and putative class members felt compelled to continue working for Defendants.

## CLASS ACTION ALLEGATIONS

81.     Plaintiffs bring claims for actual and punitive damages on behalf of themselves and all similarly situated persons pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

82.     At all times relevant to this action, Plaintiffs and other putative class members were admitted to the United States on J-1 visas under the Summer Work Travel Program, 22 C.F.R. § 62.32, and/or the Trainee and Intern Program, 22 C.F.R. § 62.22.

83.     The class is defined as all foreign nationals who were admitted to the United States on J-1 visas under the Summer Work Travel or Trainee and Intern Program, for whom Defendant APEX was the J-1 sponsor petitioner, and for whom at least one Defendant was the de facto employer upon arrival in the United States at any time from June 15, 2008 through December 31, 2013 (the "Class").

### A.     Rule 23(a).

84.     The precise number of individuals in the class is known only to Defendants, but the Class is believed to include at least 50 to upwards of 100 individuals.  Because of the number of putative class members and because putative class members are foreign nationals and migrant workers, joinder of all putative class members is impracticable.

85.     This action involves questions of law common to the class, including:

CLASS ACTION COMPLAINT

    a.   Whether Defendants' conduct violated the forced labor and trafficking provisions of the Trafficking Victims Protection Reauthorization Act (18 U.S.C. §§ 1589, 1590, 1593A, and 1594); and

    b.   The nature of damages available to Plaintiffs and other putative class members, including the applicability of compensatory and/or punitive damages.

86.    This action involves questions of fact common to the Class, including:

    a.   Whether Defendants recruited, harbored, transported, obtained and/or provided Plaintiffs and other putative class members for the purpose of subjecting them to forced labor and/or involuntary servitude;

    b.   Whether Defendants used and/or threatened Plaintiffs and other putative class members with physical restraint, serious harm, and/or abuse of the legal process in order to obtain Plaintiffs' and other putative class members' labor or services;

    c.   Whether Defendants knowingly benefitted from participating in a venture that Defendants knew or should have known was engaged in providing and/or obtaining Plaintiffs' and other putative class members' labor or services through physical restraint, serious harm, and/or abuse of the legal process;

CLASS ACTION COMPLAINT

d.   Whether Defendants knowingly benefitted from participating in a venture that Defendants knew or should have known was engaged in the recruitment, harboring, transporting, obtaining and/or providing Plaintiffs and other putative class members for the purpose of subjecting them to forced labor and/or involuntary servitude;

e.   Whether Defendants used standardized recruitment, record-keeping, and employment policies and practices for Plaintiffs and putative class members; and

f.   The source of Plaintiffs' and other class members' damages.

87.   The claims asserted by Plaintiffs are typical of the claims of the Class.

88.   Plaintiffs will fairly and adequately protect the interests of the Class.

89.   Plaintiffs' counsel are experienced in handling class action litigation on behalf of immigrant workers like Plaintiffs and are prepared to advance costs necessary to vigorously litigate this action.  In addition, Plaintiffs' counsel have experience represented immigrant workers in labor trafficking actions such as *Casilao, et al. v. Hotelmacher, LLC, et al.*, Case No. 17-cv-800-SLP (W.D. Okla.).

**B.   Rule 23(b)(3).**

90.   Common questions of law and fact relevant to the claims for relief, as identified above, predominate over any pertinent questions involving only individual members.

91.     A class action is superior to other available methods of adjudicating the

claims set forth in the claims for relief because, *inter alia*:

      a.   Common issues of law and fact, as identified in part above,

           substantially diminish the interest of putative class members in

           individually controlling the prosecution of separate actions;

      b.   The putative class members are foreign nationals who lack the means

           and/or resources to secure individual legal assistance and/or who are

           particularly likely to be unaware of their rights to prosecute these

           claims;

      c.   No member of the class has already commenced litigation to

           determine the questions presented; and

      d.   A class action can be managed with efficiency and without undue

           difficulty because Defendants have systematically and regularly

           committed the violations complained of herein and have used

           standardized recruitment, record-keeping, and employment policies

           and practices.

### CLAIM FOR RELIEF
**Violations of the Trafficking Victims Protection Reauthorization Act**
**18 U.S.C. § 1595 *et seq.***
**Against All Defendants**

92.     Plaintiffs re-allege and incorporate by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

CLASS ACTION COMPLAINT

93.     Plaintiffs bring this claim on behalf of themselves and all other similarly situated individuals against all Defendants.

94.     Plaintiffs are authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1595.

95.     Plaintiffs are victims of forced labor, involuntary servitude and human trafficking in violations of Title 18 U.S.C. §§ 1589, 1590, 1593A, and 1594.

96.     Defendants attempted to and did subject Plaintiffs and putative class members to forced labor in violation of 18 U.S.C. § 1589.

97.     Defendants knowingly obtained the labor and services of Plaintiffs and putative class members through serious harm and threats of serious harm, including serious financial and physical harm, in violation of 18 U.S.C. § 1589(a)(2).  Defendants induced Plaintiffs and putative class members to work in rural Oklahoma under the pretense of fraudulent contracts and promises, and then intentionally kept Plaintiffs and putative class members in a condition of financial vulnerability and under threat of implied physical harm so that they had no choice but to labor for Defendants.

