# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CHRISTINE PEARCE, ANTHONY KENNEDY, and DORRET FRANCIS, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Case No.: CIV-18-583-SLP |
| v. | |
| APEX USA, INC.; HOTELMACHER, LLC, dba HOLIDAY INN EXPRESS; SONTAG, INC. dba HAMPTON INN CLINTON; STEAKMACHER, LLC, dba MONTANA MIKE'S STEAKHOUSE; SCHUMACHER INVESTMENTS, LLC, dba WATER ZOO INDOOR WATER PARK; WALTER SCHUMACHER; and CAROLYN SCHUMACHER, | |
| Defendants. | |

# PLAINTIFFS' MOTION FOR CERTIFICATION OF
## A RULE 23 CLASS AND OPENING MEMORANDUM OF LAW

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................... iv

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS .................................................................................................1

    A.    The J-1 Program ...................................................................................................1

    B.    Defendants' Scheme ............................................................................................1

            1.    Defendants' Recruitment Promises..........................................................2

            2.    Based On The Defendants' Promises, Class Members Incurred
                  Significant Costs To Travel To The United States ....................................3

            3.    Once Class Members Arrived In The  United States, Those
                  Promises Were Quickly Broken.................................................................3

            4.    Class Members Were Also Subjected To Threats Of Deportation
                  And Implied Physical Harm.......................................................................5

    C.    NATURE AND SCOPE OF THE PROPOSED CLASS .......................................8

ARGUMENT .....................................................................................................................8

    A.    Standard For Class Certification .........................................................................8

    B.    The Requirements Of Rule 23(a) Are Satisfied...................................................9

            1.    The Class Is So Numerous That Joinder Of All Members Is
                  Impracticable.............................................................................................9

            2.    The Class Members Share Common Questions Of Law And Fact ..........11

            3.    The Named Plaintiffs' Claims Are Typical Of The Class ........................11

             4.    The Named Plaintiffs And Class Counsel Will Fairly And
                  Adequately Protect The Interests Of The Class.......................................12

    C.    The Requirements Of Rules 23(b)(3) Are Satisfied ...........................................15

            1.    Common Questions Predominate .............................................................15

                   (a)    Evidence That Defendants Obtained Or Provided Class
                        Members' Labor Is Either Not In Dispute Or Will Require
                          Only Common Evidence To Establish...........................................17

                       i.    Plaintiffs Can Show That Defendants Obtained
                           Class Members' Labor Via Prohibited Means Using
                           Common Evidence That A Jury Can Use To Infer
                           Class-wide Practices .......................................................18

|   |   | a. | Defendants Used A Common Scheme To Obtain Class Members' Labor | 19 |
|   |   | b. | Defendants Used Threats Of Abuse Of The Legal Process To Obtain Class Members' Labor | 26 |
|   |   | c. | Defendants Used Serious Harm, And Threats Thereof, To Obtain Class Members' Labor | 28 |
|   | (b) | | Plaintiffs Can Prove Knowledge Through Common Evidence | 31 |
|   | (c) | | Establishing Venture Liability Will Depend On Common Issues | 32 |
| 2. | | | Class Treatment is Superior to Individual Litigation | 33 |
| CONCLUSION | | | | 35 |

# TABLE OF AUTHORITIES

Page(s)

## CASES

In re Access Cardiosystems, Inc.,
  776 F.3d 30 (1st Cir. 2015) .............................................................................. 18, 19

Adamson v. Bowen,
  855 F.2d 668 (10th Cir. 1988) ............................................................................ 8, 11

Anderson v. City of Albuquerque,
  690 F.2d 796 (10th Cir. 1982) ................................................................................. 7

Barrientos v. CoreCivic, Inc.,
  951 F.3d 1269 (11th Cir. 2020) .............................................................................. 28

Bhasker v. Kemper Casualty Insurance Co.,
  361 F. Supp. 3d 1045 (D.N.M. 2019) ....................................................................... 8

Bistline v. Parker,
  918 F.3d 849 (10th Cir. 2019) ................................................................................ 31

Braver v. Northstar Alarm Services, LLC,
  329 F.R.D. 320 (W.D. Okla. 2018) ......................................................................... 13

Bryan v. United States,
  524 U.S. 184 (1998) ............................................................................................... 29

CGC Holding Co., LLC v. Broad & Cassel,
  773 F.3d 1076 (10th Cir. 2014) .............................................................................. 15

Colorado Cross Disability Coalition v. Abercrombie & Fitch Co.,
  765 F.3d 1205 (10th Cir. 2014) ................................................................................ 9

Cortez v. Vieira Custom Chopping, Inc.,
  No. 17-cv-01647-DAD-SKO, 2019 U.S. Dist. LEXIS 162454 (E.D. Cal.
  2019) ...................................................................................................................... 32

Covarrubias v. Capt. Charlie's Seafood, Inc.,
  No. 10-CV-10-F, 2011 U.S. Dist. LEXIS 72636 (E.D.N.C. 2011) .......................... 9

Cuzco v. Orion Builders, Inc.,
  262 F.R.D. 325 (S.D.N.Y. 2009) ............................................................................ 33

David v. Signal International, LLC,
    37 F. Supp. 3d 822 (E.D. La. 2014) ...................................................................... 27

DG ex rel. Stricklin v. Devaughn,
    594 F.3d 1188 (10th Cir. 2010) ...................................................................... 11, 12

Eisen v. Carlisle & Jacquelin,
    391 F.2d 555 (2d Cir. 1968) ................................................................................... 8

Erica P. John Fund, Inc. v. Halliburton Co.,
    563 U.S. 804 (2011) ............................................................................................. 16

Esplin v. Hirschi,
    402 F.2d 94 (10th Cir. 1968) ................................................................................. 8

Foster v. Apache Corp.,
    285 F.R.D. 632 (W.D. Okla. 2012) ...................................................................... 13

Francis v. Apex USA, Inc.,
    406 F. Supp. 3d 1206 (W.D. Okla. 2019) ............................................................ 27

Iglesias-Mendoza v. La Belle Farm, Inc.,
    239 F.R.D. 363 (S.D.N.Y. 2007) ........................................................................ 33

Jackson v. Oppenheim,
    533 F.2d 826 (2d Cir. 1976) ................................................................................ 18

Loughrin v. United States,
    573 U.S. 351 (2014) ............................................................................................. 18

Menocal v. GEO Group, Inc.,
    320 F.R.D. 258 (D. Colo. 2017), aff'd, 882 F.3d 905 (10th Cir. 2018), cert.
    denied, 139 S.Ct. 143 (2018) ................................................................................. 9

Menocal v. GEO Group, Inc.,
    882 F.3d 905 (10th Cir. 2018), cert. denied, 139 S.Ct. 143 (2018) ...................... 9

MidAmerica Federal Savings & Loan Association v. Shearson/American Express
    Inc.,
    886 F.2d 1249 (10th Cir. 1989) ........................................................................... 18

Moodie v. Kiawah Island Inn Co., LLC,
    309 F.R.D. 370 (D.S.C. 2015) ............................................................................... 9

Moreno-Espinosa v. J & J Ag Products, Inc.,
    247 F.R.D. 686 (S.D. Fla. 2007) ........................................................................... 9

Naylor Farms, Inc. v. Chaparral Energy, LLC,
        923 F.3d 779 (10th Cir. 2019) .............................................................................. 11

Neder v. United States,
        527 U.S. 1 (1999) ................................................................................................ 20

Paguirigan v. Prompt Nursing Employment Agency LLC,
        No. 17-cv-1302 (NG) (JO), 2018 WL 4347799 (E.D.N.Y. Sept. 12, 2018) ......... 27

Payne v. Tri-State CareFlight, LLC,
        332 F.R.D. 611 (D.N.M. 2019), leave to appeal denied, No. 19-702, 2019
        WL 8329300 (10th Cir. Dec. 3, 2019) ................................................................... 9

Recinos-Recinos v. Express Forestry, Inc.,
        233 F.R.D. 472 (E.D. La. 2006) ........................................................................... 33

Rodriguez v. Carlson,
        166 F.R.D. 465 (E.D. Wash. 1996) ...................................................................... 32

Rodriguez v. Hermes Landscaping, Inc.,
        No. 17-2142 (CM), 2018 U.S. Dist. LEXIS 151454 (D. Kan. 2018) ................... 33

Rosas v. Sarbanand Farms, LLC,
        329 F.R.D. 671 (W.D. Wash. 2018) ................................................................ 24, 28

Rutter & Wilbanks Corp. v. Shell Oil Co.,
        314 F.3d 1180 (10th Cir. 2002) ............................................................................ 13

Salas-Mateo v. Ochoa,
        No. 03-14357-CIV, 2004 WL 1824124 (S.D. Fla. Mar. 26, 2004) ...................... 10

Sanders v. John Nuveen & Co.,
        619 F.2d 1222 (7th Cir. 1980) .............................................................................. 18

Saur v. Snappy Apple Farms, Inc.,
        203 F.R.D. 281 (W.D. Mich. 2001) ...................................................................... 33

Shook v. El Paso County,
        386 F.3d 963 (10th Cir. 2004) ................................................................................ 8

Smith v. MCI Telecommunications Corp.,
        124 F.R.D. 665 (D. Kan. 1989) ............................................................................ 34

Tyson Foods, Inc. v. Bouaphakeo,
        136 S.Ct. 1036 (2016) ...................................................................... 11, 16, 23

United Food & Commercial Workers Union v. Chesapeake Energy Corp.,
    281 F.R.D. 641 (W.D. Okla. 2012) .......................................................................... 14

