Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

DORRET FRANCIS, et al.,      )
                           )
        Plaintiffs,      )
                           )
v.                       )     Case No.  5:18-cv-00583-SLP
                           )
APEX USA INC., et al.      )
                           )
        Defendants.     )

## DEFENDANTS' EXPERT WITNESS LIST

In accordance with the Court's Order entered July 8, 2020 [Dkt. 101] and Rule 26 of the Federal Rules of Civil Procedure, Defendants hereby identify and disclose the following expert witness:

| <u>NO.</u> | **WITNESS** | **ADDRESS** | **EXPECTED TESTIMONY** |
|------|-------------|-------------|------------------------|
| 1 | Greg H. Bristol | PO Box 504<br>Front Royal, VA 22630 | See Expert Report enclosed herewith as Exhibit "1." |

Respectfully submitted,

*/s/    C. Eric Shephard*
C. Eric Shephard, OBA # 22299
A. Wayne Billings, OBA #31483
FELLERS, SNIDER, BLANKENSHIP,
  BAILEY & TIPPENS, P.C.
100 North Broadway, Suite 1700
Oklahoma City, OK 73102-9211
Telephone:  (405) 232-0621
Facsimile:  (405) 232-9659
Emails:     eshephard@fellerssnider.com
             wbillings@fellerssnider.com
***Attorneys for Defendants***

## CERTIFICATE OF SERVICE

     I hereby certify that on July 24, 2020, I filed the attached document with the Clerk of the Court.  Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to those registered participants of the Electronic Case Filing System.

     */s/ C. Eric Shephard*
     C. Eric Shephard

#76981/847238



# EXPERT REPORT

Submitted to
C. Eric Shephard, Esq.
Fellers Snider, Attorneys At Law
100 North Broadway, Suite 1700
Oklahoma City, Oklahoma 73102-9211
Phone: (405) 232-0621


In the matter of
Dorret Francis et al. v. APEX USA, INC., et al.
USDC - Western District of Oklahoma, Case No. 18-cv-583-SLP


Prepared by:
The Human Trafficking Investigations & Training Institute, LLC
Post Office Box 504
Front Royal, Virginia 22630


Report Date: July 24, 2020


By
Greg H. Bristol
President of The Human Trafficking Investigations & Training Institute, LLC

Human Trafficking Investigation Report: Human Trafficking Expert

## Table of Contents

I.   BACKGROUND & QUALIFICATIONS ........................................................... 3

II.   SUMMARY OF OPINIONS ....................................................................... 4

III.  HUMAN TRAFFICKING OVERVIEW ......................................................... 5

IV.  CASE STUDY .......................................................................................... 7

V.   THE NAMED PLAINTIFFS' EXPERT ....................................................... 16

VI.  DISCUSSION & CONCLUSIONS ............................................................. 23

APPENDIX A - CURRICULUM VITAE ............................................................. 26

APPENDIX B - LIST OF MATERIALS REVIEWED .......................................... 32

APPENDIX C - FEE SCHEDULE ................................................................... 34

1. My name is Greg H. Bristol. I have been retained by Fellers Snider, the law firm that represents the Defendants in this case. I have been asked to provide opinions on the factual findings, opinions, and conclusions contained in the Named Plaintiffs' expert witness report, dated June 16, 2020.

2. I am a subject-matter expert in the fields of human trafficking criminal investigations and crime scene evidence collection to validate human trafficking findings in criminal courts.

3. My Curriculum Vitae is in Appendix A. A list of the materials that I have reviewed in this matter is in Appendix B. I am being compensated at my standard rates, which are listed in Appendix C.

4. I reserve the right to supplement or amend my opinions due to any further allegations, depositions, or expert reports that may occur after my report is submitted.

# I.   BACKGROUND & QUALIFICATIONS

5. I am a former Trooper with the Michigan State Police, a retired Federal Bureau of Investigation (FBI) Special Agent, and a former Special Agent with the Special Inspector General for Afghanistan Reconstruction (SIGAR). In my 34-year law enforcement career, I have investigated dozens of human trafficking cases in the United States, one in Afghanistan and one in Iraq. I have collected evidence in human trafficking criminal investigations, testified in grand jury proceedings that led to federal indictments, and arrested human traffickers.

6. I am currently the President of The Human Trafficking Investigations & Training Institute, LLC (HTITI), which is a Virginia company that provides law enforcement officers with advanced instructor-led classroom instructions on how to investigate human trafficking crimes.

7. I am currently a paid Department of Justice (DOJ), Office for Victims of Crime (OVC), Training & Technical Assistance Center (TTAC) human trafficking consultant. OVC TTAC provides training and technical assistance for victim service providers and allied professionals who serve crime victims.

8. I am currently an unpaid consultant working on a human trafficking online training project for the Massachusetts Institute of Technology's (MIT) Lincoln Library. MIT has a contract with the U.S. Department of Homeland Security (DHS) to develop that project.

## A.   Experience in Investigating Human Trafficking Crimes

9. From September 1987 through February 2010, I was a Special Agent with the FBI, assigned to its field office in Washington, D.C. My duties included foreign counterintelligence cases and public corruption investigations. I began investigating human trafficking crimes in 2006 after being assigned to an FBI Civil Rights Squad. That assignment built upon what was then my 28 years of state and federal law enforcement experience.

3

10. In 2007, I helped develop the D.C. Human Trafficking Task Force and Northern Virginia Human Trafficking Task Force to increase prosecutions of human traffickers.

11. In 2008, I started teaching human trafficking investigation methods to D.C. area law enforcement as a certified FBI Police Trainer. I also taught courses at the FBI Training Academy and the DOJ National Advocacy Center.

12. After I retired from the FBI in February 2010, I became a Special Agent with SIGAR to investigate complex contract fraud cases in Afghanistan, including forced labor cases on U.S. reconstruction contracts.

13. I have created three human trafficking online courses for a college, written five HTITI human trafficking investigation training courses, and taught 27 HTITI courses in 10 states. Since leaving the FBI, I have trained more than 600 law enforcement officers on how to identify human trafficking and given 49 HTITI human trafficking presentations, including at the United Nations Office on Drugs and Crime in Austria, and the U.S. Embassy in Egypt.

## II.  SUMMARY OF OPINIONS

14. While this case is only at the class certification stage, the current allegations and evidence in this case do not support a determination of class-wide or other human trafficking. If this case progresses to the merits stage, I reserve the right to provide further analysis in support of this opinion.

15. I have not found evidence to reasonably support the inference that any of the Defendants engaged in class-wide or other labor trafficking in this case.

16. Many of the opinions offered by the Named Plaintiffs' purported expert are flawed, improper, and subjective.

17. Migrant laborers often leave their home country and travel to the U.S. to make better wages, which can be arduous at times when it involves special visas, spending borrowed personal finances to travel, and misunderstandings of their contracts. However, those are not indicators of human trafficking of foreign nationals in the U.S. by Americans. The Named Plaintiffs' purported expert repeatedly conflates the experiences of migrant laborers in this case with the experiences of human trafficking victims identified by law enforcement agencies in criminal investigations.

18. Opinions asserted by the Named Plaintiffs' purported expert are subjective, and his views appear to be formulated by merely accepting the Named Plaintiffs' unsupported allegations and ignoring any countervailing evidence.

19. The individualized nature of the alleged human trafficking, which involves specifically overriding the unique will of individual victims, is not subject to a determination on a class or group-wide basis in this case, because the experiences and circumstances of each proposed Plaintiff are so uniquely specific to each individual.

20. The totality of the circumstances is critical when making a determination of human trafficking because often only a labor dispute is present with no force, fraud, or coercion involved. By contrast, it is inappropriate to ignore certain pieces of evidence

4

and rely instead on abstract presumptions or unsupported allegations, as the Named Plaintiffs' purported expert does.

# III.   HUMAN TRAFFICKING OVERVIEW

21. Human trafficking, also known as trafficking in persons or modern-day slavery, is a crime that involves compelling or coercing a person to provide labor or services, or to engage in commercial sex acts. The coercion can be subtle or overt, physical or psychological. The exploitation of a minor for commercial sex is human trafficking, regardless of whether any form of force, fraud, or coercion was used.[1]

22. Labor trafficking is defined as the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.[2]

23. On October 28, 2000, the U.S. Congress enacted the Victims of Trafficking and Violence Protection Act (TVPA), which set up formidable actions to combat trafficking in persons. Specifically:

   A. Coordinate and monitored anti-trafficking activities through an interagency task force;

   B. Prevent human trafficking through training, education, and public awareness campaigns;

   C. Protect human trafficking survivors by not detaining them, providing them with medical care, and protecting them and their families from revictimization; and

   D. Strengthening prosecution and punishment of human traffickers.

24. Throughout my career, I have investigated about 60 human trafficking cases while with the FBI. I have now trained approximately 1,000 law enforcement officers on how to identify the red flags of trafficking.[3] Through my research, experience, and review of federal and state prosecutions of human traffickers, I have identified some common themes in human trafficking cases. They include:

   A. Human trafficking victims are typically paid less than minimum wage if they are paid at all.

   B. If victims are "paid" by their trafficker, the trafficker will often maintain control of their money, through access to bank accounts or maintaining physical possession.

