Exhibit 2

1                    GREG H. BRISTOL

2              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF OKLAHOMA
3        ----------------------------------------------X
         MADELYN CASILAO, HARRY LINCUNA and ALLAN GARCIA,
4        on behalf of themselves and all others similarly
         situated,
5                                          Case No.
                       Plaintiffs, 5:17-CV-00800-SLP
6                v.

7        (1) HOTELMACHER, LLC, dba HOLIDAY INN EXPRESS;
         (2) STEAKMACHER, LLC, dba MONTANA MIKE'S
8        STEAKHOUSE; (3) SCHUMACHER INVESTMENTS, LLC,
         dba WATER ZOO; (4) APEX USA, INC.; (5) WALTER
9        SCHUMACHER; and (6) CAROLYN SCHUMACHER,

10                          Defendants.
         ----------------------------------------------X
11       DORRET FRANCIS, ANTHONY KENNEDY and CHRISTINE
         PEARCE, on behalf of themselves and all others
12       similarly situated,

13                                         Case No.
                       Plaintiffs,  CIV-18-583-SLP
14               v.

15       APEX USA, INC.; HOTELMACHER, LLC, dba HOLIDAY INN
         EXPRESS; SONTAG, INC. dba HAMPTON INN CLINTON;
16       STEAKMACHER, LLC, dba MONTANA MIKE'S STEAKHOUSE;
         SCHUMACHER INVESTMENTS, LLC, dba WATER ZOO INDOOR
17       WATER PARK; WALTER SCHUMACHER and CAROLYN
         SCHUMACHER,

18                          Defendants.
19       ----------------------------------------------X

20       VIDEOTAPED DEPOSITION VIA ZOOM VIDEOCONFERENCING

21                            OF

22                    GREG H. BRISTOL

23              Friday, August 21, 2020

24       Reported By:
         LINDA J. GREENSTEIN
25       JOB NO. 315886

1               GREG H. BRISTOL

2                    August 21, 2020
                     13:03 UTC Time
3

4

5

6

7          Videotaped Deposition held via Zoom

8     Videoconferencing of Greg H. Bristol, taken by

9     Plaintiffs, before Linda J. Greenstein, a

10    Certified Shorthand Reporter and Notary Public of

11    the State of New York.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     GREG H. BRISTOL

 2      A P P E A R A N C E S:
        (All parties appear via Zoom Videoconferencing)
 3

 4      SKADDEN, ARPS, SLATE, MEAGHER & FLOM, L.L.P.
        Attorneys for Plaintiffs
 5                 500 Boylston Street
                   Boston, Massachusetts 02116
 6

 7      BY:        CATHERINE FISHER, ESQ.
                   617.573.4867
                   catherine.fisher@skadden.com
 8

 9

10      FELLER SNIDER
        Counsel for Defendants
11                 BancFirst Tower
                   100 N. Broadway Avenue
12                 Suite 1700
                   Oklahoma City, Oklahoma 73102

13      BY:        C. ERIC SHEPHARD, ESQ.
                   405.232.0621
14                 eshephard@fellersnider.com

15

16      DOERNER, SAUNDERS, DANIEL & ANDERSON, L.L.P.
        Counsel for Philadelphia Indemnity Insurance
17      Company
                   210 Park Avenue
18                 Suite 1200
                   Oklahoma City, Oklahoma 73102-5600
19
        BY:        WILLIAM C. MCALISTER, ESQ.
20                 405.898.8658
                   wmcalister@dsda.com
21

22      Also Present:

23      SKADDEN, ARPS, SLATE, MEAGHER & FLOM, L.L.P.
        Elizabeth J. Perkins, Esq.
24
        Dan Macom, Legal Video Specialist
25      U.S. Legal Support
```

```
1                    GREG H. BRISTOL

2     study or your course of study for Michigan State?

3          A.     I went to the College of Social

4     Science and my degree was in criminal justice.

5          Q.     Okay.  And do you have any other

6     further degrees after that?

7          A.     No.  Nothing further than a

8     Bachelor's degree.

9          Q.     Okay.  And then I'm going to actually

10    turn your attention to your page 23, Appendix A of

11    the H-2B report.

12         A.     Okay.

13         Q.     And this is your resume or curriculum

14    vitae; is that correct?

15         A.     Yes, it is.

16         Q.     And is that accurate as of today's

17    date?

18         A.     Yes, it is.

19         Q.     Is there anything you would add --

20    that needs to be added to this resume since you

21    submitted it to us?

22         A.     Not regarding work history other than

23    some minor things like EEO work.

24         Q.     When you say "EEO," can you just

25    explain what the acronym means?
```

```
 1                      GREG H. BRISTOL

 2          Q.     Could you give a relative percentage

 3     of how many of the cases you investigated involved

 4     labor trafficking?

 5          A.     I would say with regards to case

 6     openings, about 50/50.  They're more labor

 7     trafficking, which I include domestic servitude

 8     and then sex trafficking.

 9          Q.     And when you were at the FBI, you

10     were -- you were primarily involved in criminal

11     investigations?