98.     Defendants knowingly obtained the labor and services of Plaintiffs and putative class members by means of a scheme, plan, or pattern which, in the totality of the circumstances, was intended to cause and did cause Plaintiffs and other putative class members to believe that they would suffer serious harm if they were to leave the employ of

Defendants, in violation of 18 U.S.C. § 1589(a)(4).  Defendants' scheme included orchestrating fraudulent recruitment practices to induce Plaintiffs and putative class members to apply for and accept work placements at Defendants through the J-1 visa programs, which required Plaintiffs and putative class members to make significant financial investments and/or incurring substantial debt in order to secure such positions. Having engaged in these fraudulent recruitment practices and induced Plaintiffs to make significant investments, Defendants made material changes to Plaintiffs' terms and conditions of employment upon their arrival in Oklahoma, such that Plaintiffs and the putative class members had no choice but to work for Defendants under inadequate and unlawful conditions to which they never agreed.  Defendants further threatened Plaintiffs and the putative class members with implied physical and financial harm.

99.     Defendants used the restrictive terms of the J-1 visas to coercive ends, in a manner that constitutes an abuse of the legal process under 18 U.S.C. § 1589(a)(3).

100.     Defendants knowingly recruited, harbored, transported, and/or obtained Plaintiffs and the putative class members for labor or services in violation of laws prohibiting involuntary servitude and/or forced labor, in violation of 18 U.S.C. § 1590.

101.     Alternatively, Defendants have knowingly benefitted financially and/or by receiving the value of labor from J-1 workers through their participation in a venture which Defendants knew or should have known was engaged in violations the Trafficking Victims Protection Reauthorization Act, or in reckless disregard of the fact that the venture

CLASS ACTION COMPLAINT

was engaged violations of the Trafficking Victims Protection Reauthorization Act, in

violation of 18 U.S.C. §§ 1589, 1593A, and 1595.  Defendants intentionally entered into

contracts with no intention of complying with the terms promised and ignored the various

complaints made by Plaintiffs and putative class members regarding such fraudulent and

coercive conditions.

102.    As a result of their participation in such venture, Defendants were to receive,

and did knowingly receive, numerous benefits including:

      a.   having workers recruited from abroad;

      b.   receiving application and recruitment fees from J-1 workers such as
          Plaintiffs;

      c.   rental income from Plaintiffs and putative class members; and

      d.   having cheap and easily exploitable labor available to staff
          Defendants' businesses.

103.    Defendants and Recruiters conspired to commit the violations of the

Trafficking Victims Protection Reauthorization Act described herein, in violation of 18

U.S.C. § 1594.  Defendants worked in partnership with the Recruiters in Jamaica to

implement a scheme of fraudulent recruitment practices, designed to induce Plaintiffs and

putative class members into making significant financial investments to enter into

employment contracts with Defendants abroad.  Defendants used the financial vulnerability

created by this recruitment scheme, along with the restrictive terms of the J-1 program, to

CLASS ACTION COMPLAINT

obtain the labor of Plaintiffs and putative class members through serious harm and/or the threat of serious harm, as described above.

104.    Plaintiffs and other putative class members suffered injury as a proximate result of these actions.

105.    Plaintiffs and other putative class members are entitled to compensatory and punitive damages in an amount to be determined at trial and any other relief deemed appropriate, including reasonable costs and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

a. Certifying Plaintiffs' Claim for Relief in this action as a class claim pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure;

b. Designating Plaintiffs as class representatives pursuant to Federal Rule of Civil Procedure 23, and designating counsel for Plaintiffs as counsel for the Class;

c. Actual damages, including restitution;

d. Compensatory damages;

e. Punitive damages;

f. Awarding Plaintiffs' reasonable attorneys' fees and costs; and

g. Such other relief as the Court deems just and appropriate.

Dated:  June 15, 2018                    Respectfully Submitted,

                                         Brady Henderson
                                         AMERICAN CIVIL LIBERTIES UNION

                              By:   */s/ Brady Henderson*
                                         _____

                                         Attorney(s) for Plaintiffs and the Proposed
                                         Class

                                         Brady R. Henderson (OBA #21212)
                                         American Civil Liberties Union of Oklahoma
                                         P.O. Box 1626
                                         Oklahoma City, OK 73101
                                         Telephone:    (405) 525-3831
                                         Facsimile:    (405) 524-2296
                                         Email:  bhenderson@acluok.org

                                         Carole Vigne, *Pro Hac Vice* Pending
                                         LEGAL AID AT WORK
                                         180 Montgomery Street, Suite 600
                                         San Francisco, CA  94104
                                         Telephone:    (415) 864-8848
                                         Facsimile:    (415) 593-0096
                                         Emails:         cvigne@legalaidatwork.org

                                         Eben Colby, *Pro Hac Vice* Pending
                                         Catherine Fisher, *Pro Hac Vice* Pending
                                         Isaac Saidel-Goley, *Pro Hac Vice* Pending
                                         500 Boylston Street
                                         Boston, MA 02116
                                         Telephone:    (617) 573-4855
                                         Facsimile:    (617) 305-4855
                                         Emails:    Eben.Colby@probonolaw.com
                                                    Catherine.Fisher@probonolaw.com
                                                    Isaac.Saidel-Goley@probonolaw.com

CLASS ACTION COMPLAINT

Christopher J. Willett, *Pro Hac Vice* Pending
Caitlin Boehne, *Pro Hac Vice* Pending
Rebecca Eisenbrey, *Pro Hac Vice* Pending
EQUAL JUSTICE CENTER
510 Congress Ave., Ste. 206
Austin, Texas  78704
Telephone:    (512) 474-0007
Facsimile:    (512) 474-0008
Emails:        cwillett@equaljusticecenter.org
              cboehne@equaljusticecenter.org
              reisenbray@equaljusticecenter.org

CLASS ACTION COMPLAINT