United States ex rel. Trim v. McKean,
    31 F. Supp. 2d 1308 (W.D. Okla. 1998) ................................................................ 31

United States v. Calimlim,
    538 F.3d 706 (7th Cir. 2008) ........................................................... 24, 28, 29

United States v. Dann,
    652 F.3d 1160 (9th Cir. 2011) ................................................................................ 27

United States v. Ho,
    311 F.3d 589 (5th Cir. 2002) .................................................................................. 29

United States v. Kalu,
    791 F.3d 1194 (10th Cir. 2015) ......................................................... 19, 27, 29, 30

United States v. Powell,
    982 F.2d 1422 (10th Cir. 1992) .............................................................................. 30

United States v. Stewart,
    872 F.2d 957 (10th Cir. 1989) ................................................................................ 19

United States v. Toure,
    965 F.3d 393 (5th Cir. 2020) ......................................................................... 16, 28

Wal-Mart Stores, Inc. v. Dukes,
    564 U.S. 338 (2011) ..................................................................................... 11, 17

Whitton v. Deffenbaugh Disposal, Inc.,
    No. 12-2247-CM, 2014 U.S. Dist. LEXIS 153405 (D. Kan. 2014)...................... 33

**STATUTES**

18 U.S.C. § 1589(a) ................................................................................... 16, 31

18 U.S.C. § 1589(a)(1)-(4) ................................................................................ 16

18 U.S.C. § 1589(b) .................................................................................... 17, 31

18 U.S.C. § 1589(c)(2) ............................................................................... 27, 28

19 U.S.C. § 1589(a) .................................................................................... 16, 17

22 U.S.C. § 2451 ............................................................................................... 1

# RULES

Fed. R. Civ. P. 23(a) ........................................................................ 8

Fed. R. Civ. P. 23(b) ........................................................................ 32

Fed. R. Civ. P. 23(b)(3)(A)-(D) ...................................................... 32

Fed. R. Civ. P. 23(a)(1)-(4) .............................................................. 8

# REGULATIONS

22 C.F.R. § 62.22 ............................................................................. 2

22 C.F.R. § 62.32 ............................................................................. 2

22 CFR §§ 62.45(a), (f)(2) ............................................................. 24

# OTHER AUTHORITIES

Handbook for Employers M-274: 6.4.1, Evidence of Status for Certain Categories – Exchange Visitors (J-1) (2020), https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274/ (last visited September 12, 2020) ....... 4

## PRELIMINARY STATEMENT

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Christine Pearce, Anthony Kennedy, and Dorret Francis (the "Named Plaintiffs") hereby move to certify a class of approximately 200 J-1 visa holders who were sponsored by Defendant Apex USA, Inc., to work in Clinton, Oklahoma, at companies controlled and operated by Defendants Walter and Carolyn Schumacher.

## STATEMENT OF FACTS

**A.    The J-1 Program**

The J-1 Exchange Visitor Program (the "J-1 Program") was created by Congress to encourage diplomacy and to "strengthen the ties which unite us with other nations" through cultural exchange. 22 U.S.C. § 2451; Compl. ¶ 34. Among the numerous J-1 Program categories, two have been particularly susceptible to exploitation: the Summer Work Travel Program, which promises college students an opportunity to work and travel in the United States during their summer break, and the Trainee and Intern Program, which promises students and recent graduates an opportunity "to enhance [their] skills and expertise . . . in their academic or occupational fields." Compl. ¶ 34; Plfs Ex. 1, C.deBaca Rpt. ¶¶ 71-76.

**B.    Defendants' Scheme**

As alleged in Plaintiffs' Complaint and corroborated through class discovery, Defendants implemented a detailed scheme to recruit students from the Dominican Republic, Indonesia, India, Jamaica and other developing countries as part of purported

cultural exchange programs to obtain cheap and easily exploited labor for their hospitality businesses in Clinton, Oklahoma.

1. **Defendants' Recruitment Promises**

The class members left their homes and their families in reliance on Defendants' promises that decent work, good wages, reasonable living conditions, and cultural exchange were awaiting them in the United States. See, e.g., Plfs Ex. 2, Jones-Gardner Decl. ¶ 4; Plfs Ex. 4, Thomas Decl. ¶ 4; Plfs Ex. 11, DEFS-J1-009092. Defendants Walter and Carolyn Schumacher owned and operated Defendant APEX USA, Inc. ("APEX"), which at the time was designated as a J-1 sponsor by the State Department to place J-1 workers with U.S. employers. Plfs Ex. 10, DEFS-J1-010192; Plfs Ex. 11, DEFS-J1-009092. As a J-1 sponsor, APEX was responsible for ensuring that host employers met their obligations to J-1 workers, and for approving and facilitating a job transfer if a J-1 worker wished to seek other employment. See 22 C.F.R. §§ 62.22, 62.32 (setting forth detailed requirements for sponsors); Plfs Ex. 1, DeBaca Rpt. ¶¶ 71-75. Contrary to the purpose of J-1 Program, Defendants used APEX to recruit and hire workers to labor at their own businesses. Plfs Ex. 1, DeBaca Rpt. ¶ 73. Coordinating with recruiters in the Dominican Republic, Indonesia, India, Jamaica and elsewhere ("Recruiters"), APEX promised to place foreign student workers in jobs at businesses owned and operated by the remaining Defendants. See, e.g., Plfs Ex. 34, DEFS-J1-002645; Plfs Ex. 5, Francis Decl. ¶ 4; Plfs Ex. 3, Soriano Decl. ¶ 6. Defendants promised that these jobs would be full time, with hourly pay rates at or higher than the U.S. minimum wage; that the workers would be able to get second jobs to supplement their

income; and that the workers would be provided with suitable, affordable housing. <u>See</u>,
<u>e.g.</u>, Plfs Ex. 12, DEFS-J1-007737-40; Plfs Ex. 32, FRANCIS-00000068-72; Plfs Ex. 8,
De Leon Arias Decl. ¶ 24; Plfs Ex. 2, Jones-Gardner Decl. ¶ 6; Plfs Ex. 7, Pearce Decl. ¶
6; Plfs Ex. 9, Saunders Decl. ¶ 6; Plfs Ex. 3, Soriano Decl. ¶ 6.

### 2. Based On The Defendants' Promises, Class Members Incurred Significant Costs To Travel To The United States

The foreign student workers who accepted jobs with Defendants (the "J-1
Workers") relied on these promises when they left their homes and families and took on
staggering debts to cover the costs of the J-1 recruitment and application process to travel
to the United States. These costs— totaling approximately $2,000 to $3,000 USD per
Plaintiff—represent an exorbitant amount of money in the J-1 Workers' home countries.
<u>See</u>, <u>e.g.</u>, Plfs Ex. 2, Jones-Gardner Decl. ¶ 7; Plfs Ex. 3, Soriano Decl. ¶ 7; Plfs Ex. 4,
Thomas Decl. ¶ 7. For example, in Jamaica, the minimum wage in 2010 for a 40 hour
work week was roughly $32 USD. Compl. ¶ 54. To cover these exorbitant costs, the J-1
Workers were forced to empty their savings and borrow large sums of money from
family, friends and/or banks. <u>See</u>, <u>e.g.</u>, Plfs Ex. 2, Jones-Gardner Decl. ¶ 8; Plfs Ex. 3,
Soriano Decl. ¶ 8; Plfs Ex. 4, Thomas Decl. ¶ 8.

### 3. Once Class Members Arrived In The United States, Those Promises Were Quickly Broken

Soon after they arrived, class members realized that they had been sold a false bill
of goods. Once the J-1 Workers arrived in Oklahoma, APEX placed them at businesses
owned and operated by Walter and Carolyn Schumacher, including Defendants
Hotelmacher, LLC (a Holiday Inn Express hotel); Sontag, Inc. (a Hampton Inn hotel);

Steakmacher, LLC (a Montana Mike's restaurant), and Schumacher Investments, LLC (a water park). Plfs Ex. 19, DEFS-J1-020327-334. Instead of the well-paying, full-time work they had been promised, the J-1 Workers were only given limited hours, were paid less than the minimum wage, had fees deducted out of their paychecks for uniforms, substandard housing, and charges for bedding or liquor licenses and were forced to live in crowded, substandard housing or motel rooms. See, e.g., Plfs Ex. 5, Francis Decl. ¶ 13; Plfs Ex. 3, Soriano Decl. ¶ 13; Plfs Ex. 4, Thomas Decl. ¶ 13; Plfs Ex. 30, DEFS-J1-000247-51; Plfs Ex. 26, C. Schumacher Dep. Tr. at 174:18-175:10, 175:11-175:17. The limited, underpaid work Defendants made available to the J-1 Workers caused them to struggle to pay for even their basic living expenses, let alone to repay the debt they had incurred to come to Clinton. See, e.g., Plfs Ex. 8, Arias Decl. ¶ 19; Plfs Ex. 5, Francis Decl. ¶ 19; Plfs Ex. 2, Jones-Gardner Decl. ¶ 17-19; Plfs Ex. 3, Soriano Decl. ¶ 18; Plfs Ex. 9, Saunders Decl. ¶ 19-20; Plfs Ex. 4, Thomas Decl. ¶ 19; Plfs Ex. 30, DEFS-J1-000238-46. When the J-1 Workers attempted to find second jobs, as Defendants promised they would be able to, they were turned away by employers who were unwilling to hire students sponsored by the Schumachers. Plfs Ex. 13, Pearce Dep. Tr. at 159:3-159:16; Plfs Ex. 14, Kennedy Dep. Tr. at 213:14-213:19, 224:16-225:3; Plfs Ex. 15, Francis Dep. Tr. at 134:22-135:10, 19:24-21:4; Plfs Ex. 4, Thomas Decl. ¶ 14; Plfs Ex. 9, Saunders Decl. ¶ 14; Plfs Ex. 3, Soriano Decl. ¶ 14. APEX, the entity responsible for approving

second jobs and facilitating job transfers,[1] did nothing to help them and even affirmatively sabotaged their job opportunities. Plfs Ex. 14, Kennedy Dep. Tr. at 225:1-3; Plfs Ex. 3, Soriano Decl. ¶¶ 15 ,18;. Students lucky enough to find a second job were ultimately unable to maintain it because Defendants refused to approve the job or abruptly changed their work schedules.  Plfs Ex. 5, Francis Decl. ¶¶ 14-15; Plfs Ex. 6, Kennedy Decl. ¶¶ 14-15. Consequently, the inferior work offered by Defendants was the J-1 Workers' only meaningful source of income. See Plfs Ex. 6, Kennedy Decl. ¶ 14; Plfs Ex. 5, Francis Decl. ¶¶ 14-16; Plfs Ex. 9, Saunders Decl. ¶¶ 14-15.