   C. Human trafficking victims usually are not paid overtime or increased wages for working longer than eight hours per day.

   D. Human trafficking victims are not typically afforded days off each week, given time off for vacations, or granted time off from work when they are sick.

---

[1] http://www.justice.gov/humantrafficking/what-is-human-trafficking.htm
[2] Title 22 U.S. Code, Section 7102(9))
[3] I trained approximately 400 while with the FBI and 600 post-FBI retirement.

E.  Human trafficking victims do not typically have an employment contract with their trafficker, but if they do the terms are typically not met or are agreed upon under duress.

F.  Human traffickers frequently recruit through coercion, fraud, or deception. For many traffickers, threats and force are only used intermittently to maintain compliance.

G.  Communication and transportation is often restricted by human traffickers when a victim is first recruited, but not necessarily after that.

H.  Human traffickers typically do not provide health insurance or facilitate government-provided health care to victims.

I.  If the human trafficking victim is a foreign national trying to enter the U.S., I have observed additional red flags, including:

    i.  If levied, recruitment or transportation fees are typically increased after arriving in the U.S.;

    ii.  If collected, recruitment or transportation fees are typically exorbitantly high when compared to fees levied for the recruitment and transportation of non-trafficked persons;

    iii.  If the human trafficking victim borrowed money to get to the U.S. from sources affiliated with the trafficker, the interest rates charged are typically high, to force the victim into a debt bondage situation. That arrangement is rarely outlined in a contract;

    iv.  Upon arriving in the U.S., transportation or identification documents are routinely confiscated from the victims and are never returned to the victims; and

    v.  Human traffickers tend to isolate the victims in the community in which they are living, avoiding contact with Americans who might try and rescue them.

25.  The National Human Trafficking Hotline provides information to the public on what human trafficking is and is not. Their website includes the following additional red flags of human trafficking:[4]

A.  The individual is not free to leave or come and go at will;

B.  High-security measures exist in the work and/or living locations (e.g., opaque windows, boarded up windows, and bars on windows);

C.  The individual is living and working on-site;

D.  The individual experiences verbal or physical abuse by their supervisor;

E.  The individual is not given proper safety equipment;

F.  The individual is forced to meet daily quotas;

---

[4] https://humantraffickinghotline.org/human-trafficking/recognizing-signs

Human Trafficking Investigation Report: Human Trafficking Expert

G. The individual is not allowed or able to speak for themselves;

H. The individual lacks knowledge of their whereabouts;

I. The individual tells scripted, confusing, or inconsistent stories; and

J. The individual protects the human trafficker who may be hurting them or minimizes abuse.

26. It is essential to consider the totality of the circumstances when making a determination of human trafficking. In contrast, it is inappropriate to ignore certain pieces of evidence and rely instead on abstract presumptions or unsupported allegations.

# IV.   CASE STUDY

27. The following opinions are based on the factual record available at this stage.  It is my understanding that this case is only at the class certification stage, and that merits discovery will not occur until later in the case.  Therefore, the merits-related opinions herein represent what my views would be based on the present record only. I reserve the right to modify, supplement, or otherwise change my views and conclusions once further discovery becomes available.

28. I am not a lawyer and do not purport to offer any legal conclusions. However, I am a subject matter expert in training law enforcement officers in identifying what is and is not human trafficking. Part of that expertise involves staying up to date on legal decisions that explain and apply the statutes that are the subject of my training courses. I therefore offer these opinions and analyses as highly material components of my expertise as a trainer of law enforcement officers and as a former FBI investigator of human trafficking.

29. The Named Plaintiffs brought this action on behalf of themselves and all other similarly situated, against the listed Defendants, and claimed that they are survivors of human trafficking. Defendants Carolyn and Walter Schumacher owned and operated several businesses in Clinton, Oklahoma, including two hotels, a large restaurant, and a waterpark.

30. The Named Plaintiffs allege that, in order to obtain cheap and easily exploited labor for these businesses, the Defendants engaged directly in a recruitment scheme overseas, whereby they induced foreign nationals to pay hefty fees to work under the J-1 work- and study-based visitor visa program through Defendant APEX USA, Inc. (APEX), the J-1 sponsor agency they controlled and operated. The Named Plaintiffs claim that, instead of the conditions that they were promised, they were transported to Oklahoma and forced to work under conditions that bore little resemblance to those to which they had agreed.

31. Specifically, the Named Plaintiffs claim:

A. Defendants created a scheme to use American visa programs to recruit foreign workers abroad and employ those workers as a pool of disposable and malleable labor at Defendants' businesses, which was part of a larger pattern and practice;

Human Trafficking Investigation Report: Human Trafficking Expert

B. Defendants exploited the role of APEX as a sponsor in the J-1 program to recruit and obtain the services of workers from abroad until December 31, 2013;

C. Defendants' overseas recruiting agents defrauded the Named Plaintiffs and other proposed class members, inducing them to pay substantial fees for recruitment, immigration processing, and travel with promises of full-time, good-paying jobs and suitable housing;

D. After the Named Plaintiffs arrived in Oklahoma, Defendants caused them to believe that if they did not work exclusively for Defendants, they would suffer abuse of the legal process and/or serious financial and/or reputational harms;

E. Defendants' schedule was designed to make the Named Plaintiffs and other proposed class members afraid, intimidated, and powerless to leave Defendants' employment;

F. Upon the Named Plaintiffs' arrival in the U.S., Defendants blatantly disregarded the terms of employment they had promised and required the Named Plaintiffs to labor under Defendants' imposed terms and conditions;

G. Specifically, the Named Plaintiffs' hourly wage rates were significantly reduced from what they had been promised and agreed to. Defendants failed to provide full-time employment as promised, and/or conspired to prevent the Named Plaintiffs from obtaining additional work from other employers;

H. Defendants failed to provide the Named Plaintiffs with affordable and suitable housing, and charged them significant fees for overcrowded, decrepit company-owned housing and/or referred them to crowded and costly motel-room accommodations; and

I. Defendants intentionally created a situation where the Named Plaintiffs were working few hours for little pay and barely earning enough to survive, let alone leave Oklahoma and return home. The Named Plaintiffs also claim they were not able to repay the loans they had taken to cover the thousands of dollars' worth of recruitment fees and travel expenses that they had been induced to pay. This left the Named Plaintiffs with no choice but to labor for Defendants on Defendants' terms.

32. The Named Plaintiffs bring this action to recover damages on behalf of themselves who worked for Defendants in Oklahoma between June 15, 2008, and December 31, 2013 (the "Relevant Time Period").

33. The allegations and evidence in this case are not consistent with the allegations and evidence in human trafficking case law involving similar industries.

## A.    United States v. Farrell

Human Trafficking Investigation Report: Human Trafficking Expert

34. In a criminal capacity, common red flags of human trafficking at motels and hotels are evidenced in the case of United States v. Farrell (the "Farrell Case"):[5]

> Robert John Farrell and his wife, Angelita Farrell, owned a Comfort Inn & Suites hotel in Oacoma, South Dakota. In 2007, a federal jury convicted the Farrells after hearing from four victims who had been held in involuntary servitude by the Farrells. After committing visa fraud to bring Philippine workers into the United States, the Farrells then enslaved the workers to perform cleaning and front desk duties at their hotel. During the trial, the victims described how the Farrells controlled every aspect of the victims' lives, including what they ate, where they lived, and the hours they worked.
>
> The victims regularly described working 16 to 18-hour days. When they finished their duties at the defendants' hotel, the victims were then expected to work a second job at local fast-food restaurants. One victim testified that she tried to join a Christmas choir, but the defendants told her that her first duty was to pay them back and that she could not spare two hours a week for choir practice.
>
> The Farrells hid their activities by issuing the victims paychecks, which the Farrells then required the victims to endorse and return to the Farrells. The victims testified that they had hoped to send money back to their children and families in the Philippines.
>
> The jury also heard evidence that the Farrells tried to isolate the victims and prevent them from meeting people who might have helped them escape. The Farrells required the Philippine victims to attend late-night debt meetings that lasted into the early morning hours. At the meetings, the Farrells would yell at the workers and berate them for their ungratefulness for all the Farrells had done to "help" them.
>
> Other facts in the Farrell Case include the following:
>
> - The victims entered the United States with H-2B visas;
>
> - The victims were promised 40 hours a week at $6.05 hour, but were paid roughly half of what they were promised;
>
> - The victims signed debt contracts;
>
> - The victims handed over upwards of 90% of their earnings to the Farrells;
>
> - When the victims arrived in South Dakota, their passports and visas were confiscated by the Farrells;
>
> - The Farrells housed nine workers in a rented two-room house; and

---

[5] 3:07-cr-30019-CBK

- The Farrells used threats of deportation and legal sanction as a primary means of controlling the workers.