12          A.     Yes, always criminal investigations.

13          Q.     Okay.  And then you --

14          A.     One clear -- my first assignments was

15     foreign counterintelligence, so that was not -- in

16     1987, that was not a criminal squad.

17          Q.     Did that involve any human

18     trafficking issues?

19          A.     No, not in 1987, no.

20          Q.     Okay.  Before you joined the Civil

21     Rights Squad in 2006, had you worked in any human

22     trafficking investigations while at the FBI?

23          A.     Yes.  The squad I was working on,

24     public corruption, was next to the Civil Rights

25     Squad and sometimes they would ask for a second
```

                        GREG H. BRISTOL

1    agent present, so I was familiar with what they

2    were doing and sometimes I sat in on interviews.

3         Q.    And before -- so while you were

4    sitting in on interviews, was it also a mix of sex

5    trafficking, labor trafficking, domestic

6    servitude?

7         A.    Yes, same amount.

8         Q.    And these were all for criminal

9    matters, criminal investigations?

10        A.    All criminal investigations, correct.

11        Q.    Okay.  And then you retired from the

12   FBI in 2010; is that correct?

13        A.    Yes.

14        Q.    And you became at that point a

15   Special Agent for the Inspector General for

16   Afghanistan Reconstruction?

17        A.    Yes, I did.

18        Q.    And what were the nature of your job

19   duties as a Special Agent -- I'm going to call it

20   "SIGAR."  I think that's correct.  If it's not,

21   let me know and I will stop, but just for quick

22   ease I'm going to call it "SIGAR."

23              What were the nature of your job

24   duties as a Special Agent for SIGAR?

```
 1                    GREG H. BRISTOL

 2                    I spoke in Egypt, they asked me to

 3      speak at the U.S. Embassy in Egypt on human

 4      trafficking.

 5           Q.    Okay.  Was that a presentation

 6      similar to what you would give to law enforcement

 7      in America showing, you know, what are the signs

 8      of human trafficking to look for?

 9           A.    I've had many meetings.

10                    I met the Egyptian law enforcement

11      and I focused on that.  I did speeches to media in

12      Egypt and I did general human trafficking training

13      to the Embassy staff.

14           Q.    Have they ever asked you to consult

15      on the civil remedy portions of the TVPA?

16           A.    No, never.

17           Q.    And then looking at the next

18      paragraph down, paragraph 8, it says you are

19      currently working as a consultant on a human

20      trafficking online training project for MIT; is

21      that correct?

22           A.    Yes, I am.  It is correct.

23           Q.    And can you describe what that

24      training project is intended -- who that is

25      intended to serve?
```

                         GREG H. BRISTOL

1          Q.    Did you ever ask for specific

2    documents from defendants' counsel?

3          A.    Did I ask for -- could you explain

4    what you mean by a list or verbally?

5          Q.    A list or a type of document.

6          A.    I never made a request for documents

7    because I was receiving them and it was a lot to

8    take in, so I had enough.  And my questions had

9    been asked and answered.

10         Q.    Okay.  That goes to my next question,

11   which is, did you ever explain to them what types

12   of documents you would need to provide your

13   opinion?

14         A.    No.  I was being satisfied that the

15   things that I knew that I needed to look at were

16   being provided to me.

17         Q.    So you never gave them categories of

18   documents that you would need to provide -- to

19   provide your opinion?

20         A.    No.  I never gave them a request or

21   list for that.

22         Q.    And were there any types of documents

23   you didn't receive that you think would have been

24   helpful to prepare your opinion?

                         GREG H. BRISTOL

 1

 2          A.    Well, I would have liked to have seen

 3     all the employee payroll files of -- or all the

 4     depositions that were being done, but there -- I

 5     was receiving them as they came in.

 6          Q.    Okay.  So when you say you would have

 7     liked to have received all the employee payroll

 8     files, that's for all of the H-2B or J-1 employees

 9     or something broader?

10          A.    Well, my focus and my request were to

11     help understand if this is a human trafficking

12     case based on what Mr. deBaca's report was and

13     based on the individuals there, the depositions, I

14     had those, but I was never put on a hat as an

15     investigator to do a financial fraud or an

16     analysis of payroll records, which, of course, I

17     would need to see all those, but I didn't -- I

18     didn't ask because I wasn't doing that.  I was

19     looking at the human trafficking aspect.

20          Q.    What types of documents do you think

21     are important to review in making a determination

22     about the human trafficking aspect?

23          A.    The -- a contract or sometimes people

24     are calling them a job offer, and the terms of the

25     work, what they were doing, their pay stubs to see

```
1                      GREG H. BRISTOL

2       how much they were getting paid and anything in an

3       employee file, like awards or discipline.

4             Q.     Anything else?

5             A.     Well, that's just a general answer.

6       It all depends if I'm just looking at what is on

7       the table with the plaintiffs' expert report and

8       what he's saying is human trafficking or I'm doing

9       more of an investigation, which I was not hired to

10      do and I didn't ask to do.