### 4.   Class Members Were Also Subjected To Threats Of Deportation And Implied Physical Harm

Defendants did not just rely on economic coercion to keep J-1 students working for them. Defendants leveraged their position as the workers' employer and sponsor— and at times also their landlord—to exploit and intimidate the J-1 workers, forcing them to labor for Defendants on Defendants' terms or face the prospect of having no job, no home, and no ability to pay off their debts. See, e.g., Plfs Ex. 3, Soriano Decl. ¶ 16; Plfs Ex. 6, Kennedy Decl. ¶ 16; Plfs Ex. 34, DEFS-J1-002644-45, 2657. Defendants utilized a number of tactics to intimidate workers, including preventing workers from taking time off when sick or use vacation time, Plfs Ex. 40, DEFS-J1-002568 ("We are not approving

---

[1] Unlike the H-2B program, the J-1 program does not directly tie a visa holder's immigration status to her employment by a specific entity. Instead, the authorization to work for one or more employers is given by the sponsor. U.S. Citizenship and Immigration Servs., Handbook for Employers M-274: 6.4.1, Evidence of Status for Certain Categories – Exchange Visitors (J-1) (2020), https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274/ (last visited September 12, 2020).

vacation for interns. That was covered previously in memos and at orientation"); Plfs Ex. 39, DEFS-J1-002465; Plfs Ex. 34, DEFS-J1-002653 (stating "NO LOST TIME—NO RETURN DR. VISIT"), prohibiting workers from speaking a foreign language while at work, Plfs Ex. 27, DEFS-J1-000853; Plfs Ex. 16, DEFS-J1-001537; Plfs Ex. 2, Jones-Gardner Decl. ¶ 16; Plfs Ex. 8, De Leon Arias Decl. ¶ 16, evicting and threatening to evict J-1 Workers from Schumacher-owned housing for minor infractions, Plfs Ex. 2, Jones-Gardner Decl. ¶ 16; Plfs Ex. 5, Francis Decl. ¶ 16, and letting workers know that Mr. Schumacher worked for the local police and carried a gun, Plfs Ex. 2, Jones-Gardner Decl. ¶ 16; Plfs Ex.4, Thomas Decl. ¶ 16; Plfs Ex. 8, De Leon Arias Decl. ¶ 16; Plfs Ex. 3, Soriano Decl. ¶ 16.

But the most powerful threat that Defendants used was the threat of termination and deportation. As shown by the evidence garnered during class discovery, J-1 workers were frequently threatened with termination or taken off the schedule for minor slip-ups on the job, see, e.g., Plfs Ex. 16, DEFS-J1-001542; Plfs Ex. 3, Soriano Decl. ¶ 16; Plfs Ex. 9, Saunders Decl. ¶ 16; Plfs Ex. 5, Francis Decl. ¶ 16, complaining about unfair work conditions, Plfs Ex. 35, DEFS-J1-002605; Plfs Ex. 7, Pearce Decl. ¶ 10, or even just bringing a colleague onto the property J-1 Workers rented from the Schumachers, Plfs Ex.2, Jones-Gardner Decl. ¶ 16. In addition to explicitly threatening to terminate J-1 workers, Plfs Ex. 4, Thomas Decl. ¶¶ 16-17, Mr. and Mrs. Schumacher would also state that workers would be "sent home." Plfs Ex. 16, DEFS-J1-001542. The clear subtext of those threats was that class members would be deported. Defendants also overtly wielded

immigration consequences over J-1 Workers. For example, when one class member tried to resign, Mr. Schumacher wrote her:

> You have been watching too many other US employees. I think perhaps you have forgotten that you are an INTERN and as such you cannot resign. What you need to do is immediately return to your home country because you are terminating your internship. . . . [Y]ou will not be able to obtain a Visa to the USA for at least the next 10 years.

Plfs Ex. 18, DEFS-J1-003028.

J-1 Workers did not need to personally receive a direct threat from Defendants to know that they faced deportation if they challenged working conditions or slipped up at work. Threats made to one worker or a group of workers reverberated through the class. Plfs Ex. 5, Francis Decl. ¶¶ 15-16. Because they lived together and worked together, J-1 Workers were warned by their colleagues or witnessed the consequences of getting on Mr. Schumacher's bad side. Plfs Ex. 9, Saunders Decl. ¶ 16; Plfs Ex. 2, Jones-Gardner Decl. ¶ 16; Plfs Ex.4, Thomas Decl. ¶ 15-16. Thus, even workers who only interacted with Mr. Schumacher sparingly—or not at all—kept working for him because of the fear he instilled in his workforce. Plfs Ex. 9, Saunders Decl. ¶ 16; Plfs Ex. 4,  Thomas Decl. ¶¶ 15-16; Plfs Ex. 5, Francis Decl. ¶¶ 15-16.

Defendants used this scheme, and the accompanying threats of economic hardship and immigration consequences, to continue to obtain and procure the class members' labor. As a result, the J-1 Workers were put in a position where they were financially vulnerable and feared they would face further serious financial or immigration harm if they attempted to leave Defendants' employment, as they could not legally work elsewhere without Defendant APEX's approval and could not repay their debts if they

returned to their home countries. Plfs Ex. 5, Francis Decl. ¶¶ 12-16; Plfs Ex. 6, Kennedy

Decl. ¶¶ 11-16; Plfs Ex. 9, Saunders Decl. ¶¶ 12-17; Plfs Ex. 3, Soriano Decl. ¶¶ 12-16;

Plfs Ex. 4, Thomas Decl. ¶¶ 12-16; Plfs Ex. 34, DEFS-J1-002645.

## C.    NATURE AND SCOPE OF THE PROPOSED CLASS

Named Plaintiffs bring this action on behalf of themselves and a group of similarly

situated J-1 Workers to recover damages arising from violations of their rights under the

Trafficking Victims Protection Reauthorization Act ("TVPRA"). See Compl., ¶ 1 &

Prayer for Relief. Named Plaintiffs assert these claims on behalf of the following class:

> [A]ll foreign nationals who were admitted to the United States on J-1 visas
> under the Summer Work Travel or Trainee and Intern Program, for whom
> Defendant APEX was the J-1 sponsor petitioner, and for whom at least one
> Defendant was the de facto employer upon arrival in the United States at any
> time from June 15, 2008 through December 31, 2013 (the "Class").

Id. ¶ 83.


## ARGUMENT

## A.    Standard For Class Certification

 "In determining the propriety of a class action, the question is not whether the

plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather

whether the requirements of Rule 23 are met." Anderson v. City of Albuquerque, 690

F.2d 796, 799 (10th Cir. 1982) (citation omitted). The Named Plaintiffs have met the

Rule's requirements.

The party seeking class certification bears the burden of proving that Rule 23's

requirements are satisfied. Shook v. El Paso Cty., 386 F.3d 963, 968 (10th Cir. 2004).

When making this determination, the district court "must accept the substantive

allegations of the complaint as true." Id. Even "in doubtful cases, class certification is favored." Bhasker v. Kemper Cas. Ins. Co., 361 F. Supp. 3d 1045, 1089 (D.N.M. 2019) (citing Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968).

All classes must satisfy the prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). Once the court concludes that these threshold requirements have been met, "it must then examine whether the action falls within one of three categories of suits set forth in Rule 23(b)." Adamson v. Bowen, 855 F.2d 668, 675 (10th Cir. 1988). Here, Plaintiffs move under subsection (b)(3). As outlined below, Plaintiffs have satisfied each of the subsection (a) threshold requirements, and can also establish predominance and superiority, as required under Rule 23(b)(3).

**B.      The Requirements Of Rule 23(a) Are Satisfied.**

Plaintiffs have satisfied the threshold requirements of Rule 23(a).

**1.      The Class Is So Numerous That Joinder Of All Members Is Impracticable**

Under Rule 23, the numerosity requirement is met if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The Tenth Circuit has stated that there is 'no set formula' to determine whether the numerosity requirement is met; instead, it is a fact-specific inquiry best left to the district court's discretion." Payne v. Tri-State CareFlight, LLC, 332 F.R.D. 611, 658 (D.N.M. 2019) (citation omitted), leave to appeal denied, No. 19-702, 2019 WL 8329300 (10th Cir. Dec. 3, 2019) (citation omitted). Despite the name, evaluating numerosity is also "not a question of numbers."