35. When I teach HTITI's Advanced Law Enforcement Human Trafficking Investigator course, I spend about 30 minutes on the Farrell Case, because it is a classic case of labor trafficking at motels and hotels. The HTITI course manual has four pages on the Farrell Case, and my classroom PowerPoint presentation consists of 61 slides.

36. The human trafficking red flags and evidence seen in the Farrell Case are not consistent with the allegations and evidence in this case for a variety of reasons, including but not limited to those highlighted in Table 1.

| Table 1 (Human Trafficking Red Flags in the Farrell Case) | | |
|---|---|---|
| **Red Flag(s)** | **Farrell Facts** | **Current Case Information** |
| Berated | The Farrells yelled at victims and berated them. | Not reported in this case. |
| Community | The Farrells tried to isolate victims from meeting people. | Not reported in this case. |
| Debt Meeting | The Farrells had late-night debt meetings that victims had to attend. | Not reported in this case. |
| Debt Prioritization | The Farrells instituted a debt plan for all victims to follow. | Not reported in this case. |
| Demeanor | A local stated that victims seemed terrified of the Farrells. | Not reported in this case. |
| Deportation | The Farrells threatened deportation. | Rumors of deportation. |
| DHS I-129 Petition (H-2B) | The Farrell were obligated to pay $1,200 to process the I-129. Farrell charged each victim $1,200. | Not reported in this case. |
| Documents & Identification | Victim's passport & visa seized upon their arriving at the airport. | Not reported in this case. |
| Fleeing | The Farrell stated: "I will find you." | Not reported in this case. |
| Free Time | The victims had little free time. | Not reported in this case. |
| Hours (After Shift) | The victims were expected to work a second job. | Not reported in this case. |
| Hours (Scheduled) | The victims were promised 40 hours but worked 16-18 hour days. | No long daily hours reported in this case. |
| Income | 90% of their income went to the Farrells. | Not reported in this case. |
| Indictment | There were 27 criminal counts.[6] . | No criminal indictments in this case. |
| Incoming Mail | First opened by the Farrells. | Not reported in this case. |
| Movement | Victims were not permitted to leave the apartment. | Not reported in this case. |

---

[6] Document Servitude, False Statements, Force Labor, Forced Labor - Conspiracy, Harboring, Immigration Violation - Conspiracy, Peonage, Peonage - Conspiracy, Trafficking Into Servitude, Visa Fraud

Human Trafficking Investigation Report: Human Trafficking Expert

| Outside Job | The Farrells required it, but the visa prohibited it. | Defendants did not require it. |
|---|---|---|
| Pay Checks | The victims endorsed and returned checks to a Farrell. | Not reported in this case. |
| Promissory Note | The victims were required to sign one their first week ($3,300). | Not reported in this case. |
| Reprimands | There were known reprimands for disobeying rules. | Not reported in this case. |
| Salary | The victims received half of what they were promised. | Not reported in this case. |
| Salary (Hourly) | The victims were promised an hourly wage of $6.05 (did not receive). | Defendants used a different calculation but made payment. |
| Salary (OT) | Promised holiday & OT but did not receive it. | No promised holiday or OT $ in this case. |
| Sleeping | Nine workers lived in a rented two-bedroom house. | Various living choices offered to Plaintiffs. |
| Social Time | Victims were told that their first duty was to pay back their debts. | Not reported in this case. |
| Transportation Funds | Victims were promised to and from $ (not provided). | Named Plaintiffs claimed it was promised; Defendants state that they did not. |

37. Not only do the allegations and evidence in this case fall short of the level of trafficking in a criminal capacity, but they are also below the threshold required to support a claim for civil human trafficking arising out of "wage and hour law" violations on a class-wide or other basis. For example, in Juana Sierra Trejo, et al. v. Broadway Plaza Hotel:[7]

> "Defendants, a hotel and its management hired the five victims to clean hotel rooms. Defendants told the victims that their work would entail cleaning rooms for 8-hours per day, six days per week and that the victims would receive roughly $250 per week. However, once employed, the victims were regularly required to work seven days per week, often for 15 hours per day. They were denied any meal or bathroom breaks during working hours. After working hours, the victims were often required to clean Defendant's homes and assist Defendants with miscellaneous errands. The victims were never compensated for any overtime work. The victims were denied time off, sexually harassed, verbally abused, and threatened with deportation. The parties settled the case."

| Table 2 (Human Trafficking Red Flags in The Trejo Case) | | |
|---|---|---|
| Red Flag(s) | U.S. v. Trejo Facts | Current Case Information |
| Breaks | Victims worked without breaks. | Not reported in this case. |
| Deportation | Victims were threatened with deportation if work was refused. | Not reported in this case. |

---

[7] 1:04-cv-04005-LTC (USDC Southern District of New York)

Human Trafficking Investigation Report: Human Trafficking Expert

| Food | Victims were denied permission to eat, drink or use the restrooms. | Not reported in this case. |
|---|---|---|
| Hours | Victims worked 8 hours per day, six days per week, with some 15 hours a day. | Not reported in this case. |
| Income | $250 per week, less than minimum wage. | Payroll records do not reflect this. |
| Overtime | Victims were never paid overtime (OT) for their work. | Defendant reports that they did pay OT.[8] |
| Private Homes | Some victims were required to clean the homes of hotel management without pay. | Not reported in this case. |
| Sexual Harassment | Victims were sexually harassed by a hotel manager. | Not reported in this case. |
| Time Off | Victims denied. | Not reported in this case. |
| Verbal Abuse | Victims were verbally abused. | Not reported in this case. |

38.  During my FBI and teaching career, I have investigated dozens of human trafficking cases, trained hundreds of police officers on how to investigate allegations of human trafficking and followed the prosecutions of human traffickers yearly by reviewing court documents. Based on this experience, I can and will confidently opine that the allegations and evidence in this case do not support a determination of human trafficking on a class-wide (or other) basis because:

A.  There are no indications that Defendants berated the Named Plaintiffs or other proposed class members, which is often seen during incidents of labor trafficking.

B.  There are no indications that Defendants isolated the Named Plaintiffs or other proposed class members, which is often seen during incidents of labor trafficking.

C.  There are no indications that Defendants managed debts of the Named Plaintiffs or other proposed class members, which is often seen during incidents of labor trafficking.

D.  There are no indications that the Named Plaintiffs or other proposed class members were in fear of Defendants, which is often seen during incidents of labor trafficking.

E.  Other than unsubstantiated rumors, there are no indications that Defendants threatened to deport the Named Plaintiffs or other proposed class members.

F.  The permit or application fees requested by defendants or required by the U.S. government or the applicants home country, appear to be reasonable and not excessive.

---

[8] Defendant W. Schumacher stated in his deposition dated March 4, 2020 that in one year at Montana Mike's restaurant, they paid out $81,000 in overtime (OT). In regard to a U.S. Department of Labor (DOL) payroll review that concluded some OT was not paid, W. Schumacher stated that in some instances DOL was flat wrong. Payroll records were not reviewed in detail by this writer, and no further conclusion is made on whether or not required OT was paid by Defendants.

Human Trafficking Investigation Report: Human Trafficking Expert

G. There are no indications that Defendants seized any Named Plaintiff's passport or visa upon their arrival at the airport in Oklahoma, which is often seen during incidents of labor trafficking.

H. There are no indications that after any Named Plaintiff's coworker "absconded" or quit employment, a search was started for that former employee for purposes of "bringing them back," which is occasionally seen during incidents of labor trafficking.

I. There are no indications that the Named Plaintiffs or other proposed class members had little free time when not working, which is often seen during incidents of labor trafficking.

J. There are no indications that the Named Plaintiffs or other proposed class members were forced to work a second job, which is often seen during incidents of labor trafficking.

K. There are no indications that the Named Plaintiffs or other proposed class members were forced or ordered to work 15-18 hour workdays each week, which is often seen during incidents of labor trafficking.

L. There are no indications that the Named Plaintiffs or other proposed class members had to "turn over" their paychecks to the defendants on payday, resulting in them having little or no money, which is often seen during incidents of labor trafficking.

M. There are no indications that the Named Plaintiffs' incoming U.S. mail was first opened by Defendants, which is occasionally seen during incidents of labor trafficking.

N. There are no indications that the Named Plaintiffs or other proposed class members had to sign a promissory note for money they borrowed from their employer, which is often seen during incidents of labor trafficking.

O. There are no indications that the Named Plaintiffs or other proposed class members were reprimanded for disobeying a rule posted by Defendants, which is often seen during incidents of labor trafficking.

P. There are no indications that the Named Plaintiffs or other proposed class members were not paid the amount promised; however, there are indicators that, on occasion, Defendants may not have explained hourly salaries and calculations in detailed fashion.[9]

Q. There are no indicators that plaintiffs were promised holiday and overtime pay, and then did not receive it (but still had to work holidays or OT), which is often seen during incidents of labor trafficking.