11            Q.     Can you explain to me the difference

12      between looking at what's on the table with the

13      plaintiffs' expert report and doing an

14      investigation?

15            A.     Well, sure.  I can -- I can look at

16      statements and evidence that's already been

17      collected and knowing all the signs of a potential

18      human trafficking case involving foreign nationals

19      with an H-2B or J-1 visa, I can give you a pretty

20      good ballpark idea if it is or is not a human

21      trafficking case.

22            Q.     And that is the type of investigation

23      that you weren't asked to do here?

24            A.     Yes.  I was asked to respond and

25      review an expert witness report as my primary
```

```
 1                    GREG H. BRISTOL

 2    purpose and then to help them understand if this

 3    was a broad-stroke human trafficking case or are

 4    these individual cases, and I learned that it was

 5    very individual and different cases.

 6          Q.    Can you explain to me what a broad

 7    stroke human trafficking case would look like?

 8          A.    Well, when you go to these

 9    conferences and someone gets up there in

10    5 minutes, tells you what human trafficking is or

11    domestic servitude or forced labor, and everybody

12    just kinds of listen to it, when I know they're

13    very individual and unique, especially involving

14    foreign nationals.

15                And I don't think you can make a

16    broad stroke declaration or explanation of human

17    trafficking because it's some of the most

18    complicated criminal cases I've ever worked in the

19    FBI.

20          Q.    So is it your opinion that it's

21    basically impossible to have a broad stroke human

22    trafficking claim or case?

23          A.    I know it is, yes.  You cannot do

24    that.

25          Q.    How do you know it is?
```

```
 1                    GREG H. BRISTOL

 2         A.    Because these cases are so unique and

 3    the circumstances, especially with an employment,

 4    you have to understand what was behind the

 5    person's application, were they induced and forced

 6    to apply or did they walk into a job fair and

 7    apply, and then once they applied, what did they

 8    agree to do and what did they do when they got

 9    here.

10               I want to know what the fees people

11    paid overseas to the U.S. Embassy or to the

12    foreign country.  I want to address the

13    allegations of recruiter fees that are being

14    reported as excessive, and I want to know how they

15    got here and who paid for them to get here.

16         Q.    And when you speak about these cases

17    being so unique, are you referring to them as

18    cases, as in criminal matters?

19         A.    Yes, that's my expertise.  I would

20    only be talking about the criminal aspect.

21         Q.    Okay.  So can you opine on whether or

22    not a broad-based civil action is possible?

23         A.    Well, I'm not trained in the civil

24    aspect, but to do -- to get there, you'd have to

25    know if it's a human trafficking, and I can tell
```

```
 1                     GREG H. BRISTOL

 2      you if it is or is not human trafficking to help

 3      you make that decision.

 4            Q.    So it's your opinion that the

 5      standard for human trafficking is the same in the

 6      criminal and civil context?

 7            A.    Yes.  What is or is not human

 8      trafficking are going to be the same on the civil

 9      aspect, separate from, you know, getting a T visa

10      or something.

11                  There are times when someone doesn't

12      have to testify in court and they still can get

13      the T visa.

14            Q.    So other than getting a T visa, the

15      standard for human trafficking is the same in the

16      criminal and civil context?

17            A.    Well, my expertise is on the criminal

18      side.  I have a lot of knowledge on the civil side

19      because the people that I rescued would sometimes

20      seek civil remedies and I followed the cases, but

21      I wasn't involved in them.

22            Q.    So can you opine today on whether or

23      not the standard for human trafficking other than

24      getting a T visa is the same in the criminal and

25      civil context?
```

August 21, 2020                                    62

                        GREG H. BRISTOL

1        all of the affidavits that you cited in your J-1

2        report?

3            A.    Yes.  The ones that I looked at have

4        been delivered and signed and I saw them in the

5        binder too.

6            Q.    Has anything that you've reviewed

7        since your report was issued on July 24th changed

8        any opinions in your report?

9            A.    No, my opinion has not changed.

10           Q.    And that's true for both reports?

11           A.    Correct.

12           Q.    Is there anything that you haven't

13       received that you think would change your opinion?

14           A.    Well, again, wearing the hat of an

15       expert witness, which I'm learning, and staying

16       focused what I'm doing is different than as an

17       investigator, which I easily could do and get a

18       lot more information, but I haven't been asked to

19       do that so I don't think it's right for me to say

20       what you should be doing or should not be doing.

21           Q.    If you were in the role of an

22       investigator, what types of documents would you

23       want to have that you didn't review?

24           A.    Well, I need to talk to people.  Each

```
1                    GREG H. BRISTOL

2    one of these people should be available for an

3    interview.  Again, I'm wearing this new hat as an

4    expert witness, which I would really do a lot

5    better job if I was interviewing these people of

6    the depositions that I've read.

7                    So that's my first choice.  And then

8    I need to talk to more people to see if these are

9    similar situations or are they unique, like I

10   think they are, and I can do that in an interview.

11        Q.    Other than conducting additional

12   interviews, are there any other type of documents

13   you would have wanted to be able to review if you

14   were an investigator?