Colorado Cross Disability Coalition v. Abercrombie & Fitch Co., 765 F.3d 1205, 1215

(10th Cir. 2014) (internal quotations and citation omitted). Rather, a finding of

numerosity requires consideration of several factors going to the impracticability of

joinder, including "the unique characteristics of the class members." Menocal v. GEO

Grp., Inc., 320 F.R.D. 258, 263 n.1 (D. Colo. 2017) (hereinafter "Menocal I"), aff'd, 882

F.3d 905 (10th Cir. 2018) (hereinafter "Menocal II"), cert. denied., 139 S.Ct. 143 (2018).

In particular, courts, including the Tenth Circuit, have found that joinder is impracticable

in trafficking cases like these, where the putative class members "are spread around the

world and are not fluent in English or the U.S. legal system." Id.; see also Moodie v.

Kiawah Island Inn Co., LLC, 309 F.R.D. 370, 377 (D.S.C. 2015); Covarrubias v. Capt.

Charlie's Seafood, Inc., No. 10-CV-10-F, 2011 U.S. Dist. LEXIS 72636, **10-11

(E.D.N.C. 2011).

     The characteristics of the class members in this case, including their geographic

dispersion, lack of financial resources, lack of mastery of the English language and lack

of familiarity of the U.S. court system make joinder impracticable. According to their

own class list, Defendants employed at least 200 foreign J-1 Workers during the class

period. Plfs Ex. 19, DEFS-J1-020327-334. Members of the proposed class were born and

raised in various foreign countries, and came to the United States specifically to work for

Defendants. E.g. Plfs Ex. 2, Jones-Gardner Decl. ¶¶ 4-9. As foreign migrant workers,

they are unfamiliar with the U.S legal system, and many of the proposed class members

do not speak English as their primary language. Plfs Ex. 8, De Leon Arias Decl. Cert. of

Trans.; see Plfs Ex. 2, Jones-Gardner Decl. ¶ 16; Plfs Ex. 27, DEFS-J1-000853. Proposed

class members also lack the financial resources to bring individual cases of their own. Plfs Ex. 4, Thomas Decl. ¶ 21; Plfs Ex. 8, De Leon Aria Decl. ¶ 21. Given the circumstances of the class members in this Action, joinder is clearly impracticable.

### 2.      **The Class Members Share Common Questions Of Law And Fact**

"A plaintiff seeking class certification satisfies Rule 23(a)(2)'s commonality requirement by demonstrating that 'there are questions of law or fact common to the class.'" Naylor Farms, Inc. v. Chaparral Energy, LLC, 923 F.3d 779, 788 (10th Cir. 2019) (quoting Fed. R. Civ. P. 23(a)(2)). This is not a heavy burden: "A finding of commonality requires only a single question of law or fact common to the entire class." DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1195 (10th Cir. 2010). A common question is one for which the answer "will resolve an issue that is central to the validity of each one of the [class members'] claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). Where the question is a factual one, the question is common if there is sufficient common evidence that would allow a reasonable jury could decide that issue for each class member. Tyson Foods, Inc. v. Bouaphakeo, 136 S.Ct. 1036, 1048 (2016) (noting that common evidence at issue "could have been sufficient to sustain a jury finding as to hours worked if it were introduced in each employee's individual action"). In the discussion of predominance, infra Part C.1, Plaintiffs set forth more than a dozen common questions of law and fact. "[T]he same evidence will suffice" to answer each question as to every class members' claim. Tyson Foods, 136 S. Ct. at 1045 (citation omitted). This satisfies commonality. Dukes, 564 U.S. at 350.

### 3.      **The Named Plaintiffs' Claims Are Typical Of The Class**

Rule 23(a)(3) requires the claims of named plaintiffs to be typical of the claims of the class they seek to represent. Typicality is satisfied when the representative plaintiffs' claims arise from the same event, practice or course of conduct that provides the basis of class claims and are grounded in the same legal or remedial theory. Adamson v. Bowen, 855 F.2d 668, 676 (10th Cir. 1988). "Provided the claims of Named Plaintiffs and class members are based on the same legal or remedial theory, differing fact situations of the class members do not defeat typicality." Devaughn, 594 F.3d at 1198-99.

The Named Plaintiffs' claims are plainly typical of the claims of the proposed class. The Named Plaintiffs were subjected to the same scheme by the Defendants as the other class members. Like other class members, they were made false promises about possible earnings in the United States. Plfs Ex. 5, Francis Decl. ¶ 5; Plfs Ex. 7, Pearce Decl. ¶¶ 5-6, 8; Plfs Ex. 6, Kennedy Decl. ¶ 5. Once they came to the United States, they struggled to survive, directly received or witnessed threats made by the Schumachers, and possessed the same economic and immigration-related vulnerabilities of other class members. Plfs Ex. 5, Francis Decl. ¶¶ 10-16; Plfs Ex. 7, Pearce Decl. ¶¶ 10-16; Plfs Ex. 6, Kennedy Decl. ¶¶ 10-16. Because the Named Plaintiffs and the class suffered a common legal injury, the Named Plaintiffs have satisfied the requirement of typicality. See DG ex rel. Stricklin, 594 F.3d at 1199 ("Due to the common risk of harm and the common underlying legal theory for asserting that risk, the district court acted within its discretion to find that typicality was satisfied.").

### 4. The Named Plaintiffs And Class Counsel Will Fairly And Adequately Protect The Interests Of The Class

Rule 23(a)(4) requires that the representative party must "fairly and adequately protect the interests of the class." In order to determine whether the requirements of Rule 23(a)(4) have been satisfied, "two questions must be resolved: (1) do the named plaintiff and his counsel have any conflicts of interest with other class members? and (2) will the named plaintiff and his counsel prosecute the action vigorously on behalf of the class?" Braver v. Northstar Alarm Servs., LLC, 329 F.R.D. 320, 330 (W.D. Okla. 2018) (citing Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002)).

With respect to the first question, "[a]n alleged conflict must be more than merely speculative or hypothetical; there must be a showing that the conflict is a real probability." Braver, 329 F.R.D.at 330. As to the second question, "Rule 23(a)(4) does not require a detailed knowledge of the class's claims. Instead, the class representative need only demonstrate a basic understanding of the class claims as well as an understanding of his or her duties as the class representative and a willingness to fulfill those duties." Foster v. Apache Corp., 285 F.R.D. 632, 645 (W.D. Okla. 2012) (internal citations omitted).

In the present case, there is no apparent conflict of interest between the putative class members and either the Named Plaintiffs or Named Plaintiffs' counsel. Plfs. Exs. 6, Kennedy Decl. ¶¶ 21-23; Plfs. Exs. 7, Pearce Dec. ¶¶ 21-23; Plfs. Exs. 5, Francis Dec. ¶¶ 21-23; Plfs. Exs. 20-23. All class members have the same interest in obtaining compensation and other relief for their injuries caused by Defendants' labor trafficking and other unlawful acts. The Named Plaintiffs will not benefit in any way from actions that will prove harmful to the interests of the members of the class. Indeed, the Named

Plaintiffs can only recover if they succeed on legal theories that would also lead to recovery for the class. (See infra Part C.1.)

Moreover, the Named Plaintiffs have shown willingness to represent the class vigorously. The three putative class representatives have appeared for depositions despite considerable inconvenience: two travelled by plane to Oklahoma City to appear at their depositions in person, while the third navigated the stress and disruption caused by the COVID-19 pandemic to appear remotely. Plfs. Exs. 6, Kennedy Decl. ¶ 22; Plfs. Exs. 7, Pearce Dec. ¶ 22; Plfs. Exs. 5, Francis Dec. ¶ 22. During their depositions, the Named Plaintiffs showed their understanding of the harms that they and other putative class members have suffered. Plfs Ex. 15, Francis Dep. Tr. at 12:21-14:18; Plfs Ex. 14, Kennedy Dep. Tr. at 8:14-8:22; Plfs Ex. 13, Pearce Dep. Tr. at 116:3-117:6. The Named Plaintiffs have participated in extensive interviews with counsel during the drafting of the complaint, the extensive discovery process, and the preparation of the present motion, and have communicated with Plaintiffs' counsel regularly regarding the progress and strategy of this case. Plfs. Exs. 6, Kennedy Decl. ¶ 22; Plfs. Exs. 7, Pearce Dec. ¶ 22; Plfs. Exs. 5, Francis Dec. ¶ 22.

Finally, Plaintiffs' counsel are competent to conduct this action and fairly represent the interests of plaintiffs and the class as a whole. The Equal Justice Center, Legal Aid at Work, and ACLU of Oklahoma are well-known public interest legal services organizations with substantial experience with and involvement in class and collective action litigation on behalf of low-wage workers. Plfs. Exs. 21-23 They are joined by pro bono counsel with extensive, nation-wide complex civil litigation

experience, which includes experience litigating class and mass actions under the

TVPRA. Plfs. Ex. 20. Together, Plaintiffs' counsel have decades of experience

representing victims of labor trafficking and advocating for low-wage immigrant workers

and are thus uniquely qualified to prosecute this action. United Food & Commercial

Workers Union v. Chesapeake Energy Corp., 281 F.R.D. 641, 654 (W.D. Okla. 2012)

(adequacy of class counsel implicates "the experience and competence of the attorney[s]

representing the class" (citations omitted)). Moreover, they have invested significant time

in identifying and investigating potential claims in this action and are committed to

advancing the costs of this litigation.  Plfs. Ex. 20, ¶¶ 10-14.