---

[9] In some of the employee files I have reviewed, there are notations where a new employee is told that they will be earning $2.13 per hour, plus tips. The $2.13 per hour appears to be the federal minimum wage for tipped employees, and when tips are added to it, it rises to the federal minimum wage. It appears that this calculation method may not have been explained fully by Defendants prior to the potential applicants' travels to the U.S.

13

R. There are no indicators that plaintiffs were promised in writing reimbursement for all transportation costs to and from Oklahoma, and any such representations by "recruiters" overseas (if any were made) were unbeknownst to defendants.[10]

39. The Named Plaintiffs claim that Defendants created a scheme that included paying visa holders less than what was promised and what federal law mandated. I have reviewed the depositions of Anthony Kennedy and Christine Pearce, as well at least six affidavits or statements from other former J-1 participants who worked for Defendants and are within the proposed class definition. I offer the following insight into these payroll issues: human traffickers who are engaged in labor trafficking pay little or nothing to the people they are exploiting.

40. In my review of the 2020 Affidavit of Frank Joseph (a proposed class member), he states that he worked at Montana Mike's in Clinton, Oklahoma from 2008 to 2010, under the J-1 program. He says that the fees for the program were disclosed to him from the beginning, and he was aware that it was his responsibility to pay for his for travel costs to and from the United States as well as his food and housing costs after he arrived. He did not have to borrow money to cover any of his recruitment, application, or travel expenses and paid for them himself in one payment. He states that he was promised and given full-time work with good pay and started out making minimum wage; however, his hourly wage was later raised, and he also earned overtime (OT). While in the U.S., he lived in what he described as a "beautiful" 4-bedroom home where everyone had their own bed, at a reasonable cost of only $200 per person per month. He never felt afraid, intimidated, or powerless to leave the one business he worked for, which was Montana Mike's. He also made enough money to send approximately $1,000 home every month from his earnings at Montana Mike's. He was never threatened by anyone and was never told by W. Schumacher that W. Schumacher carried a firearm in his vehicle or was formerly a deputy sheriff (although he was aware of the latter through other employees). His experience is inconsistent with someone employed by a human trafficker employer.

41. In my review of the 2020 Affidavit of Swapnil Shukla (a proposed class member), he states that he worked primarily at Montana Mike's in Clinton, Oklahoma, under the J-1 program. Like Mr. Joseph, Mr. Shukla did not have to borrow money to pay for his J-1 related expenses and always knew that he was going to have to pay for his own airfare, accommodations, and food. He stated that his typical work involved eight-hour shifts, five or six days per week, which is what he expected, and he earned between $7.00 and $8.00 per hour. He lived in a fully-furnished 3-bedroom apartment with very low rent and enjoyed his housing "a lot." He never felt afraid to leave his job and seemingly enjoyed his cultural experiences in the U.S. while he was here. He was never threatened by the Schumachers or anyone else and was

---

[10] In Defendant W. Schumacher's deposition dated March 4, 2020, he stated that he did not have contracts with recruiters, but did meet with them to determine if they ran programs honestly. He stated that he did not review their financial records, because the U.S. Department of State did not require that.

Human Trafficking Investigation Report: Human Trafficking Expert

not told that W. Schumacher carried a firearm in his car.  His experience is inconsistent with someone employed by a human trafficker employer.

42.    In my review of the 2020 Affidavit of Anil Amin (a proposed class member), he states that he worked at Montana Mike's (solely) in Clinton, Oklahoma from 2011 to 2012 under the J-1 program. He says that the fees involved to work here were disclosed to him in his home country, and they indicated that he was responsible for his travel expense to and from the United States. Like Messrs. Joseph and Shukla, he did not have to borrow money to cover any recruitment, application, or travel expenses, as his parents paid for them.  He also understood that his food, transportation, and living expenses were his responsibility.  He lived in a 2-bedroom apartment wherein $500/month rent was split 3-4 ways depending on how many roommates he had at the time.  He states that he was promised and given full-time work with good pay, and he earned the minimum wage of $7.25 while working for Montana Mike's. He added that he often worked more than 40 hours per week if he wanted to.  He also made enough money to send money home on a monthly basis and was never told that W. Schumacher carried a firearm in his car.  He was never threatened with physical restraint and has used what he learned from his experience to open and operate two restaurants in Alberta, Canada.  He described his time in Clinton, Oklahoma as "one of the best times of [his] life."  His experience is inconsistent with someone employed by a human trafficker employer.

43.    In my review of the 2020 Statement[11] from Manesha Kolhapuray (a proposed class member), she states that she worked twice for Defendants, first between 2008-09 at Montana Mike's under the J-1 program as a hostess and waitress, and then between 2009-10 at Montana Mike's under the J-1 program as a certified trainer and front office person. She states that she worked eight-hour shifts, and five days a week, which is what she expected.  She also worked some at the Clinton Hampton Inn because she wanted to learn about the hotel business but did not work for anyone else.  She says that she was paid at least the minimum wage, which she thought was good, and it met her expectations. She understood that she was responsible for food, transportation, and living expenses and lived at two different houses in Clinton, Oklahoma while she was there.  She described the houses as "awesome" and "like a dream home," and she even lived with Named Plaintiff Dorret Francis, who she described as a "happy" person that "never complained of any problems" as far as she remembered.  She did not have to borrow money to cover any recruitment, application, or travel expenses, as her parents paid for them.  She got the job she was promised and never felt afraid, intimidated, or powerless to leave it, and she was never threatened or forced in any way at all. Like the other individuals referenced herein, she was also able send money home from her earnings.  She was never told W. Schumacher carried a firearm in his car and was never afraid of or intimidated by the Schumachers.  She even described the Schumachers are

---

[11] Ms. Kolhapuray's last name was formerly Deshpande.  She was interviewed for purposes of this report, and a draft of her statement has been sent to her for approval.  My comments here are based on that draft, which is obviously subject to any changes Ms. Kolhapuray may make.

"really nice and helpful people" that "never wronged us and were always helpful and understanding." Her experience is inconsistent with someone employed by a human trafficker employer.

44. In my review of the 2020 Statement[12] of Nilesh Kadbhane (a proposed class member), he states that he worked primarily for Montana Mike's in Clinton, Oklahoma from 2008 to 2009 and 2009 to 2010 on two separate J-1 visas. He also worked a small amount of time as a room attendant at the Clinton Hampton Inn but did not work anywhere else. His J-1 fees were disclosed up front, and he always knew he would have to pay for his own airfare, food, and living expenses, but W. Schumacher actually voluntarily paid for Mr. Kadbhane's last-minute return airfare to India in April 2009 after his father had a heart attack. Like the other individuals above, he did not have to borrow money to cover any recruitment, application, or travel expenses. He was promised and given full time work with good pay and never even looked for a second job because, in his eyes, he did not need to given what he was making. He never felt afraid, intimidated, or powerless to leave his employment and sent a considerable amount of money home from his earnings. He was never physically threatened by anyone and never feared physical or other harm. He was also never told that W. Schumacher carried a firearm in his car. His experience is inconsistent with someone employed by a human trafficker employer.

45. In my review of the 2020 Statement of Soniya Lipihande (a proposed class member), she states that she worked at the Clinton Hampton Inn (solely) between 2010 and 2011 under the J-1 program, first as a front office agent, and later as the night manager. She states that she worked eight-hour shifts, five days a week, and was paid minimum wage. She says that she was interviewed in India by Defendant W. Schumacher, and the application fees were disclosed to her from the beginning. She notes that she was aware that she would be responsible for her travel to and from the United States along with her food and living expenses, and her actual pay was what she was promised. Like the other individuals noted above, she did not have to borrow any money to cover any recruitment, application, or travel expenses, as her parents paid those expenses. She lived in a 2-bedroom apartment with another J-1 visa holder wherein $500/month rent was split two ways. She never felt afraid, intimidated, or powerless to leave her employment and was able to send home approximately $8,000-$9,000 from her earnings. W. Schumacher never told her he carried a firearm in his car, and she was never threatened with physical or other restraint. She described the Schumachers as a "family" to her and characterized her experience as a "home away from home." Her experience is inconsistent with someone employed by a human trafficker employer.

## V.    THE NAMED PLAINTIFFS' EXPERT

46. Many of the opinions asserted by the Named Plaintiffs' Expert Luis C. deBaca are improper and subjective. Mr. deBaca's views appear to be formulated by simply

---

[12] Like Ms. Kolhapuray, Mr. Kadbhane was interviewed for purposes of this report, and a draft of his statement has been sent to him for approval. My comments here are based on that draft, subject to any changes Mr. Kadbhane may make.

accepting the Named Plaintiffs' unsupported allegations and ignoring countervailing evidence or summarily rejecting it as false or unreliable. Mr. deBaca inappropriately attempts to draw parallels between the current litigation and actual human trafficking cases through critical omissions of fact (See Table 3).