15        A.    I'd like to see the Embassy's files

16   of the interviews of these applicants, which I did

17   as an FBI agent.

18        Q.    Anything else?

19        A.    With these countries like the

20   Philippines, they have these offices, they have

21   files of how they're interviewing people.  I'd

22   like to see that, which I would not have gotten

23   because I would have had to use an MLAT, which

24   would take about three years to get them, so, best

25   wish, yeah, I'd like to have seen what they
```

```
 1                     GREG H. BRISTOL

 2         Q.     And --

 3         A.     But it's not a scheme.

 4         Q.     Have you reviewed the documents that

 5    are called the Polo documents -- P-O-L-O -- that

 6    are submitted to the Filipino Embassy for Filipino

 7    workers for returning or going overseas?

 8         A.      In this binder, I saw them for the

 9    first time last night so I highlighted them and

10    they're readable.

11              There are a few sections in some of

12    the depositions, like half of a document is

13    unreadable, but I've never seen such great P-O-E-M

14    and P-O-L-O documents as -- than what you showed

15    me here.

16         Q.     So before receiving the binder, you

17    hadn't seen those documents in detail?

18         A.     Right.  I just saw a section of a

19    piece of it.  Yeah, I've seen -- I saw 10 percent

20    of what you showed me last night and today.

21         Q.     Okay.  And you mentioned that it's

22    not the FBI's business or the Department of

23    Labor's business if the housing costs were

24    slightly different than what they understood them

25    to be; is that correct?
```

```
 1                    GREG H. BRISTOL

 2      Exhibit 1.

 3                    And I want to focus specifically on

 4      the part of the sentence where you say "the

 5      current allegations or evidence do not support a

 6      determination of other human trafficking."

 7                    Could you just explain to me what

 8      that means, what you're referring to?

 9           A.    I was trying to do a catch-all to say

10      anything related to human trafficking, so I looked

11      up what class certification stage was and I looked

12      up what the merit stage was and then I asked

13      questions to Eric and his partner what level of

14      the process we're at and they explained to me what

15      class certification was.  So it sounded like it

16      was important to be able to say all these are

17      human trafficking cases or they have to be looked

18      at individually.

19                    My position is you have to really

20      look at them individually whatever form of human

21      trafficking you're talking to, so other human

22      trafficking would -- at that point, the human

23      trafficking seemed to be less of an issue when you

24      look at Mr. deBaca's report, rather than class

25      certification, which is, I'm not qualified to go
```

August 21, 2020                           104

```
 1                   GREG H. BRISTOL

 2    into detail of.

 3         Q.    Okay.  When you say you looked up

 4    what class -- sorry, let me make sure I get this

 5    right.

 6         A.    Class certification stage.

 7         Q.    Stage, yes.

 8               What did you look up?

 9         A.    Oh, I just read some news stories of

10    civil lawsuits and class-action stuff.  There's a

11    lot of materials out there.

12               There wasn't anything that I needed

13    to quote other than help me explain the process on

14    the civil side of the house, which I'm learning

15    about.

16         Q.    Okay.  And was any of that material

17    included in the appendix to your report where you

18    listed the materials you reviewed?

19         A.    No.  I looked -- was looking at

20    definitions.

21         Q.    Where were you looking at

22    definitions?

23         A.    I looked up the word "class

24    certification stage" and there's a lot of

25    information comes out, civil, and the different
```

August 21, 2020                              107

```
 1                     GREG H. BRISTOL

 2      that you have to look at them closely to

 3      understand them.  And that's why I said -- because

 4      that's how I end it.  They're so uniquely specific

 5      to each individual.

 6                     So it's not the case in the other

 7      class-actions and other types of crimes or

 8      violations where they're very similar.

 9                     So from what I understood, that's why

10      I added it, because it was a -- and this is the

11      only time I'm really talking about the class

12      aspects too.

13           Q.    What is the basis for your statement

14      that these are very individual and unique cases

15      that you have to look at them closely to

16      understand them?

17           A.    Okay.  A lot of people come in H-2B

18      visas that are J-1s and they don't pay a recruiter

19      any type of fee.  A lot of them pay or have family

20      members in the United States, so the

21      transportation issues or lodging is not an issue.

22                     You don't see those numbers, the

23      dollar numbers, the costs to come here by those

24      applications because when you sit down and look at

25      them, it's not there.
```

```
 1                   GREG H. BRISTOL

 2                   So when someone says it's a class or

 3      a group or they're all the same, I know it's not

 4      the case because I know those people didn't pay

 5      those, quote-unquote, "recruiting fees" that we've

 6      been talking about for 20 years that nobody --

 7      nobody really wants to address, so --

 8           Q.     How do you know that those people

 9      didn't pay those recruiting fees?

10           A.     Because there are statements here

11      that family members covered their expenses.

12           Q.     So when you say "those people," are

13      you referring specifically to the plaintiffs or to

14      someone else?

15           A.     Well, they would have been the

16      individual interviewed by the defense.  There were

17      statements there that they weren't -- they didn't

18      pay recruiting fees.