## C.    The Requirements Of Rules 23(b)(3) Are Satisfied

To satisfy the requirements of Rule 23(b)(3), the proposed class representatives

must show "that the questions of law or fact common to putative class members

predominate over any questions affecting only individual members, and that a class

action is superior to other available methods for fairly and efficiently adjudicating the

controversy." Fed. R. Civ. P. 23(b)(3). In the present action, common questions

predominate and class treatment is far superior to other methods for adjudicating the

matters at issue.

### 1.    Common Questions Predominate

Common issues predominate over any individual inquiries necessary to establish

Defendants' liability under the TVPRA.

When considering whether common issues predominate under Rule 23(b)(3), the

court "must characterize the issues in the case as common or not, and then weigh which

issues predominate" by evaluating "how the class intends to answer factual and legal questions to prove its claim." Menocal II, 882 F.3d at 915 (quoting CGC Holding Co. LLC v. Broad & Cassel, 773 F.3d 1076, 1086 (10th Cir. 2014)) (emphasis omitted). When assessing whether a factual question is common, the court should ask whether the Plaintiffs have provided a set of evidence that would be "sufficient to sustain a jury finding" in each class member's favor in an individual suit. Tyson Foods, 136 S. Ct. at 1048. In evaluating whether common issues predominate, the Court should consider whether the common questions are "more prevalent or important than the non-common" questions, and whether the "proposed class[ is] sufficiently cohesive to warrant adjudication by representation." Id. at 1045. Not all issues—or even all important issues—must be common for common issues to predominate:

> When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.

Id. (internal quotations and citation omitted).

Here, common issues predominate because the factual and legal issues that will drive the outcome of class members' forced labor claim will be decided under identical legal standards and can be resolved using common evidence.

The first step in determining whether common questions predominate is to consider "the elements of the underlying cause of action. Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011). The TVPRA prohibits persons from "knowingly provid[ing] or obtain[ing] the labor or services of a person by any one of, or

16

by any combination of" a series of "means." 18 U.S.C. § 1589(a). In other words, the

Plaintiffs must show: (i) that Defendants "provid[ed] or obtain[ed]" their labor; (ii) "by

means of" actions prohibited by 18 U.S.C. § 1589(a)(1)-(4); and (iii) that Defendants did

so knowingly. Id.; see also United States v. Toure, 965 F.3d 393, 400 (5th Cir. 2020)

(listing the elements of a criminal violation of 19 U.S.C. § 1589(a)). If Plaintiffs establish

that just one Defendant is liable under § 1589(a), they can establish liability as to the

remaining Defendants under § 1589(b) by demonstrating that the remaining Defendants

participated in the common venture, knowingly obtained anything of value from their

participation, and operated with either knowledge or reckless disregard of the unlawful

means used to procure the class members' labor. See 18 U.S.C. § 1589(b); Bistline v.

Parker, 918 F.3d 849, 873–74 (10th Cir. 2019).

> **(a)   Evidence That Defendants Obtained Or Provided
> Class Members' Labor Is Either Not In Dispute Or
> Will Require Only Common Evidence To Establish**

The first element for direct liability—that Defendants obtained or provided the

class members' labor—can be resolved with little effort using common records, such as

the class list already produced by Defendants, which purports to identify all foreign

nationals who received a J-1 visa sponsored by APEX and for whom at least one

Defendant was the "de facto" employer during the class period. Plfs Ex. 19, DEFS-J1-

020327-34. Further, substantial evidence shows that Walter and Carolyn Schumacher

exerted significant control over all of the Corporate Defendants, Plfs Ex. 24, W.

Schumacher 8/24/2020 Dep. Tr. at 68:18-70:2, and were directly involved in APEX's

recruitment activities, Plfs Ex. 24, W. Schumacher 8/24/2020 Dep. Tr. at 28:4-19. Thus,

the court will be able to determine whether Defendants provided or obtained class

members' labor "in one stroke." <u>Dukes</u>, 564 U.S. at 350.

> **i.   Plaintiffs Can Show That Defendants Obtained
> Class Members' Labor Via Prohibited Means Using
> <u>Common Evidence That A Jury Can Use To Infer Class-wide Practices</u>**

Plaintiffs can show through common evidence that Defendants utilized the

prohibited means set forth by 18 U.S.C. § 1589(a)(2)-(4):

> (2) . . . serious harm or threats of serious harm to that person or another person;

> (3) . . . the abuse or threatened abuse of law or legal process; or

> (4) . . . any scheme, plan, or pattern intended to cause the person to believe that, if
> that person did not perform such labor or services, that person or another person
> would suffer serious harm or physical restraint.

Plaintiffs must show both that the Defendants used at least one of these prohibited means,

and also that class members' labor was obtained or provided by Defendants "by means

of" one or more such aforementioned activities.  Although the Tenth Circuit has not yet

decided exactly what showing must be made to establish this "causation element," <u>see</u>

<u>Menocal II</u>, 882 F.3d at 918, Congress's choice to use "by means of" to describe the

causation element of the statute provide clear guidance as to what showing is required of

Plaintiffs. Plaintiffs must establish "some causal connection" between the prohibited

activity or activities and the provision of labor. <u>See, e.g.</u>, <u>In re Access Cardiosystems,</u>

<u>Inc.</u>, 776 F.3d 30, 36 (1st Cir. 2015) ) (interpreting phrase "by means of" in securities

fraud statutes) (citing <u>Sanders v. John Nuveen & Co.</u>, 619 F.2d 1222, 1225 (7th Cir.

1980) and <u>Jackson v. Oppenheim</u>, 533 F.2d 826, 830 & n.8 (2d Cir. 1976)); <u>MidAmerica</u>

<u>Fed. Sav. & Loan Ass'n v. Shearson/Am. Express, Inc.</u>, 886 F.2d 1249, 1254 (10th Cir.

1989) (same). See also Loughrin v. United States, 573 U.S. 351, 363 (2014), aff'g, 710 F.3d 1111 (10th Cir.) (interpreting phrase "by means of" in bank fraud statute); Toure, 965 F.3d at 400-02 (stating that unlawful means was used "in order to secure [victim's] compliance"). "[I]t is 'well settled' that 'by means of' does not create a reliance requirement"; instead, to establish the "requisite connection" Plaintiffs need only show that such illegal activity "was used" to procure or obtain class members' labor. In re Access Cardiosystems, Inc., 776 F.3d at 36 (quoting Sanders, 619 F.2d at 1225). The Supreme Court recently explained that an end is reached "by means of" a given activity if "the given result (the 'end')"—in this case, the procurement of class members' labor— "[wa]s achieved, at least in part, through the specified action, instrument, or method (the 'means'), such that the connection between the two is something more than oblique, indirect, and incidental." Loughrin v. United States, 573 U.S. 351, 363 (2014) (emphasis omitted) (interpreting phrase "by means of" in bank fraud statute). Thus, to establish the "requisite connection," Plaintiffs need only show that Defendants used one or more prohibited means in the process of procuring or obtaining class members' labor. See In re Access Cardiosystems, Inc., 776 F.3d at 36.

To demonstrate that Defendants procured of class members' labor, at least in part, through the means prohibited by 18 U.S.C. § 1589(a)(2)-(4), Plaintiffs intend to use the following common proof.

    **a.  Defendants Used A Common Scheme To Obtain Class Members' Labor**

The "scheme, plan, or pattern" means under 18 U.S.C. 1589(a)(4) asks whether the Defendants have crafted a scheme or pattern "intended to cause [a] person to believe that . . . that person or another person would suffer serious harm or physical restraint." In analyzing whether a scheme exists, what matters is the Defendants' intention; not whether that scheme successfully caused any class member to believe they would suffer serious harm. See Neder v. United States, 527 U.S. 1, 25, (1999) ("By prohibiting the "scheme to defraud," rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted."); United States v. Kalu, 791 F.3d 1194, 1203 (10th Cir. 2015) (mail fraud statute requires intent to defraud); United States v. Stewart, 872 F.2d 957, 960 (10th Cir. 1989) (noting that under mail fraud statute, prosecution must prove the existence of the scheme, not the success of that scheme). Analyzing common evidence, a jury could infer the existence of a common scheme intended by Defendants to cause class members to believe that they would be subjected to serious harm if they did not continue to perform work for Defendants. Because the analysis of claimed TVPA inquiry will focus on the Defendants' intent with respect to any threats made against Plaintiffs, and on a reasonable person's perception of those threats, the TVPA inquiry will not turn on, or require, individualized determinations.

Plaintiffs intend to establish, using common evidence, that Defendants developed and implemented a scheme under 18 U.S.C. § 1589(a)(4) to cause class members to believe that they would be subject to serious harm if they did not continue to perform work for Defendants. Plaintiffs will show that Defendants made standard

misrepresentations about the J-1 Workers' ability to earn money in the United States using formulaic offer letters and representations at public recruiting events run by Defendants and their agents. E.g., Plfs Ex. 12, DEFS-J1-007737-40; Plfs Ex. 32, FRANCIS-0000068-72; e.g., Plfs Ex. 14, Kennedy Dep. Tr. at 20:4-21:7, 129:1-5. Additionally, they will use APEX's annual Fee Schedule, e.g., Plfs Ex. 25, DEFS-J1-004831-32, and corroborating testimony, Plfs Ex. 26, C. Schumacher Dep. Tr. at 163:22-164:19, 165:11-6;  Plfs Ex. 4, Thomas Decl. ¶ 7; Plfs Ex. 2, Jones-Gardner Decl. ¶ 7, to show that Defendants charged J-1 Workers standardized fees that left the workers in serious debt once they arrived in the United States. See Menocal II, 882 F.3d at 920 (question is common where Defendants' used common policy or practice, or jury could rely on same inference for each class member).