47. For example, on page nine of his expert witness report, Mr. deBaca lists "trends" that he claims to have identified through his experience and education, including:

   A. Breach of contract;

   B. Imbalances of power between guest-workers, recruiters, and their sponsoring employers;

   C. Overt threats and violence;

   D. The particular vulnerabilities of workers on guest-worker visas in the U.S. and other countries;

   E. The effects on foreign workers of both explicit threats and more subtle reminders of the potential for law enforcement or deportation;

   F. The effect of State power and political corruption on workers' willingness to come forward; and

   G. Withholding of contracts, or substitution of contracts during the recruitment or transportation phases.

48. Mr. deBaca does not cite any research to support these trends, which appear to have been strategically crafted to parallel the allegations in this case and coincidentally omits "trends" that are inconsistent with the claims of this case. For example, Mr. deBaca does not mention:

   A. Victims who are forced to meet daily quotas (e.g., cleaning five motel rooms per hour for ten hours);

   B. Leveraging of pre-existing debt or recruitment fees;

   C. Levying additional debts in the workplace (the "company store");

   D. Physical isolation and control of movement;

   E. The holding of passports or other identification documents;

   F. Unsafe work conditions, and

   G. Victims who live and work at the same location.

49. It has been my understanding after attending DOJ and FBI human trafficking training courses and conferences that the term "trends in human trafficking" usually means a general direction in which something is developing or changing. In HTITI's course "Advanced Law Enforcement Human Trafficking Investigator," I wrote a chapter in the course manual called "Trends and Issues," and discuss topics that have recently (less than a year or two) been seen in human trafficking cases, such as street gangs getting involved in sex trafficking, sex tourism advertisements, and trafficking in persons for the purpose of organ removal. Those topics are things that I did not often see 10 years ago.

50. Mr. deBaca also inappropriately attempts to draw parallels between the current litigation and actual human trafficking cases through critical omissions of fact, as summarized in Table 3:

| Table 3 (Prosecutions Cited by deBaca) | | |
|---|---|---|
| Case Name | deBaca Summary | Objective Summary of Facts |
| U.S. v. Bradley | P14 (Forced labor through threats of immigration consequences. He says Bradley is illustrative in the instant case. | Bradley promised $15-20/hour<br>Bradley seized passports<br>Workers paid $7 hour & injured<br>Bradley charged with 21 criminal counts<br>Case vacated on Booker grounds. |
| U.S. v. Djoumessi | P14 (Instances where a servant's burden may have been lifted do not shield their tormenters from liability.) | A 14-year old girl entered the U.S. with a false name and a fraudulent passport. She worked every day 6 AM to 10 PM.<br>No compensation, girl kept in a basement. A girl was beaten and sexually abused. A person was charged & convicted of involuntary servitude. |
| U.S. v. Pipkins | P15 (Involuntary servitude can be for any term of time.) | 265-count indictment for prostituting juvenile females, convicted of RICO violation. Endless false promises, physical violence, financial control. |
| U.S. v. Kozminski | P 13 (The Supreme Court noted that the particular vulnerabilities of a child or immigrant victim should be considered in assessing whether their will was overborne, and the TVPA, which through the enactment of Section 1589 clarified that service can be proven involuntary if it is obtained or maintained through psychological manipulation, threats of deportation, and other subtle forms of coercion.) | Victims worked on defendants' dairy farm seven days a week, up to seventeen hours a day, and were paid very little if anything. The victims suffered psychological, physical, and verbal abuse at the hands of defendants and were deprived medical care. |

Human Trafficking Investigation Report: Human Trafficking Expert

| U.S. Alzanki | P14 (The effect of defendant's threats to or abuse of third parties is creating a climate of fear.) | The victim was a domestic servant at the household of the defendant's family in Kuwait. The family kept her from leaving and held on to her passport. She was later sent to the Massachusetts residence of defendant and his wife. After she arrived, defendant took away the victim's passport. The victim was told by the defendant that she would be shot by the police if she left the residence or even went out onto the balcony. She was physically abused on at least two occasions, was denied dental treatment and later food, and was not provided protection from the household chemicals with which she was forced to clean. She remained at the defendant's residence for four months and was supposedly paid $120 per month. |
|---|---|---|
| U.S. v. Booker | P14 (Defendants' creation or taking advantage of a climate of fear that permeated a workforce.) | One defendant owned a migrant camp, and the other two defendants were lieutenants at the camp. Workers were brought to the camp being promised stead work and pay but were forced to pay off "debts" before being allowed to leave. Defendants withheld wages from workers and threatened them with violence. The victims left the camp to buy personal items and were picked up by two of the defendants, who severely beat them and brought them back to the camp. Victims were told they would be beaten or killed if they tried to leave again. Representatives of Farm Workers' Legal Services arrived and drove the victims away from the camp. One defendant was sentenced to 10 years in prison, and another was sentenced to five years. The appellate court upheld the judgment. |

Human Trafficking Investigation Report: Human Trafficking Expert

| U.S. v. Harris | P14 (Defendants' creation or taking advantage of a climate of fear that permeated a workforce.) | Victims were recruited by methods ranging from deception to kidnapping. Costs for food and drink were deducted from their wages, and although the laborers were supposed to be paid every two weeks, the evidence showed that they only received $5.00 each on payday. |
| --- | --- | --- |
| | | The evidence also showed that workers were guarded at night, and any who tried to flee were picked up and returned by Harris or others. There was proof of actual and threatened physical violence to prevent workers from leaving or to force them to work faster. A house, called the "jail," was used to confine workers who had tried to run away. Harris and Dennis Warren each carried a piece of rubber hose and beat laborers with them. Workers who complained of illness or injuries were denied medical assistance. |
| U.S. v. Bibbs | P14 (The lack of an affirmative duty to escape on the part of a victim.) | In November 1975, defendant Bibbs hired victims Richard Lee Brown and Charles Vonzell Brown in Salisbury, North Carolina, promising them that they would be returned to Salisbury in a few days. The Browns quickly became indebted to Ivory Lee Wilson, and they attempted to leave his employ approximately nine days after they began working for him. Defendants William Bibbs and Ivory Lee Wilson stopped the Browns with a gun. Wilson threatened to kill them and told them that they could not leave until they paid their debts. When Richard Lee Brown attempted to escape again with victim Elliot Johnson, Rosco Wilson found them and had Bibbs and another man beat them. Although Brown suffered internal injuries in the beating, Ivory Lee Wilson forced him to work the next morning. Brown rode to the fields with the other workers, including Charles Vanzell Brown, and told them he had been beaten for attempting to escape. The Browns testified that they remained in Ivory Lee Wilson's employ because they feared for their lives. |

| U.S. v. Calimlim | P14 (Warnings of the possibility of arrest or deportation are not valid warnings of legitimate consequences but are a misuse of the legal process for the employers' own ends.) | In 1985, wealthy Filipino doctors, Jefferson and Elnora Calimlim, brought I.M. from the Philippines to their home to work as their housekeeper. Upon arrival, the Calimlims confiscated I.M.'s passport and other documents. I.M. was 19-years old at the time. During her 19-years of service, the Calimlims forbade I.M. to leave the house unescorted; required her to lock herself in her bedroom when guests were in the house; refused to allow her to have friends; refused to allow her to attend a church of her choice or engage in church social activities; denied her necessary medical and dental care; failed to pay her a salary, and paid her parents a total of about $20,000; and restricted I.M. 's contact and communications with her family in the Philippines. I.M. worked for the Calimlims seven days a week, on average 17 hours a day. The Calimlims coerced I.M. to work through an elaborate scheme which included her total isolation from society and her family; repeated lies about her immigration status; and continuous threats that I.M. would be arrested, jailed, and deported if anyone discovered her.<br><br>After receiving an anonymous tip concerning the Calimlims, federal agents raided their home on 29 September 2004.  I.M. was found in the basement shaking. |
| --- | --- | --- |

51.  Mr. deBaca concludes that one of the issues that needs to be examined in a forced labor claim is how the structural circumstances and direct actions compel labor, and he claims the Named Plaintiffs were in an overarching recruitment and employment scheme controlled in its various aspects by the Defendants. That could not be further from the truth. Defendants were approved by the federal government to participate in the J-1 program, and they followed government policies on how to manage that program as a sponsor.

52.  There are examples in employee files disclosed to Mr. deBaca as well as affidavits and statements of J-1 employees that I have reviewed which reveal that the subject employees' wages exceeded minimum wage and that the employees received what they were promised (see the above-referenced summaries of affidavits/statements from Frank Joseph, Anil Amin, Manesha Kolhapuray, Soniya Lipihande, Nilesh Kadghbane, and Swanpil Shukla, all of whom are proposed class members).  Mr. deBaca, on the other hand, does not cite or mention any specific instance (whether

21

in the form of deposition testimony, personnel files, or otherwise) where any given Named Plaintiff or proposed class member received something less than they were promised.