19           Q.     Because their fees were paid for by

20      family members instead?

21           A.     That -- that was a common -- of the

22      reasons or how they paid this stuff, it was -- it

23      was paid that way or a family member paid a

24      transportation fee, which is common.

25           Q.     And when you testified that a lot of
```

1                         GREG H. BRISTOL

2        people come in on H-2Bs or J-1s and they don't pay

3        a recruiter any type of fee, are you referring

4        specifically to the class numbers, in this case,

5        or to individuals generally?

6             A.    Based on my experience in having

7        cases 10 years ago and then following other cases,

8        I see many H-2B people whether there's no mention

9        of recruiting fees involved in the case.

10            Q.    So these are H-2B people from prior

11       cases that you've worked on?

12            A.    Yes, or cases that I followed.

13            Q.    Okay.  And is that also the case for

14       the J-1s, you're referring to J-1 cases that you

15       followed or worked on?

16            A.    Well, I have followed J-1s a little

17       bit closer because of the cultural stuff, and I've

18       got family members involved in the cultural world.

19                  And I have not heard -- I don't read

20       often where J-1 applicants pay exorbitant

21       recruiting fees like you might see more so in the

22       H-2B.

23            Q.    Okay.  So when you refer to the fact

24       that a lot of people come in on the H-2B or J-1

25       and they don't pay a recruiter or any type of fee,

```
 1                  GREG H. BRISTOL

 2    you're speaking generally about those types of

 3    immigrants and not specifically about the class

 4    members in these cases?

 5         A.    No.  When I start hearing the word

 6    there's a scheme going on, it could create

 7    excessive recruiting fees, and that's not the case

 8    based on the ones that I'm reading, it shouldn't

 9    be called a scheme as a group because it's not a

10    scheme.  I can show you on the documents that you

11    provide in this book, people that aren't paying

12    it, so why are you trying to call it as a -- as a

13    group.

14         Q.    So are you testifying that among the

15    people who are class members, some people paid

16    fees and some people did not, or you're testifying

17    that none of them paid fees?

18         A.    No.  I'm saying some paid fees and

19    some didn't.

20         Q.    And you're basing that off of the

21    affidavits that you've reviewed that said that

22    family members paid the fees instead?

23         A.    Yes.  But they're lumped into --

24         Q.    So -- please go ahead.  Sorry.

25         A.    By the complaint, it's reading that
```

```
 1                    GREG H. BRISTOL

 2    these people, the colleagues who had these visas

 3    are part of a scheme and they're not if they're

 4    not paying any type of visa -- or processing fees

 5    or recruiters fees.  That's how I understood the

 6    class aspect.

 7          Q.    Okay.  And for people who didn't have

 8    family members paying for fees, presumably, they

 9    had to pay those fees themselves?

10          A.    Yes.  That would be the opposite

11    where they had to pay the fee, or they chose to

12    pay the fee.

13          Q.    What in your view would be sufficient

14    to permit a determination on a class-wide basis of

15    whether or not there was trafficking?

16          A.    Could you repeat the question again,

17    please?

18          Q.    What type of evidence would support a

19    determination on a class-wide basis of human

20    trafficking?

21          A.    If I read the complaint and the first

22    paragraph started off these individuals -- certain

23    individuals have been certified as victims of

24    human trafficking and the word scheme was in

25    there, I would really be perking up and looking at
```

```
 1                   GREG H. BRISTOL

 2    it really closely for human trafficking.

 3              But I don't see that because I don't

 4    think it is human trafficking.

 5         Q.    Okay.  So I'm not speaking

 6    specifically about these cases anymore.  Just

 7    generally, what type of evidence would support a

 8    determination on a class-wide basis of human

 9    trafficking?

10         A.    That all the people are -- have been

11    determined to be victims of human trafficking.

12    Someone making that decision.  The group --

13         Q.    And the person making that decision

14    would be the Department of Health and Human

15    Services?

16         A.    Or the judge.

17         Q.    So how would a judge make a decision

18    before a complaint is filed whether someone is the

19    victim of human trafficking?

20         A.    You're asking me for a conclusion

21    from people I've never met, so I don't want to --

22    I can't answer that question.

23              Someone's got to make a decision that

24    these people are human trafficking victims.

25         Q.    And what facts should they consider
```

```
1                  GREG H. BRISTOL

2          A.    I'm not sure.  It looks similar to

3     it.  I actually think I took it out of the course

4     manual.

5          Q.    So if you turn back to Exhibit 1, you

6     see there's a footnote there that gives a URL?

7          A.    Yes.

8          Q.    I'm going to represent to you that

9     the document behind 28 is the page that's

10    currently -- that is that URL.

11         A.    Oh, okay.  Thank you.  And I did not

12    see that when I looked at this.

13         Q.    Do you remember looking at this web

14    page when you created that list of red flags?

15         A.    Yes, I do.

16         Q.    And I'm going to -- if you look at --

17    there's a list starting with the first page of

18    common work and living conditions and four down it

19    says "is unpaid, paid very little or paid only

20    through tips."