Once in Clinton, Oklahoma, Defendants, led by Walter and Carolyn Schumacher, implemented a "single, common scheme" consisting of coercive, illegal practices, including implied and explicit threats of economic and psychological harm and threatened abuse of legal processes, to demonstrate the extreme control that they held over Plaintiffs and the putative class members. Id. Defendants' scheme consisted of a number of common practices, including many that Defendants' own expert has identified as "red flags" signaling labor trafficking:

- Paying wages below what was stated in the J-1 workers' offers of employment, see, e.g., Plfs Ex. 27, DEFS-J1-000853 (stating wage below minimum wage as punishment for using "your Native Language in the restaurant");

- Overstaffing their properties so that the workers were not working full time and could not make a viable wage on piece-rate or tip-dependent work, see

Plfs Ex. 28, DEFS-J1-000029; Plfs Ex. 29, DEFS-J1-000172 ("We also have lots of staff right at the moment so most people are down below 40 hours."); Plfs Ex. 30, DEFS-J1-000227 ("We have 14 servers scheduled for the evening shift and therefore I am not calling anyone in for that shift. 13 servers should be more than enough"); Plfs Ex. 13, Pearce Dep. Tr. at 237:20-238:2; Plfs Ex. 2, Jones-Gardner Decl. ¶ 12; Plfs Ex. 4, Thomas Decl. ¶ 12;

- Preventing workers from obtaining additional work at non-Defendant employers, Plfs Ex. 28, DEFS-J1-000029; Plfs Ex. 13, Pearce Dep. Tr. at 159:3-159:16; Plfs Ex. 14, Kennedy Dep. Tr. at 213:14-213:19, 224:16-225:3; Plfs Ex. 15, Francis Dep. Tr. at 134:22-135:10, 19:24-21:4; see also Plfs Ex. 31, DEFS-J1-002833 (requiring workers to "give up any other outside employment" and live in "Company housing" to get work at Montana Mike's); Plfs Ex. 9, Saunders Decl. ¶ 14; Plfs Ex. 4, Thomas Decl. ¶ 14; Plfs Ex. 2, Jones-Gardner Decl. ¶ 14;

- Threatening class members that they would terminated or deported for minor infractions at work, or for complaining about working conditions, Plfs Ex. 34, DEFS-J1-002657 (stating that failure to "show up early for work" would result in class member being "terminated and deported"), Plfs Ex. 27, DEFS-J1-000854; Plfs Ex. 4, Thomas Decl. ¶ 15;

- Berating and reprimanding class members "for disobeying rules," Plfs Ex. 8, De Leon Arias Decl. ¶ 16; Plfs Ex. 2, Jones-Gardner Decl. ¶ 16; Plfs Ex. 27, DEFS-J1-000844;

- Threatening class members that they would lose scheduled work and/or pay for minor infractions at work, Plfs Ex. 3, Soriano Decl. ¶ 16; Plfs Ex. 27, DEFS-J1-000853 ("[F]ailure to abide by the English Only policy would result in a permanent drop in wage rate"); id. at DEFS-J1-000855 ("The next time you are late expect a 5 day suspension"), DEFS-J1-000851-52 ("EITHER GET MOTIVATED IMMEDIATELY TO PROVIDE EXCELLENT STEAKS TO OUR GUESTS OR USE THIS WEEKS CHECK TO BUY A TICKET HOME."), or for complaining about working conditions, Plfs Ex. 35, DEFS-J1-002605; Plfs Ex. 7, Pearce Decl. ¶ 10; Plfs Ex. 6, Kennedy Decl. ¶ 16;

- Reducing class members' hours for minor violations, see Plfs Ex. 29, DEFS-J1-000172 ("Her hours were cut back by me because her performance in Expo was below acceptable standards . . . . Shes not being punished just slowed down till we get some enthusian and pre planning"); Plfs Ex. 16, DEFS-J1-001514 ("A FRIEND OF SHANES DIED IN INDIA – SHANE DID NT COME TO WORK THAT DAY NOW THATS

BULLSHIT AND HE SEE HOW MANY DAYS HE LOSE ON THE
SCHEDULE FOR THAT"); Plfs Ex. 9, Saunders Decl. ¶ 12.

- Managing debts owed by the class members, by deducting amounts owed
  for APEX program fees from their wages; compare Plfs Ex. 30, DEFS-J1-
  000229-30, Plfs Ex. 30, DEFS-J1-000235; Plfs Ex. 33, DEFS-J1-00114-42
  ("If a substantial amount of the outstanding balance is not paid by the end
  of business tomorrow, you will be taken off of the next schedule."); Plfs
  Ex. 16, DEFS-J1-001511;

- Reducing class members' wages by charging them for uniforms and other
  expenses, and deducting these expenses from employees' paychecks,
  resulting in class members having little or no money, Plfs Ex. 38, DEFS-J1-
  002466 (pay check with no net pay); Plfs Ex. 17, DEFS-J1-001904
  (indicating class member received $0 check); Plfs Ex. 17, DEFS-J1-001911
  (charging class member $121 for entering a room "that was marked DO
  NOT DISTURB"), Plfs Ex. 17, DEFS-J1-001916 (charging class member
  for liquor license); Plfs Ex. 30, DEFS-J1-000255 ("If no one claims to have
  made the [long-distance] calls then at the end of the week . . . $60 will be
  deducted from each person's paycheck that is living at Concord"); Plfs Ex.
  49, DEFS-J1-010620 (perpetual history report indicating total net payments
  of $37.53 for named Dorret Francis);

- Dictating or coercing class members' to live substandard housing, Plfs. Ex.
  32, FRANCIS-00000070 ("If you choose not to live in housing, you will
  still be responsible for your rent payment"); Plfs Ex. 16, DEFS-J1-001545,
  inspecting and surveilling class members' housing, Plfs Ex. 52, DEFS-J1-
  007409; and restricting access to preferred housing based on job
  performance, Plfs Ex. 27, DEFS-J1-000849;

- Threatening class members that they could not leave, or would face severe
  immigration consequences for seeking to leave before their scheduled end
  date, Plfs Ex. 18, DEFS-J1-003028;

- Informing class members and other foreign workers that Walt Schumacher
  had a gun and was a sheriff to threaten class members, and policing
  plaintiffs while they were not at work, Plfs Ex. 2, Jones-Gardner Decl. ¶ 16;
  Plfs Ex. 4, Thomas Decl. ¶ 16; Plfs Ex. 8, De Leon Arias Decl. ¶ 16; and

- Searching for class members once they had left or escaped Defendants'
  employ, Plfs Ex. 41, DEFS-J1-010222; Plfs Ex. 7, Pearce Decl. ¶ 16.

Many of these policies and threats can be shown through documents and policies common to the class, such as payroll records showing amounts earned and deductions taken for business expenses, Plfs Ex. 50, DEFS-J1-010822-9220 (showing payroll for Clinton Hampton), receipts documenting standard charges imposed on class members, sheets tracking debts owed to Defendants, Plfs Ex. 16, DEFS-J1-001511 (tracking unpaid program fees); Plfs Ex. 30, DEFS-J1-000235 (tracking housing debts); and announcements and memoranda provided to groups of workers, see, e.g., Plfs Ex. 27, DEFS-J1-000851; Plfs Ex. 16, DEFS-J1-001542.

Furthermore, although Defendants' scheme may have affected class members in different ways, similar actions taken against individual workers or groups of workers provide common circumstantial evidence for each class member's claim that the Defendants implemented a scheme of policies and threats in a concerted effort to compel work. See Menocal II, 882 F.3d at 920 & n.10 (defendant's official policy "provides the 'glue' that holds together the class members' reasons for" performing labor). In other words, a jury could reasonably rely on the Defendants' treatment of a "subset of employees [as] probative" of the scheme they implemented to compel all class members to work. See Tyson Foods, Inc., 136 S. Ct. at 1048.

Use of the treatment of a subset of employees is particularly reasonable in this circumstance, as even when a Defendant made a threat in the presence of one or a small group of workers, or a single worker was punished, the Defendants immediately reached the other putative class members, who worked in the same restaurant and hotels and lived in the same overcrowded housing, and served as a warning to the entire class to be afraid

of Mr. Schumacher. See, e.g., Plfs Ex. 13, Pearce Dep. at 237:20-238:2; Plfs Ex. 2, Jones-Garner Decl. ¶ 16; Plfs Ex. 9, Saunders Decl. ¶¶ 16-17; Plfs Ex. 3, Soriano Decl. ¶ 16; Plfs Ex. 5, Francis Decl. ¶¶ 10, 14, 16.

In order to establish that Defendants engaged in a scheme to coerce class members to work, Plaintiffs will need to show that Defendants "intended to cause [the putative class members] to believe that, if [they] did not perform such labor or services, [they] or another person would suffer serious harm." 18 U.S.C. § 1589(a)(4); United States v. Calimlim, 538 F.3d 706, 711 (7th Cir. 2008) (describing intent language as a "second" scienter requirement). Wrongful intent "may be inferred from circumstantial evidence considered in its totality," Kalu, 791 F.3d at 1205 & n.13 (discussing intent element under mail fraud statute); such circumstantial evidence is regularly used to prove intent in criminal prosecutions, see, e.g., United States v. Powell, 982 F.2d 1422, 1430 (10th Cir. 1992). Certain types of conduct are particularly probative of a defendants' intent. For example, "[i]ntent may be inferred from evidence that the defendant attempted to conceal activity." Kalu, 791 F.3d at 1205.