53. Mr. deBaca also fails to account for the uniquely individualized facts and circumstances that are relevant to a trafficking determination. It is highly inappropriate to paint all J-1 visa workers with the same brush or to treat them as some homogenous group even if they are employed by a collective group of companies owned by the same individuals. The facts indicate a wide variety of experiences and circumstances experienced by the Named Plaintiffs, making even their respective cases incapable of uniform treatment. For example:

    a. Contrary to the Named Plaintiffs' allegations that they and the proposed class were uniformly promised free airfare, food, or housing, Named Plaintiffs Christine Pearce and Anthony Kennedy both understood that these costs were their responsibility (or at least had documentation showing that was the case). Kennedy Depo. at pp. 48:18-49:7, 68:19-23, 87:18-88:8, 140:6-14, 261:8-262:2; Pearce Depo. at pp. 32:1-33:8, 36:16-37:8.

    b. Contrary to the typical human trafficking trend where workers are harmed if they do not follow the rules, Named Plaintiff Christine Pearce testified that no one threatened her with violence and that she was never sexually harassed. Pearce Depo. at pp. 105:16-109:6, 148:4-6. She was also never physically restrained by being tied up, locked in a room, confined in a facility, etc. Id. at pp. 199:19-201:3. When asked, she could not explain how she was allegedly prevented from leaving her employment with anyone. Id. at 206:4-209:14. She also never heard W. Schumacher say anything about sending someone home "in a box." Id. at 74:9-76:7.

    c. Named Plaintiffs Anthony Kennedy and Christine Pearce were never told that W. Schumacher carried a firearm in his car. Kennedy Depo. at pp. 250:16-251:12; Pearce Depo. at p. 74:9-76:7.

    d. Named Plaintiff Anthony Kennedy was sponsored by Defendant Apex USA, Inc. in the J-1 program multiple times, including one prior occasion as an employee of Bar-S in Clinton, Oklahoma. He even recruited other students in Jamaica for Apex sponsorships. However, his only complaint in this case concerns his J-1 visit in 2012. Kennedy Depo. at pp. 10:4-22, 60:13-61:23, 215:4-10. But he testified that he had no complaints whatsoever about the hours worked or wages paid for numerous pay periods in 2012 and acknowledged that he was routinely given full-time employment at the wage rate he had agreed upon in 2012 offer letter. Id. at 161:16-198:5, 202:8-203:6. He was also regularly given the opportunity to work overtime while employed at the Clinton Holiday Inn and believed he left his employment with that business on good terms. Id. at 203:12-18. After he completed his 2012 participation in the J-1 program (the only time period he takes issue with in this case), he was willing to return to Clinton, Oklahoma on another Apex-sponsored J-1 visa if he was eligible and could find a "better-paying place with better terms." Id. at 233:15-18.

    e. Like Named Plaintiff Christine Pearce and the proposed class members referenced above (Joseph, Amin, Shukla, Kadghbane, Lipihande and

Kolhapuray), Named Plaintiff Anthony Kennedy was never physically restrained or threatened by the Defendants in 2012. Kennedy Depo. at pp. 257:25-258:5.

f.  Although Christine Pearce borrowed money from friends and family to cover her J-1 related costs, she has never been threatened if she did not repay those loans. Pearce Depo. at pp. 27:18-31:3.

These factual nuances demonstrate why uniform treatment of the unique experiences of alleged human trafficking victims is inconsistent with the design and purpose of the TVPA and TVPRA. Common examples of such factual nuances include different employment terms (job titles, wages, hours, etc.), different employers, different working/living conditions, and differing disciplinary treatment. *See, e.g., Panwar v. Access Therapies,* 2015 WL 329013 (S.D. Ind. Jan. 22, 2015) (denying class certification of TVPA claims because common questions did not predominate the entire proposed class of foreign workers).

# VI.  DISCUSSION & CONCLUSIONS

54.  The Named Plaintiffs claim that their action is brought by survivors of human trafficking; however, there has been no evidence shown that a U.S. agency has certified the Named Plaintiffs or any proposed class member as human trafficking victims. A foreign national adult victim of human trafficking is eligible for federal and state benefits and services to the same extent as a refugee upon issuance of a letter of certification by the U.S. Department of Health and Human Services (HHS). HHS issues a Certification Letter after notification from DHS granting a person Continued Presence, or a T visa, or that a bona fide T visa application has not been denied.[13] I have not seen any mention during my review of documents or a search of public news stories that DHS or HHS have considered the three plaintiffs to be victims of a severe form of human trafficking, or that they have been issued a T visa.

55.  The Named Plaintiffs claim Defendants created a recruitment scheme overseas, whereby they induced foreign nationals to pay hefty fees to work under the J-1 visa program. A review of the facts, in this case, show the fees involved are not "hefty" per se. Apex USA, Inc. followed the J-1 sponsorship rules on what they could or could not charge. It should be noted that the U.S. and foreign countries where the J-1 applicants live also charged the Named Plaintiffs' fees (e.g., the U.S. Embassy interview fee).

56.  In Defendant W. Schumacher's deposition dated March 4, 2020 he stated that he never heard about an overseas recruiter asking for additional recruiting fees over the collected program fee, a fact not mentioned by the Named Plaintiffs' purported expert witness. W. Schumacher stated that they paid $100 to $200 to a recruiter for their services.

57.  W. Schumacher also stated that they followed government rules on how to use recruiters, and he would make the decision on which applicant to select, not the

---

[13] Title 22, U.S. Code, Section 7105

recruiter. He said that he looked for honest, above-board recruiting companies and would meet with them before using them.

58. The Named Plaintiffs claim that they were promised full-time work with good pay and long-term work potential, but instead, they were forced to work under conditions that carried little resemblances to those to which they had agreed. A review of the facts shows the hours applicants were offered were consistent with what they received, and the prevailing minimum wage in Oklahoma was paid when tips were included in their wage calculation. I am not addressing situations where a newly arrived person did not want to work, or freely left employment on their terms for whatever reason after being in Oklahoma for a short period.

59. A review of depositions in this case reveals some Named Plaintiffs admitted to different interpretations of working conditions. For example, Named Plaintiff Christine Pearce stated when she arrived in Oklahoma, she was placed into a motel, but that is not what she was expecting. She said that she could not cook in a motel, and if she could not cook, that was "not housing." Pearce Depo. at pp. 202:2-203:3.

60. Named Plaintiff Christine Pearce also stated that her employee handbook did discuss what type of housing would be provided, but she may have overlooked that because she went through it too fast. She added, "I can't blame APEX for that, and I can't blame the Schumachers for that."  Pearce Depo. at pp. 244:9-245:2.

61. Allegations that hourly wage rates were significantly reduced from what they had agreed to are without merit, especially when taking into account actual job openings available when the Named Plaintiffs arrived in Oklahoma. Defendants have stated several times that they tried to find the right job for their employees, and when doing so, they complied with minimum wage rules and regulations.

62. The Named Plaintiffs' claim that Defendants intentionally created a situation where the Named Plaintiffs were working few hours for little pay is an unjustified conclusion. The Named Plaintiffs have payroll records (produced by Defendants) showing J-1 employees were paid correctly.

63. The Named Plaintiffs' claim that Defendant W. Schumacher made it widely known to the Named Plaintiffs that he was a current and/or former police officer for purposes of intimidation is an unreasonable conclusion. There is nothing wrong with a police officer owning a motel or restaurant. Evidence shows that Defendant W. Schumacher rarely had contact with his motel or restaurant employees while performing police duties, and there is no evidence he took any actions that would have intimidated them. Although it appears that some Named Plaintiffs may claim to have had a fear of police officers based on experiences from their home country, that should not be used against Defendants to build a case that they were human traffickers.

64. The examples of possible labor trafficking provided by the Named Plaintiffs are complex and contained many aspects and legal contracts. They each deserve a thorough review, which does not appear to have occurred here by the Named Plaintiffs or their purported expert witness. The circumstances of each individual

Named Plaintiff and/or proposed class member should not and cannot be "lumped" into one catch-all allegation. There could be many reasons why a visa applicant takes a job in the U.S. that involves low pay, to include gaining experience, making business contacts, and visiting the U.S. Likewise, to allege human trafficking has occurred, one must examine the 26 "red flags of human trafficking" that I listed in Table 1 before jumping to the conclusion that a particular situation is labor trafficking, as opposed to a labor dispute or even an allegedly poor business practice.

65. Human trafficking criminal investigations are complicated. No two cases are exactly alike, and they should not be lumped together when being examined by someone with little experience in investigating human trafficking crimes. The term "scheme" is used casually by the Named Plaintiffs when no scheme by the Defendants in its true meaning was observed in my examination.

66. I saw no signs Defendants punishing workers harshly for purported minor infractions like human traffickers are known to do.  However, I did see signs of Defendants dealing with employee infractions in a typical business way, usually involving following company policy as defined in their employee handbook.