21              Do you see that?

22         A.    Okay.

23         Q.    Why did you decide not to include

24    that in your list of red flags in paragraph 25?

25         A.    Just that I was going to pick about
```

```
 1                    GREG H. BRISTOL

 2    10 things and try not -- to avoid duplication.

 3         Q.    What made you decide to pick just 10

 4    things?

 5         A.    I tried to do this section in one

 6    page.  Two pages at the most.  I had an outline of

 7    what I was going to do and I didn't want it to be

 8    running too late.  I wanted to show another

 9    entity, add information that was showing what

10    human trafficking is and if the reader wanted to

11    do it, they can go take a look at it.

12         Q.    Okay.  And do you see three down from

13    that sentence I just read, one of the red flags

14    listed is:  "Owes a large debt and is unable to

15    pay it off."

16              Do you see that?

17         A.    Yes, I do.

18         Q.    And did you decide to include that in

19    paragraph 25?

20         A.    No.  Some of this stuff had been

21    talked about before.

22         Q.    Can you show me where this red flag

23    was talked about before in your list of --

24         A.    Well, I talk about it in my Table 1,

25    in the following pages about salaries.
```

```
 1                    GREG H. BRISTOL

 2              So when I look at large debt and

 3    unable to pay it off, that's -- that's the lowest

 4    measurement that I would use on a human

 5    trafficking case.  This is very insignificant to

 6    me because of people who get arrested for human

 7    trafficking or victims are identified.  This stuff

 8    never -- it's not that important.

 9              The windows are important.  The high

10    security -- they're forcing them to live on-site,

11    that's important.  The verbal or physical abuse,

12    that's really important.  Construction workers who

13    need safety equipment who don't get it, so -- I

14    knew I was going to write a -- I think I do 47

15    later lists, at a different list.

16              This was -- I planned on keeping this

17    down to two pages.

18         Q.    And you decided not to include flags

19    that were similar to the allegations in the

20    complaint?

21         A.    No, I did not.

22         Q.    Right below that, it says -- one of

23    the flags is:  "Recruited through false promises

24    concerning the nature or conditions of his or her

25    work."
```

```
 1                   GREG H. BRISTOL

 2              Do you see that?

 3        A.     Yes, I see it.

 4        Q.     And did you include it in paragraph

 5   25?

 6        A.      In paragraph C I talk about payment,

 7   paragraph B is payment, D is hours, C is

 8   employment contracts.

 9        Q.     Can you tell me what paragraph you're

10   looking at?

11        A.     Oh, the -- 24 is the bullet point and

12   then there's A, B, C through I, before I get to 25

13   bullet point, the human trafficking hotline.

14        Q.     Okay.  So you're saying you don't

15   think you included that because you think you

16   included it in paragraph 24 as an important red

17   flag for human trafficking?

18        A.     Yeah.  I'm trying to say which

19   sources other than me, we've got TVPA talking

20   about stuff, I have my career, and then I talk

21   about the hotline and then I wanted to get into

22   the meat of my report.

23              I know I'm -- at this time, I am

24   writing Table 1, which I think has 47 red flags,

25   so I'm writing these things down and then I'm
```

```
 1                    GREG H. BRISTOL
 2     putting them in order.  I'm doing them
 3     alphabetical, like beratement, salary, working
 4     conditions, and I'm kind of plugging them in and
 5     avoiding duplication.
 6              You know, if you add them all
 7     together, it would probably be 60, but to avoid
 8     duplication, I tried to keep it down and even then
 9     I couldn't get it on one page.
10         Q.    And these are all red flags that you
11     would tell somebody to consider when they're
12     trying to make a determination on whether or not
13     to report potential human trafficking?
14         A.    Yes.  I show the website on my
15     presentation and how to click on certain things
16     and sometimes it's the first time people have ever
17     seen it and why it's important and that's how we
18     got some calls sometimes.
19              People are learning what it is and
20     what is not and then they pick up the phone and
21     call.
22         Q.    And are these the same red flags that
23     the Department of Health and Human Services uses
24     when it makes a determination of whether or not to
25     certify someone as a human trafficking victim?
```

```
 1                    GREG H. BRISTOL

 2         A.     You know, I've heard them speak about

 3    what they do.  I don't know if there's a

 4    checklist.  I know they look at more of charging

 5    documents and police reports and, you know, it's a

 6    variety.  It all depends on who's doing the

 7    processing.  It's a process that HHS has.

 8         Q.     And so you're not sure what

 9    specifically the people doing this processing at

10    HHS look for when they make a determination of

11    whether or not someone is a human trafficking

12    victim?

13         A.     I'm not qualified to answer that.  I

14    can't tell you what they do.

15         Q.     Okay.

16         A.     I've heard them speak, but it was

17    very general speeches.

18         Q.     Can you please turn to Exhibit 5.

19                     (Exhibit 5 for

20    identification, three-page article titled

21    "Combatting Human Trafficking Takes Everyone.")