Plaintiffs will show through common evidence that Walter and Carolyn Schumacher had the requisite intent to cause class members to believe they would suffer serious harm through their own words and actions. For example, the jury can infer Mr. and Mrs. Schumacher's intent to create the belief that leaving would cause class members' serious harm through memoranda sent to foreign workers with explicit threats and awareness of debts, see, e.g., Plfs Ex. 30, DEFS-J1-000235-36; Ex. 27, Plfs Ex. 27, DEFS-J1-000855, as well as from the defendants' use of the phrase "runaway" in their

records, Plfs Ex. 40, DEFS-J1-002586; Plfs Ex. 48, DEFS-J1-006204, to describe foreign

workers who left Clinton before their scheduled end date.[2]  United States v. Dann, 652

F.3d 1160, 1172 (9th Cir. 2011) (use of word "escape" indicative of defendant's intent).

The requisite intent can also be inferred from Defendants' personnel files, which show

exchanges between recruiters and students stating that one of the "unwritten rules" was

that the recruiter could not book a class member's return ticket to India  "unless and until

APEX has given you clear permission to leave early," Plfs Ex. 34, DEFS-J1-002645, yet

that class member was still working for the Defendants four months after requesting to go

home, Plfs Ex. 34, DEFS-J1-002657.

### b. Defendants Used Threats Of Abuse Of The Legal Process To Obtain Class Members' Labor

Plaintiffs will also argue that Defendants and their agents utilized "threats of abuse

of the legal process" to obtain the class members' labor, in violation of § 1589(a)(3).

Threats of deportation are threats of abuse of the legal process. United States v.

Calimlim, 538 F.3d 706, 713 (7th Cir. 2008); Rosas v. Sarbanand Farms, LLC, 329

F.R.D. 671, 689-90 (W.D. Wash. 2018) (holding that common issues predominated in

forced labor claim where harvesters claimed that growers "threatened to terminate them

and send them back to Mexico if they asked questions, complained about work

---

[2] Defendants' treatment of other foreign workers, including their treatment of Casilao action class members, may also provide circumstantial evidence that supports a common scheme and defendants' intent to create that scheme. For example, defendants' use of the term "fled" to describe Casilao class members who left their jobs is indicative of the defendants' intent to compel their work. Ex. 51, DEFS-H2B007133.

conditions, or received three written warnings for not meeting Growers' production

standard"). As explained supra, the J-1 Workers could only legally work for employers

that were approved by their J-1 sponsor. If they quit or were fired from their job with an

employer Defendant, they would have to go through Defendant APEX to find another

source of legal income or risk deportation. 22 CFR §§ 62.45(a), (f)(2) (engaging in

employment without sponsor's authorization is a non-reinstatable program violation).

Plaintiffs can establish that Defendants repeatedly and regularly threatened workers with

the possibility of termination, in part by using standardized disciplinary forms that

highlighted the risk of termination. Plfs Ex., DEFS-J1-000167; Plfs Ex. 34, DEFS-J1-

002657. They can also establish that Defendants routinely and systematically made such

threats when class members violated even minor workplace rules—such as not properly

cooking a steak, "needing a haircut," or not showing up for work early—or expressed any

sort of discontent with the illegal wages and working conditions they faced. See, e.g., Plfs

Ex. 29, DEFS-J1-000167; Plfs Ex. 29, DEFS-J1-000170; Plfs Ex. 27, DEFS-J1-000844;

Plfs Ex. 16, DEFS-J1-001509; Plfs Ex. 16, DEFS-J1-001516; Plfs Ex. 34, DEFS-J1-

002644; Plfs Ex. 34, DEFS-J1-002654.

 Although many of the threats made by Defendants left the immigration

consequences of termination unsaid, some did include explicit threats of deportation. See,

e.g., Plfs Ex. 34, DEFS-J1-002657 (stating that the "Consequences if Employer's

Expected Response is NOT Achieved" was "Terminated and Deported"); Plfs Ex. 41,

DEFS-J1-010222; Plfs Ex. 18, DEFS-J1-003028; Plfs Ex. 44, DEFS-H2B006678; see

also DeBaca Rpt. ¶¶ 61, 63 (opining that "warnings of immigration consequences, when

used to maintain a compliant and cheap workforce, are not mere statements of fact" and

"heighten the serious harm [foreign workers] might face" by failing to comply with an

employer's demands); Plfs Ex. 6, Kennedy Depo. Tr. 247:13-24.

Defendants' policy of threatening the J-1 Workers with immigration consequences

as a form of discipline can also be shown through State Department investigative records

finding that an "APEX representative had threatened deportation and visa revocation,"

Plfs Ex. 10, DEFS-J1-010192, and messages sent by APEX employees to non-Defendant

employers describing one advantage of employing J-1 Workers as: "They cannot quit or

get fired or they are deported back home!" Plfs Ex. 43, DEFS-J1-010116. The pervasive

nature of the threats will allow a jury to infer that (1) the J-1 Workers as a class were

either directly threatened with termination or learned of such threats through their

coworkers, (2) threats of termination were in fact threats to deport the class members, see

United States v. Dann, 652 F.3d 1160, 1171 (9th Cir. 2011) (recognizing that even where

defendant never made explicit threat, the "inference was clear"), and (3) such threats

were used to retain class members' labor.

### c.  Defendants Used Serious Harm, And Threats Thereof, To Obtain Class Members' Labor

Plaintiffs intend to argue Defendants used "serious harm or threats of serious

harm" to coerce class members' labor, 18 U.S.C. § 1589(a)(2), using much of the same

evidence discussed above for establishing the existence of a scheme. To establish a

violation of 18 U.S.C. § 1589(a)(2), Plaintiffs will have to show that the combined

actions of Defendants threatened harm or inflicted harm was "sufficiently serious, under

all the surrounding circumstances, to compel a reasonable person of the same background

and in the same circumstances to perform or to continue performing labor or services in

order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). Plaintiffs can do so through

inference, using common evidence that Defendants threatened the same types of

financial, psychological, and immigration harms on the entire class of J-1 Workers, to

show that class members faced the "same range of possible sanctions" if they did not

acquiesce to Defendants' demands. Menocal II, 882 F.3d at 916 n.10; Kalu, 791 F.3d at

1212 (holding threats of deportation may constitute threats of serious harm); Dann, 652

F.3d at 1172 (9th Cir. 2011) (holding that being "forced to leave the country" and being

forced to stay in the country without documentation could both be serious harms);

Francis v. Apex USA, Inc., 406 F. Supp. 3d 1206, 1211 (W.D. Okla. 2019) ("The 'threat

of financial harm constitutes serious harm within the meaning of the TVPA.'" (quoting

Paguirigan v. Prompt Nursing Empl. Agency LLC, No. 17-cv-1302 (NG) (JO), 2018 WL

4347799, at *8 (E.D.N.Y. Sept. 12, 2018)); David v. Signal Int'l, LLC, 37 F. Supp. 3d

822, 832 (E.D. La. 2014) (inducing plaintiffs into incurring substantial debts such that

plaintiffs were compelled to continue working to repay those debts constitutes a violation

of 18 U.S.C. § 1589(a)(2)). Further, because all class members share a common set of

core characteristics—being (a) a student from foreign country, (b) having spent a

significant sum of money to come to the United States, primarily consisting of standard

program fees paid to APEX and airfare to the United States (c) having been offered the

same or similar employment from Defendants, (d) having worked in hospitality for
minimum or sub-minimum wages, (e) having lived in overcrowded housing provided by
defendants either directly or indirectly, (f) in Clinton, Oklahoma, on a temporary J-1 visa,
(g) having been sponsored by an entity controlled by their employer—the jury could
determine based on the testimony of a subset of workers whether the possible sanctions
would, on a class-wide basis, "compel a reasonable person of the same background and in
the same circumstances to perform or to continue performing labor or services in order to
avoid incurring that harm." 18 U.S.C. § 1589(c)(2); Sarbanand Farms, LLC, 329 F.R.D.
at 690 (holding that because class members "share many salient characteristics, including
that they are Mexican nationals, were employed under the same H-2A contracts, worked
under the same conditions, and were subjected to the same threats, a uniform reasonable
person standard may be applied to determine whether Growers' statements violated the
TVPA"); ("Plaintiffs have alleged that Growers' use of the threats was pervasive and
directed at the class as a whole . . . , the determination of whether Growers threatened
serious harm sufficient to compel a reasonable person to perform labor is susceptible to
generalized, class-wide evidence"); Paguirigan v. Prompt Nursing Employment Agency
LLC, No. 17-CV-1302, 2018 WL 4347799, at *8 (E.D.N.Y. Sept. 12, 2018) ("The
question is not whether each individual felt compelled to continue her employment as a
result of defendants' conduct, but whether a reasonable person of the same background
and in the same circumstances would find that conduct a threat of serious harm sufficient
to compel continued work."); Nunag-Tañedo v. E. Baton Rouge Par. Sch. Bd., No. LA
CV10-01172 JAK, 2011 WL 7095434, at *8 (C.D. Cal. Dec. 12, 2011) (noting that class-

wide decision could be made where common characteristics "shared by the class members" were far more significant than any individualized circumstances).