67. The Defendants, who were approved yearly by the U.S. government to participate in the J-1 visa program, have provided examples that they follow visa program policies in good faith. In my opinion, the claim that Defendants created a scheme to maintain a low-paid, easily controlled workforce in a human-trafficking-like manner is unjustified, especially in light of the examples of human trafficking in Table 1 that are not present in this case.  Based on this analysis, this is not a trafficking case.  At best, it is a labor dispute.  *See Castellanos v. Worldwide Distribution Systems USA, LLC,* 2016 WL 11678220 (E.D. Mich. June 20, 2016) (denying class certification of TVPA claims because TVPA did not govern fraudulent enticement vis-à-vis fraudulent letters to potential workers; TVPA was designed to prevent coercion, not enticement).

68. I reserve the right to supplement or amend my opinions due to any further allegations, depositions, or expert reports that may occur after my report is submitted.

Respectfully submitted this 24th day of July 2020

s/ *Greg H. Bristol*
Greg H. Bristol

## APPENDIX A
# Greg H. Bristol – Curriculum Vitae

Post Office Box 53
Points, West Virginia
Email: Gbristol@HumanTraffickingTraining.expert

**PROFILE**

Reliable and people-driven professional with in-depth theoretical and practical knowledge in a wide array of safety and security practices, and 34+ years of law enforcement expertise to promote the protection of the public.

Demonstrated leadership in the criminal justice response to combatting human trafficking. Expertly deliver full-spectrum instructional responsibilities and academic guidance to students of all ages and learning levels across reputable government institutions. Knowledgeable of law enforcement theory, practices, and their application to a variety of services and programs, including investigation and identification, patrol, records management, care and custody of people, property, and crime prevention. Excel at handling tasks that involve planning, coordinating, and implementing best procedures to expedite learning and promote the philosophy and goals of the organization. Perfect communication and interpersonal skills needed to establish rapport with cross-functional, multi-level, and culturally-diverse stakeholders.

---

### WORK HISTORY

**President of Bristol Public Safety Consultants Company**                    2018 - Present

- **Manage a company providing consulting services** regarding fraud, preventing elder financial abuse, public corruption, human trafficking prevention, and compliance with the U.S. Foreign Corrupt Practices Act.
- Lead the development and implementation of company goals, objectives, and priorities for each assigned service area, recommend and administer policies and procedures.
- Monitor and evaluate the effectiveness of service delivery methods and procedures, as well as allocate resources accordingly.
- **Analyze and assess safety programs**, policies, operational needs, and make appropriate adjustments.

2012 – Present

**President of The Human Trafficking Investigations & Training Institute (HTITI),** Front Royal, Virginia

- **Coordinate the HTITI's basic and advanced human trafficking investigations training** for law enforcement and NGOs.
- **Built a training company** providing basic and advanced human trafficking investigation courses for law enforcement officers.
- **Taught 27 law enforcement human trafficking investigation courses** in ten U.S. states, and internationally in Egypt and Trinidad and Tobago; participated as a panel member at a 2017 United Nations human trafficking conference in Vienna, Austria.
- Ensured the development and **implementation of comprehensive public safety programs**, policies, and procedures, emergency preparedness plans, including orientation and training.

2010 – 2012

**Special Agent, Special Inspector General for Afghanistan Reconstruction**, Kandahar Province, Afghanistan

- Investigated fraud, waste, and abuse involving U.S. federal contracts in Afghanistan.

26

Human Trafficking Investigation Report: Human Trafficking Expert

- Enforced the law and involved in national security issues, monitoring ongoing situations, conducting investigations to look for threats.
- Handled undercover assignments, gathered evidence through surveillance and observation, monitored activity on court-authorized wiretaps, interviewed witnesses or suspects to obtain intelligence on illegal activities, and examining records.

**Special Agent, Federal Bureau of Investigation (FBI), Washington Field Office**                    1987 – 2010

- Investigated Foreign Counterintelligence, Public Corruption, Corporate Fraud, and Civil Rights Crimes with a focus on human trafficking.
- Led the U.S. diplomatic mission security programs to include protection of personnel, facilities, and sensitive information.

**Trooper, Michigan State Police**                    1978 – 1987

- Enforced laws to promote safety, responding to civil disorders, preventing disturbances and riots, relaying evidence to detectives, and preparing testimony for court appearances.

---

## EDUCATION AND CERTIFICATION

*Bachelor of Arts in Social Science*, MICHIGAN STATE UNIVERSITY, 1978

*Certified EEO Investigator, EEOC Training Institute, 2013*
*Certified Federal Law Enforcement Officer (FBI), 1987*
*Certified Law Enforcement Officer, Michigan Department of State Police, 1978*

---

## HONORS AND AWARDS

- Michigan Department of State Police Meritorious Service Medal
- Secretary of Defense Medal for the Global War on Terrorism
- U.S. Attorney General's Award for Exceptional Service

---

## TEACHING EXPERIENCE AT COLLEGES AND UNIVERSITIES

- American University, Washington, DC
- Columbia Southern University, Orange Beach, AL
- Georgetown University, Washington, DC
- Montgomery College, Rockville, MD
- Patrick Henry Community College, Martinsville, VA
- University of Louisville, Louisville, KY
- Saint Thomas University, Miami Lakes, FL

---

## TEACHING EXPERIENCE AT FEDERAL ENTITIES

- Department of Justice, National Advocacy Center, Columbia, SC
- FBI Training Academy, Quantico, VA

---

## SPECIALIZED KNOWLEDGE RELATED TO HUMAN TRAFFICKING

- California Transparency in Supply Chains Act of 2010

- End Trafficking in Government Contracting Act of 2013
- Federal Strategic Action Plan on services for victims of human trafficking
- How to conduct a forensic examination of an illicit massage business
- How to investigate human trafficking crimes
- Human trafficking task force development and management
- State laws on human trafficking and sexual exploitation
- United Nations' General Assembly protocols on human trafficking
- U.S. Department of Homeland Security's Blue Campaign
- U.S. Trafficking Victims Protection Act of 2000 and its reauthorizations

## ONLINE HUMAN TRAFFICKING COURSE DEVELOPMENT

- For Columbia Southern University, Orange Beach, AL (2017)
- For eNursingResources.com, Haddonfield, NJ (2018)
- For Savant Learning Systems, Martin, TN (2018)

## PUBLICATIONS RELATED TO HUMAN TRAFFICKING

- Combatting Human Trafficking Takes Everyone, American Gas Magazine, June 2018
- Contributor to the Virginia Department of Criminal Justice Services' Model Policy on Human Trafficking, November 13, 2014

## FILM AND PUBLIC SERVICE ANNOUNCEMENT CREDITS

Interviewed in *The Awakening, The Realities of Sex Trafficking in Michigan, produced by Girbe Eefsting*, narrated by Heavenly Hope International, (www.heavenlyhopeinternational.org/resources/)          2016

Narrated a one-minute Public Service Announcement on child sex trafficking titled *I Just Wanted To Die - A Child Speaks Out*, produced by US Fund for UNICEF, (www.youtube.com/watch?v=j1sRy8RJBh8)          2014

Interviewed for a three-minute video on child sex trafficking titled *UNICEF USA: Over 100,000 Children are Victims of Sex Trafficking in the U.S.* Produced by US Fund for UNICEF, (www.youtube.com/watch?v=s6hbEthqVSw) 2014

Featured in the film *Not My Life* about an FBI domestic servitude victim rescued in     Virginia      in      2009, (https://vimeo.com/50650206)                                                                                              2014

## COURSES DEVELOPED for HTITI

- 911 Operator Responses to Human Trafficking Calls
- Anti-Human Trafficking Training for Community Groups & Healthcare Providers
- Basic and Advanced Law Enforcement Human Trafficking Investigator
- Forensic Analysis of Fake Massage Businesses Engaged in Sex Trafficking
- Human Trafficking Awareness for Healthcare Providers

## OVERVIEW OF HTITI's PAST COURSES and PRESENTATIONS

*COURSE TITLES*
- Advanced Law Enforcement Human Trafficking Investigator
- Forensic Analysis of Fake Massage Businesses Engaged in Sex Trafficking

CO      Denver (2X)
FL      Aventura, Daytona Beach, Fort Lauderdale (3X), Orlando

GA      Kennesaw (2X), Marietta
KS      Garden City, Hays
MD      Bel Air, Sykesville
MI      Lansing, Livonia
NC      Edneyville (2X), Fayetteville, Winston-Salem
NJ      Rockaway
NV      Las Vegas (2X)
VA      Fairfax, Roanoke (2X)
INTL    Trinidad & Tobago

---

## HTITI PRESENTATIONS

**2019**

- Human Trafficking Awareness, Rotary Club of Chagrin Valley, Ohio
- Human Trafficking Awareness, Rotary Club of Chesterland, Ohio


**2018**

- Combatting Trafficking in Persons in Egypt, Cairo, Egypt, Guest Speaker of the U.S. Embassy in Cairo, Invited by U.S. Department of State's Speaker's Program
- Defining Human Trafficking, And The Importance of The T-Visa For Human Trafficking Victims, Georgetown Law School, Washington, DC
- Guest Speaker at *Hidden in The Shadows*, Plymouth, MI, hosted by Pearls of Great Price Coalition, a Conference About Human Trafficking in Michigan
- Guest Speaker at Hope Changes Everything Conference, Lake Placid, NY, Hosted by The Clinton, County District Attorney's Child Advocacy Center
- Understanding & Recognizing Human Trafficking in Our Public Schools, Center City Public Charter School, Washington, DC