22    BY MS. FISHER:

23         A.     Okay.

24         Q.     Do you recognize this document?

25         A.     It's a report I co-authored for a
```

```
 1                    GREG H. BRISTOL
 2          Q.    Do you know what the elements are for
 3    the claim for the civil remedy claim?
 4          A.    No, I'd have to look it up.
 5          Q.    So in your report, when you opine on
 6    that you don't think that that evidence supports
 7    the determination of human trafficking, you're not
 8    referring to the elements of the civil remedy
 9    claim?
10          A.    No.  I'm doing my mind frame and I'd
11    have to look at my report was, if it's not human
12    trafficking, then the civil aspect is not
13    accurate.  That's how I was looking at it.  You
14    might --
15          Q.    When you were making the
16    determination -- sorry.
17          A.    That's okay.
18          Q.    Please continue.
19          A.    I just said, it could be something
20    else other than human trafficking.
21          Q.    What were you using as your
22    definition of human trafficking?
23          A.    It's defined under TVPA what they
24    consider a severe form of human trafficking.
25    Because there's a lot of -- there's also human
```

```
 1                    GREG H. BRISTOL

 2     trafficking, but since it's not severe, the

 3     prosecutors won't prosecute it.

 4         Q.    Okay.  So you were focused on the

 5     severe form that a prosecutor would decide to

 6     prosecute?

 7         A.    Yes.  As defined by the TVPA, which

 8     has a section for the civil remedies.

 9         Q.    Do you know whether the definition of

10     human trafficking in the severe form that a

11     prosecutor would decide to prosecute is the same

12     as the definition in the section for civil

13     remedies?

14         A.    I don't know.

15         Q.    Are you aware that the Department of

16     Labor investigated two of the defendants in this

17     action?

18         A.    I am aware of it.  I have not read

19     their ruling.

20         Q.    Okay.  How did you become aware of

21     it?

22         A.    Before I signed an agreement with the

23     firm, I did Google searches of the name and saw

24     some newspaper stories and it mentioned Department

25     of Labor.
```

```
 1                    GREG H. BRISTOL

 2      Attorney's Office and they remind us over and over

 3      that they're more than willing to help on human

 4      trafficking cases, but they're not getting the

 5      calls from law enforcement.

 6           Q.    And the only information you have

 7      about the Department of Labor investigation is

 8      what you found when you searched for information

 9      on the Internet?

10           A.    Yes.  I saw references of Department

11      of Labor and then -- and I saw -- yeah, that's

12      where I saw it, but I -- I never pursued it.

13           Q.    So you don't know what claims the

14      Department of Labor were pursuing?

15           A.    I know they were -- there's

16      references to settlements of back wages in

17      Mr. Schumacher's deposition or Mrs. Schumacher's

18      deposition, that there were back pay and he paid

19      it reluctantly.

20           Q.    But you didn't think it was important

21      to look at the documents themselves to determine

22      whether or not that his representations were

23      accurate?

24           A.    The Department of Labor's or his?

25           Q.    Mr. Schumacher's testimony that the
```

```
 1                    GREG H. BRISTOL

 2      settlement was about back pay.

 3           A.     Well, I didn't -- I didn't need it.

 4      I wasn't asked to do it.  And, so -- if I had time

 5      and I was given the ability of what more that I

 6      want is kind of clear that I had enough work to do

 7      with the documents that I was being given and it

 8      was -- my process was going well and the report

 9      was going -- was getting very thorough and I could

10      support my claim, so I didn't need more work.

11                It wouldn't -- it wouldn't add

12      anything more to it other than more accuracy on

13      the payroll stuff, but I wasn't asked to do a

14      payroll financial report, which I'm capable of

15      doing.

16           Q.     How do you know it wouldn't have

17      added anything more if you never reviewed the

18      documents?

19           A.     Because when I see the word "scheme"

20      used in the complaint eight times and Mr. deBaca's

21      report using it more than 30 times -- sometimes,

22      though, in titles -- and this constant schemes

23      that aren't there, that's my focus on, because

24      many of these allegations are labor disputes and

25      DOLs, or he come out saying there were differences
```

```
 1                    GREG H. BRISTOL

 2      in labor, and that Mr. Schumacher pays it, it's

 3      not really any of my business.

 4           Q.    And when you say that the DOL come

 5      out and say there were differences in labor,

 6      you're referring to Mr. Schumacher's

 7      characterization of the settlement with the DOL;

 8      is that correct?

 9           A.    Yeah.  And then references in news

10      stories that there was a -- Department of Labor

11      did a wage settlement.  It's a civil action, not a

12      criminal action.

13           Q.    If the Department of Labor had

14      determined that this was a labor trafficking case,

15      would that have changed your opinion?

16           A.    Yes, it would.

17           Q.    And if the Department of Labor had

18      conducted interviews of employees at the

19      Schumacher companies and H-2B workers at the

20      Schumacher companies, would those interviews have

21      been relevant to your determination of whether or

22      not this was human trafficking?

23           A.    I had already made that conclusion

24      before I would even have considered adding more.