**(b)** **Plaintiffs Can Prove Knowledge Through Common Evidence**

The scienter requirement—the last element needed to establish direct liability—can be established with common proof. Plaintiffs can proffer ample common evidence indicating that Mr. Schumacher acted "knowingly" to cause class members "to work by prohibited means." Toure, 965 F.3d at 402; Barrientos v. CoreCivic, Inc., 951 F.3d 1269, 1276 (11th Cir. 2020); Calimlim, 538 F.3d at 711 ("[T]he jury must find that the defendant knew that the circumstance existed."); see also United States v. Ho, 311 F.3d 589, 605 (5th Cir. 2002) ("[U]nless the text of a statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense.") (quoting Bryan v. United States, 524 U.S. 184, 193 (1998)). Plaintiffs can use common evidence to establish that Walter and Carolyn Schumacher were aware of the facts that constituted the offense. Indeed, the record evidence, including Walter and Carolyn Schumacher's own testimony, indicates that Walter Schumacher was intimately involved in the day-to-day operations of the various businesses, including the recruitment, hiring, supervision, and discipline of putative class members. See Plfs Ex. 45, W. Schumacher 3/4 Depo Tr. 70:14-72:23; Plfs Ex. 30, DEFS-J1-000227-29; Plfs Ex. 27, DEFS-J1-00844-45. Correspondence with Plaintiffs and class members indicates that Walter and Carolyn Schumacher were well aware of the threats of deportation they were making, Plfs Ex. 18, DEFS-J1-003028, and were well aware of the financial and psychological duress caused by the extremely low pay, threats of termination, and other coercive

conditions imposed on class members and other foreign workers. Plfs Ex. 45, W.

Schumacher 3/4 Depo Tr. 162:10-14, 163:11-25; Plfs Ex. 46, DEFS-J1-000582.

    (c)    **Establishing Venture Liability Will Depend On Common Issues**

Plaintiffs intend to rely on venture liability under 18 U.S.C. § 1589(b) to impose

liability on any Defendants not found directly liable under 18 U.S.C. § 1589(a). The

existence of such liability is a common question that can be answered via common proof.

Section 1589(b) proscribes liability for those parties that: (1) have "participat[ed] in a

venture which has engaged in the providing or obtaining of labor or services by any of

the means" prohibited in § 1589(a); (2) have "knowingly benefit[ed], financially or by

receiving anything of value, from" such participation, and (3) knew or acted "in reckless

disregard of the fact that the venture has engaged in the providing or obtaining of labor or

services by any of such means." 18 U.S.C. § 1589(b); <u>see also</u> <u>Bistline v. Parker</u>, 918

F.3d 849, 873 (10th Cir. 2019).

Each element centers on the actions and knowledge of each Defendant, not a

particular class member and can be established through common proof. To prove the first

element—participation in a common venture—Plaintiffs can rely on Walter

Schumacher's testimony demonstrating that each of the corporate Defendants operated

under his control, Plfs Ex. 24, W. Schumacher 8/24 Depo Tr. 68:8-72:3; Plfs. Ex. 29,

DEFS-J1-000166, and records demonstrating that the companies acted in a coordinated

fashion with regard to class members' treatment, Plfs Ex. 30, DEFS-J1-000255; Plfs. Ex.

16, DEFS-J1-001513. The same or similar evidence can be used to establish the second

and third elements, as Mr. Schumacher's personal knowledge can be imputed to the

corporation under his control. See, e.g., United States ex rel. Trim v. McKean, 31 F. Supp. 2d 1308, 1315 (W.D. Okla. 1998) ("[W]here a corporate officer has knowledge of the falsity of a claim, that knowledge is imputed to his employer—the corporation itself."); 18B Am. Jur. 2d Corporations §§ 1413, 1418 (2020). Finally, common evidence including the class list shows that class members' labor was in fact used by Defendants Hotelmacher, LLC, Steakmacher, LLC, Sontag, Inc., and Schumacher Investments, LLC, Plfs Ex. XXX, DEFS-J1-020327-334, the schedule of fees charged by APEX and records confirming that such fees were in fact collected from the class members, Plfs Ex. 25; DEFS-J1-004831-32, and the financial records of each corporate Defendant, see, e.g. Ex. 50, DEFS-J1-010822-9220 (showing payroll for Clinton Hampton), can be used to show that Defendants benefited from the unlawful procurement of the class members' labor.

## 2.      Class Treatment is Superior to Individual Litigation

Rule 23(b)(3) sets forth a non-exclusive list of factors pertinent to the Court's inquiry into the superiority of a class action:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

With respect to the first factor, it is extremely unlikely that individual class members have any interest in instituting or controlling their own individual actions. The J-1 Workers were brought to the U.S. to perform low-wage jobs; they are unfamiliar with the United States justice system, and some do not have mastery of the English language

beyond what was required to perform their job duties. Plfs Exs. 2-7, Class Member Decs. ¶ 19; see also Rodriguez v. Carlson, 166 F.R.D. 465, 480 (E.D. Wash. 1996) (migrant workers' limited understanding of the U.S. legal system is presumed). When confronted with low-wage and migrant workers, courts typically find that the first factor weighs toward the superiority of class treatment. See Cortez v. Vieira Custom Chopping, Inc., No. 17-cv-01647-DAD-SKO, 2019 U.S. Dist. LEXIS 162454, at *17 (E.D. Cal. 2019) ("the superiority requirement is satisfied because the proposed class consists of many low-wage workers, most of whom are seasonal workers who lack the means to finance individual lawsuits"); Rodriguez v. Hermes Landscaping, Inc., No. 17-2142 (CM), 2018 U.S. Dist. LEXIS 151454, at *16 (D. Kan. 2018) (individual resolution of claims "is likely not feasible given their geographic dispersal, the language barrier, their general legal unsophistication, and especially, the reality that it would not be economically feasible to bring these claims individually"); Cuzco v. Orion Builders, Inc., 262 F.R.D. 325, 335 (S.D.N.Y. 2009) (finding superiority where "[t]he proposed class members are almost exclusively low-wage workers with limited resources and virtually no command of the English language or familiarity with the legal system"); Iglesias-Mendoza v. La Belle Farm, Inc., 239 F.R.D. 363, 373 (S.D.N.Y. 2007) (same); Recinos-Recinos v. Exp. Forestry, Inc., 233 F.R.D. 472, 482 (E.D. La. 2006) (finding superiority prong is met where class members "reside in Mexico and Guatemala, are not fluent in English and lack sufficient resources to bring an individual lawsuit").

The second factor is inapplicable in the context of this case as Plaintiffs' counsel knows of no separate action commenced by any members of the class. (ATTORNEY DECLS.) In the absence of evidence that a separate action exists, the Court should assume that this is the only action concerning this controversy. See Saur v. Snappy Apple Farms, Inc., 203 F.R.D. 281, 289 (W.D. Mich. 2001) ("There is no mention of previous

lawsuits filed and the Court assumes from the absence of mention that no such lawsuits have been filed.").

The third factor weighs heavily in favor of class certification. Defendants, Defendants' corporate representatives, and all relevant records are in the Western District of Oklahoma. See Whitton v. Deffenbaugh Disposal, Inc., No. 12-2247-CM, 2014 U.S. Dist. LEXIS 153405, at *23-24 (D. Kan. 2014) ("[I]t is desirable to concentrate the litigation in Kansas because [defendant] is located in Kansas and it likely possesses the necessary records about every class member."). Furthermore, "[l]itigating these claims in various courts raises a risk of inconsistent judgments that, if realized, would fail to establish what defendant[s] [are] required to do under law, and a risk that plaintiffs' claims will be resolved inconsistently." Hermes Landscaping, Inc., 2018 U.S. Dist. LEXIS 151454, at **16-17.

Finally, although every class action presents administrative difficulties, this case does not present insurmountable manageability issues. As outlined supra Part C.1, common issues predominate; the fact that final damage calculations may require individual analysis would not render a class action unmanageable. See Smith v. MCI Telecomms. Corp., 124 F.R.D. 665, 680 (D. Kan. 1989) ("[T]o the extent that individual issues, such as the amount of each class member's damages, exist, the court may address these issues following trial or in separate proceedings.").

## **CONCLUSION**

For the above reasons, this Court should grant Plaintiffs' Motion for Class Certification and (i) certify the Class; (ii) appoint the named Plaintiffs as class representative; and (iii) appoint the undersigned attorneys as class counsel.

Dated:  September 14, 2020                Respectfully Submitted,

*/s/ Catherine Fisher*
Meghan Lambert (OBA #33216)
ACLU OF OKLAHOMA
P.O. Box 13327
Oklahoma City, OK 73113
Telephone:    (405) 525-3831
Facsimile:     (405) 524-2296
Email:          mlambert@acluok.org

George Warner, Pro Hac Vice
LEGAL AID AT WORK
180 Montgomery Street, Suite 600
San Francisco, CA  94104
Telephone:    (415) 864-8848
Facsimile:     (415) 593-0096
Emails:         gwarner@legalaidatwork.org

Eben Colby, Pro Hac Vice
Catherine Fisher, Pro Hac Vice
500 Boylston Street, 23rd Floor
Boston, MA 02116
Telephone:    (617) 573-4800
Facsimile:     (617) 573-4822
Emails: Eben.Colby@probonolaw.com
            Catherine.Fisher@probonolaw.com

Christopher J. Willett, Pro Hac Vice
Caitlin Boehne, Pro Hac Vice
Rebecca Eisenbrey, Pro Hac Vice
EQUAL JUSTICE CENTER
510 Congress Ave., Ste. 206
Austin, Texas  78704
Telephone:    (512) 474-0007
Facsimile:     (512) 474-0008
Emails: cwillett@equaljusticecenter.org
            cboehne@equaljusticecenter.org
            reisenbrey@equaljusticecenter.org

*Attorneys for Plaintiffs*

36