**2017**

- Awareness of Human Trafficking Among Airport Police and Airline Flight Crews, UNODC, Vienna, Austria
- Human Trafficking Awareness, Defense Intelligence Alumni Association, McLean, VA
- Investigative Strategies for Practitioners, St. Thomas University's School of Law, Human Trafficking Academy, Miami, FL

**2016**

- Human Trafficking: How to Identify and Report It, Fairfax County, Alliance for Human Services, Annandale, VA
- Investigative Strategies for Practitioners, St. Thomas University's School of Law, Human Trafficking Academy, Miami, FL
- Law Enforcement's Role in Combating Human Trafficking, DC Rotary, Washington, DC
- Law Enforcement's Role in Combating Human Trafficking, Hermitage High School, Richmond, VA
- Law Enforcement's Role in Combating Human Trafficking, Providence Presbyterian Church, Fairfax, VA
- Screening of *Not My Life*, Royal Circle Foundation, Washington, DC
- Understanding How Homeless People Are Often Victims of Forced Labor, Georgia Alliance to End Homelessness, Savannah, GA

**2015**

- Health Effects of Human Trafficking, Regional Occupational Health Conference, Laurel, MD
- Human Trafficking Awareness For Community Groups, Hosted by Heavenly Hope International, Farmington, MI
- Human Trafficking Awareness For Community Groups, Hosted by Heavenly Hope International, Highland Park, MI
- Human Trafficking Awareness, Lunch Speaker, Defense Intelligence Alumni Association, McLean, VA
- Investigative Strategies for Practitioners, St. Thomas University's School of Law, Human Trafficking Academy, Miami, FL
- Law Enforcement's Role in Combating Human Trafficking, Hermitage High School, Richmond, VA
- Understanding How Homeless People are Often Victim of Forced Labor, Georgia Alliance to End Homelessness, Savannah, GA
- Webinar: Healthcare Providers Fighting Against Human Trafficking, National Association of County and City Health Officials, Washington, DC

**2014**

- Healthcare Providers Fighting Against Human Trafficking, NSA Occupational Health Unit, Fort Meade, MD
- Health Effects of Human Trafficking, Mary's Center, Washington, DC
- Health Effects of Human Trafficking, Royal Circle Foundation, Baltimore, MD
- Interviewed by Blogger Who Was Writing About Human Trafficking, Virginia Free Citizens, Richmond, VA
- Law Enforcement's Role in Combating Human Trafficking, DC Stop Modern Slavery, Washington, DC
- Law Enforcement's Role in Combating Human Trafficking, Georgetown University Law Center, Washington, DC
- Law Enforcement's Role in Combating Human Trafficking, Hermitage High School, Richmond, VA
- Law Enforcement's Role in Combating Human Trafficking, Montgomery College (Criminal Justice Class), Rockville, MD
- Law Enforcement's Role in Combating Human Trafficking, Montgomery County TV - Channel 10, Rockville, MD
- Law Enforcement's Role in Combating Human Trafficking, World Affairs Council, Washington, DC
- Online Community Q&A Discussion on Human Trafficking, REDDIT & UNICEF USA, New York, NY (2,406 views)
- Webinar: General Awareness of Human Trafficking, US Department of Agriculture, Washington, DC
- Webinar: The Role of Healthcare Providers in Identifying Human Trafficking Victims, FBI Occupational Health Unit, Washington, DC

**2013**

- Law Enforcement's Role in Combating Human Trafficking, The American University, Washington, DC
- Law Enforcement's Role in Combating Human Trafficking, T-Bone Films, Denver, CO
- Law Enforcement's Role in Combating Human Trafficking, DC Stop Modern Slavery, Washington, DC
- Law Enforcement's Role in Combating Human Trafficking, National Intelligence Association, Springfield, VA
- Law Enforcement's Role in Combating Human Trafficking, Patrick Henry Community College, Martinsville, VA
- Law Enforcement's Role in Combating Human Trafficking, Project Restoration Hope Festival and Human Trafficking Summit, Denver, CO
- Law Enforcement's Role in Combating Human Trafficking, Richmond Justice Initiative, Richmond, VA

- Law Enforcement's Role in Combating Human Trafficking, The John Hopkins University, Washington, DC
- Law Enforcement's Role in Combating Human Trafficking, Worldwide Documentaries, Rochester, NY
- Law Enforcement's Role in Combating Human Trafficking, Project Restoration Hope Fest and Human Trafficking Summit, Denver, CO
- Screening of *Not My Life*, Hosted by Reston Hospital, Reston, VA
- Screening of *Not My Life*, Hosted by Holy Cross Hospital, Silver Springs, MD
- The Role Nurses Play in Identifying Human Trafficking Victims, Association of Occupational Health Nurses, Washington, DC

**2012**
- Human Trafficking Awareness, SunTrust Bank – Financial Intelligence Unit, Atlanta, GA
- Law Enforcement's Role in Combating Human Trafficking, Hermitage High School, Richmond, VA
- Radio Interview About Human Trafficking, AM 1370, by Bob Smith, Rochester, NY
- Screening of *Not My Life*, Hosted by Media Watch, Santa Cruz, CA

# APPENDIX B

## Materials Reviewed

a) Class Action Complaint filed in this case on June 15, 2018
b) Affidavits or Statements from:
   i. Anil Amin
   ii. Frank Joseph
   iii. Manesha Kolhapuray
   iv. Soniya Lipihande
   v. Swapnil Shuka
   vi. Nilesh Kadbhane
c) Depositions (Named Plaintiffs):
   • Anthony M. Kennedy
   • Christine Pearce
d) Depositions (Defendants)
   • Carolyn Schumacher (corporate representative of Apex USA, Inc.)
   • Walter Schumacher (corporate representative of Apex USA, Inc.)
e) Materials from Human Resources files of Named Plaintiffs
f) Report Prepared by Named Plaintiffs' Expert Witness

**Additional Materials Reviewed**

Castellanos v. Worldwide Distribution Systems USA, LLC, 2016WL 11678220 (E.D. Mich. June 20, 2016)

HTITI Course Manual *"Law Enforcement Human Trafficking Investigator,"* various years.

International Labour Organization report, "Recruitment Fees and Related Costs

National Guestworkers Alliance, "*Leveling the Playing Field: Reforming the H-2B Program to Protect Guestworkers and U.S. Workers"* (Feb 2012).

Panwar v. Access Therapies, 2015 WL 329013 (S.D. Ind. Jan. 22, 2015)

Polaris, *"Labor Trafficking in the U.S.: A Closer Look at Temporary Work Visas"* (Oct. 2015).

Southern Poverty Law Center, *"Close to Slavery: Guestworker Programs in the United States*" (2013).

U.S. Code, Title 18, Chapter 77 "Peonage, Slavery, and Trafficking in Persons."

U.S. Code of Federal Regulations, Title 32, Section 62.23 "Summer work travel."

32

Human Trafficking Investigation Report: Human Trafficking Expert

U.S. Code of Federal Regulations, Title 32, Section 503.16 "Assurances and obligations of H-2B employers."

United States Department of State, *"Trafficking in Persons Reports,"* various years

United States Government Accountability Office, "*H-2A and H-2B Visa Programs: Increased Protections Needed For Foreign Workers,"* GOA-15-154 (March 2015)

U.S. v. Alzanki, 54 F.3d 994, 1001-02 (1st Cir. 1995)

U.S. v. Bibbs, 564 F.2d 1165, 1168 (5th Circ. 1977)

U.S. v. Booker, 655 F.2d 562, 566 (4th Cir. 1981)

U.S. v. Bradley, 309 F.3d 145 (1st Cir. 2004)

U.S. v. Calimlin, 538 F.2d 706 (7th Cir. 2008)

U.S. v. Djoumessi, 538 F.3d 547 (6th Cir. 2008)

U.S. v. Farrell, 563 F.3d 364 (8th Cir. 2009)

U.S. v. Garcia, 2003 WL 22956917 (W.D. NY, 2003)

U.S. v. Harris, 701 F.2d 1095, 1100 (4th Cir. 1983)

U.S. v. Kaufman, 546 F.3d 1242 (10th Cir. 2008)

U.S. v. Kozminski, 487 U.S. 931 (1988)

U.S. v. Pipkins, 378 F.3d 1281, 1281, 1297 (11th Cir.2004)

**APPENDIX C**

**<u>Fee Schedule</u>**

Expert Consultation and Testimony

Deposition or trial testimony: $350 per hour (4 hour minimum)

Investigations, office meetings, research, or writing: $125 per hour

Telephone calls: $75 hour

Travel (in car or air): $75 hour