25           Q.    And how did you make that conclusion?
```

```
 1                    GREG H. BRISTOL

 2     or I've looked at and they're very confusing at

 3     times.  180 --

 4          Q.    And so just from looking at the

 5     complaint and description of the scheme, you knew

 6     that it wasn't actually a scheme?

 7          A.    On the first one, yes.  I know it's

 8     not a scheme because I know how these Embassies

 9     work.  I've seen it firsthand and I've interviewed

10     these H-2B people and -- or I've seen them at

11     conferences and with tears running down their eyes

12     on how much they're paying, but, you know, if

13     there's a calculation that they knew they're going

14     to make X amount of dollars and there's a profit

15     at the end of six months or nine months, who am I

16     to tell people to not do this when they're

17     choosing to do -- do it.

18                    There's many reasons for someone

19     to -- according to the reports -- to take an H-2B

20     job when they break even at the end of six months

21     or nine months.

22          Q.    And if the calculation that they knew

23     they were going to make X amount of dollars turns

24     out to be incorrect, does that change your

25     assessment of whether or not there was human
```

```
 1                    GREG H. BRISTOL

 2         Q.     Why is it immaterial?

 3         A.     Because I want to know what happens

 4    in the United States, in Ohio or Michigan, and did

 5    they think they were getting a job at a car

 6    dealership and they end up on a chicken farm with

 7    a guard and a barbed wire fence and German

 8    Shepherds.  That's what I need to know.

 9              That's how I'm going to build a case

10    of human trafficking, because I've already got

11    prosecutors telling me:  "Where is the German

12    Shepherd and barbed wire fences?"  That's what

13    they want.

14         Q.     That's what they want for cases that

15    they're going to criminally prosecute?

16         A.     Yes, the easy cases.

17         Q.     Are there any other schemes that you

18    were able to dismiss based on what was written in

19    the complaint?

20         A.     Yes.  If I could look at it, I could

21    see them.

22         Q.     Right now, you don't remember what

23    those schemes were that you thought were not

24    credible based on the complaint?

25         A.     Yeah.  I've got -- it's hard to --
```

```
 1              GREG H. BRISTOL

 2    And I think Mr. Schumacher said:  "If we didn't

 3    charge that $50, we'd be flooded with hundreds of

 4    people."  You know?

 5         Q.    Sorry, what relevance does your

 6    answer have to my question, which is, why does it

 7    matter if evidence is in a language you don't

 8    speak?

 9         A.    Because what decision they made in

10    another country is not a violation of U.S. law.  I

11    mean, you'd have to know the contents and was

12    pressure put on someone to do it, what was the

13    tone of their voice.

14              I can't even get a prosecutor to work

15    on a case here in this county.  How can I do

16    something in a foreign country with a language I

17    can't speak?

18         Q.    So for practical reasons, you have to

19    ignore evidence that's hard to access because you

20    can't understand it?

21         A.    Well, I don't ignore anything.  I do

22    what I can as an investigator to collect the

23    evidence, but it's going to be more important

24    what's happening in the United States and then --

25    than on these other countries.  It's nice to
```

```
 1                    GREG H. BRISTOL

 2    know -- it's helpful to know if there is a scheme

 3    going on or is it just a misunderstanding of

 4    permit applications.

 5              But it's such a small point, I don't

 6    want to spend my time on the language difference

 7    of who agreed to what and what the recruiter said

 8    was going to be done for the running of the permit

 9    over to the U.S. Embassy because he has a friend

10    who came through the front door.  It's not human

11    trafficking.

12         Q.    So you don't think recruitment

13    promises made that are untrue could be relevant to

14    human trafficking?

15         A.    I think it's relevant but it's at the

16    very low perspective of the elements that are

17    going to convince a prosecutor to prosecute.

18         Q.    And so we had been asking what number

19    of red flags would a prosecutor care about.

20              What number of red flags would you

21    advise people to pay attention to in your

22    training?

23         A.    In my training, I often or am capable

24    of breaking them down to less likely trafficking,

25    in the middle of the road you need to take a
```

```
 1                     GREG H. BRISTOL

 2      Exhibit 1, I want to look at page 12, specifically

 3      paragraph E.

 4            A.    Okay.

 5            Q.    Let's look at the version in

 6      Exhibit 2.  So Exhibit 2, page 12, same Exhibit E.

 7                  It reads:  "Other than

 8      unsubstantiated rumors, there are no indications

 9      that the defendant threatened to deport the named

10      plaintiffs or other proposed class members."

11                  Do you see that?

12            A.    Yes.

13            Q.    Okay.  What type of evidence would

14      you have considered an indication that the

15      defendants threatened to deport the named

16      plaintiff or proposed class members?

17            A.    Well, I'm looking at rumors versus

18      someone saying "he threatened me for deportation,"

19      or if I had evidence like in the Farrell case, we

20      picked up the phone and called -- called

21      immigration, or in my case the Bachalana, the

22      rebuttal, she's saying:  "If you don't get on a

23      plane, I'm calling the FBI and you're going to

24      lose your visa on Monday."

25                  I'm looking at those kinds of
```