# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DORRET FRANCIS, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 5:18-cv-00583-SLP |
| | ) | |
| APEX USA, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

---

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION TO CERTIFY CLASS

---

C. Eric Shephard, OBA No. 22299
A. Wayne Billings, OBA No. 31483
FELLERS, SNIDER, BLANKENSHIP,
BAILEY & TIPPENS, P.C.
100 N. Broadway Ave., Suite 1700
Oklahoma City, OK 73102
Telephone:   (405) 232-0621
Facsimile:   (405) 239-7659
Email:       EShephard@FellersSnider.com
             WBillings@FellersSnider.com

*Attorneys for Defendants*

Date:  October 12, 2020

i

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 3

ARGUMENTS AND AUTHORITIES ................................................................. 6

I.      Plaintiffs bear the burden of affirmatively proving, by a preponderance of the
        evidence, that each requirement of Rule 23 is present. ................................. 6

II.     Plaintiffs have failed to carry their strict burden of proof as to any element of
        the Rule 23 analysis ....................................................................................... 8

        A.  Plaintiffs have no evidence establishing numerosity under Rule 23(a)(1),
            either quantitatively or qualitatively ...................................................... 8

            1.  Plaintiffs have no evidence—and refused to produce any in discovery—
                that would establish geographical dispersion. ................................. 10

            2.  The Motion lacks sufficient detail as to any proposed class member's
                current financial resources. ............................................................. 12

            3.  Not one of Plaintiffs' affidavits attempts to show that any class member
                currently lacks proficiency in the English language ....................... 12

            4.  There is no proof of unfamiliarity with the U.S. legal system ....... 13

        B.  Plaintiffs cannot identify a single question common across the entire class
            that may be resolved "in one stroke." .................................................... 14

            1.  Paying wages below what was stated in job offers. ....................... 15

2. Overstaffing properties. .................................................................. 16

3. Preventing J-1s from obtaining additional work. ........................... 16

4. Threatening class members they would be terminated and/or deported for "minor infractions." ................................................................... 17

5. Berating," "reprimanding," or "threatening" class members for disobeying rules. ........................................................................... 18

6. Reducing hours for "minor violations."........................................... 18

7. Deducting amounts owed to APEX or deducting uniform expenses from class members' paychecks. ............................................................ 19

8. Making class members live in "substandard" housing. .................. 19

9. Informing class members that Mr. Schumacher had a gun. ............ 20

10. Searching for class members once they left Defendants' employment. ....... 21

11. Venture liability. ............................................................................. 22

C. The named Plaintiffs assert claims that are inherently unique to them and not in any way typical of the proposed class. ................................... 22

D. Plaintiffs cannot adequately represent a class where at least six conflicts of interest are clearly present. .............................................................. 26

E. There are no common questions, meaning no common issues are available to predominate over individual issues. ........................................... 27

     1.  Causation is absolutely necessary under the TVPRA.................................... 28

     2.  Plaintiffs' claims of false promises embody the inescapably
        individualized concept of reliance on those promises. ................................. 30

III. The *Menocal* decision illustrates why class certification is inappropriate under the
     facts of the present case............................................................................................. 31

    A.  The uniform Sanitation Policy in *Menocal* was the glue that held the class
        together, and nothing even remotely comparable is present in this case.......... 32

    B.  This case lacks the common, circumstantial evidence that allowed the
        *Menocal* class to prove causation. ................................................................. 33

**CONCLUSION** .......................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Aiello v. City of Wilmington, Del.*, 426 F. Supp. 1272, 1282-83 (D. Del. 1976) .................. 9

*Albertson's, Inc. v. Amalgamated Sugar Co.*, 503 F.2d 459, 463–64 (10th Cir. 1974) ...... 26

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997) ............................................. 27

*Baricuatro v. Indus. Pers. Mgmt. Servs., Inc.*, 2013 WL 6072702, at *2 (E.D. La. Nov. 18, 2018) ...................................................................................................... 8, 11

*Berger v. Compaq Computer Corp.*, 257 F.3d 475, 481-482 (5th Cir. 2001) ................ 8, 11

*Bhasker v. Kemper Cas. Ins. Co.*, 361 F. Supp. 3d 1045, 1089 (D.N.M. 2019) .................. 7

*Bryant v. Southland Tube*, 294 F.R.D. 633, 648 (N.D. Ala. 2013) .................................... 23

*Castano v. American Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) ............................... 15

*Castellanos v. Worldwide Distrib. Sys. USA, LLC*, 2015 WL 13862060, at *3 (E.D. Mich. Aug. 19, 2015) ................................................................................................ 9, 10

*CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014) .................. 27

*Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) ............................................................. 7

*David v. Signal Intern., LLC*, 2012 WL 10759668, *19-20, 22 (E.D. La. Jan. 4, 2012) ...................................................................................................... 16, 29, 31

*Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968) ........................................................... 7

*Gen. Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 159, 160 n. 15 (1982)........ 6, 15

*Golden v. City of Columbus*, 404 F.3d 950, 966 (6th Cir. 2005) ........................................ 9

*Hansberry v. Lee*, 311 U.S. 32 (1940)................................................................................26

*In re Samsung Top-load Washing Mach. Mktg., Sales Practices & Prod. Liab. Litig.*, 2020 WL 2616711, at \*4 (W.D. Okla. May 22, 2020)................................................... 1, 7, 13

*Indep. Sch. Dist. No. 89, Okla. Cty., Okla. v. Bolain Equip. Inc.*, 90 F.R.D. 245 (W.D. Okla. 1980) ........................................................................................................................ 9

*Jaynes v. United States*, 69 Fed. Cl. 450, 454-55 (Fed. Cl. 2006) ....................................... 8

*Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 554 (5th Cir. 2011)........................ 8

*M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012)................................ 14

*Menocal v. GEO Group, Inc.*, 882 F.3d 905, 910, 915, 916, 919-921 (10th Cir. 2018)......... ....................................................................................... 3, 15, 27, 31, 32, 33, 34, 35

*Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 486 (3d Cir. 2018) ...................... 9

*Minersville Coal Co. v. Anthracite Export Ass'n*, 55 F.R.D. 426, 428 (M.D. Pa. 1971)...... 9

*Neder v. United States*, 527 U.S. 1 (1999) ........................................................................ 27

*Patterson v. Mobil Oil Corp.*, 241 F.3d 417, 419 (5th Cir. 2001) ...................................... 15

*Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).................... 22

*Rex v. Owens ex rel. State of Okl.*, 585 F.2d 432, 435 (10th Cir. 1978) .............................. 7

*Rodriguez v. Carlson*, 166 F.R.D. 465, 480 (E.D. Wash. 1996) .......................................... 13

*Schy v. Susquehanna Corp.*, 419 F.2d 1112 (7th Cir. 1970) .............................................. 26

*Shook v. El Paso Cty.*, 386 F.3d 963 (10th Cir. 2004) ......................................................... 6

*T.R. v. Sch. Dist. of Philadelphia*, 2019 WL 1745737, at *11-12 (E.D. Pa. Apr. 18, 2019) ................................................................................................................ 12, 13

*Tabor v. Hilti, Inc.*, 2010 WL 11465270, at *1 (N.D. Okla. Sept. 21, 2010) ................ 6, 13

*Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006) .................................................... 7

*Tyson Foods, Inc. v. Bouaphakeo*, —— U.S. ——, 136 S.Ct. 1036, 1045 (2016).............. 27

*United States v. Kalu*, 791 F.3d 1194, 1211-12 (10th Cir. 2015) ................................. 28-29

*United States v. Stewart*, 872 F.2d 957 (10th Cir. 1989) .................................................... 28

*Utah v. Am. Pipe and Constr. Co.*, 49 F.R.D. 17, 21 (C.D. Cal. 1969) .............................. 9

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338-352 (2011) .............. 1, 6, 7, 13-15, 22, 32-33

**Statutes**

18 U.S.C. § 1589 ...............................................................................................3, 22, 28-29

18 U.S.C. § 1590 .................................................................................................................. 3

18 U.S.C. § 1593A.............................................................................................................. 3

18 U.S.C. § 1594 .................................................................................. 3

22 C.F.R. § 62.22(b)(1)-(2) ................................................................ 30

22 C.F.R. § 62.32(b) ......................................................................... 30

Trafficking Victims Protection Reauthorization Act ..............3, 4, 6, 18, 19, 22, 27-32, 35

**Other Authorities**

1 Newberg on Class Actions § 3:31 (5th ed.) ..................................... 22

7 Wright and Miller, Federal Practice and Procedure § 1768 ............... 26

Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.Rev. 97, 132 (2009) .................................................................................. 14

**Rules**

Fed. R. Civ. P. 23 .........................................1, 4, 6-8, 10, 12, 14, 22, 27, 32, 35

LCvR5.2(a), 7.1(e) ............................................................................ 15

# INTRODUCTION

The Motion to Certify Class (Doc. 113) ("Motion" or "Mot.") filed by Plaintiffs, Dorret Francis, Anthony Kennedy, and Christine Pearce ("Plaintiffs"), fails to satisfy the requirements of Fed. R. Civ. P. 23 and should therefore be denied for the following reasons:

1. Plaintiffs are entitled to no deference or presumption of truth under Rule 23. Far from being a mere pleading standard, Rule 23 places a strict burden of proof on Plaintiffs to affirmatively demonstrate, by a preponderance of the evidence, that each element of the Rule 23 analysis is satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011); *In re Samsung Top-load Washing Mach. Mktg., Sales Practices & Prod. Liab. Litig.*, 2020 WL 2616711, at *4 (W.D. Okla. May 22, 2020).

2. Plaintiffs have failed to carry their strict burden of proving actual compliance with each of the Rule 23 elements:

  a. <u>Numerosity</u>: Although Plaintiffs invoke considerations like geographical dispersion, financial limitations, limited English skills, and unfamiliarity with the American legal system, they have no actual proof that *any* of these factors are actually present. Courts in other jurisdictions have refused class certification under virtually identical facts and evidentiary failures.

  b. <u>Commonality</u>: The Motion fails to identify even a single question that can truly be resolved in one stroke across the entire class. The simple fact is that there is no single question of fact or law that unites the proposed class and enables class-wide resolution of any issue. Only by examining the claims of every individual class member could the Court reach a determination that would be central to resolving this litigation.

1

c.      Typicality:  The named Plaintiffs' claims are not even typical of each other, much less typical of the claims of the class.  Plaintiffs admit they did not personally experience many of the facts the Complaint describes as supposedly being experienced by *all* class members.  Plaintiffs' evidence is also limited to individuals from just two of the twelve countries at issue, meaning Plaintiffs cannot carry their burden of showing the Court what a "typical" claim really is.  Moreover, Plaintiffs have no rebuttal to the six affidavits Defendants have procured from would-be class members, all of which describe how these individuals' experiences were *nothing* like those Plaintiffs allege and disagree with *every* substantive allegation at issue.  Thus, typicality is plainly absent.

d.      Adequacy of Representation: Plaintiffs have a clear and actual conflict of interest with at least six class members who have submitted affidavits discrediting the entirety of Plaintiffs' Complaint.  Plaintiffs cannot "adequately represent" such individuals or others like them, who saw the Schumachers as beloved "second parents."

e.      Predominance: Plaintiffs' failure to establish commonality is fatal to predominance.  The one issue that could be said to predominate across the proposed class is aggregation-defeating, not aggregation-enabling.  That issue is causation.  Did a class member provide labor to Defendants *because of* any of the conduct Plaintiffs have alleged?  The evidence shows that the class members did not even experience the same conduct, much less have the same causal reaction to it.  This overriding issue can only be addressed by assessing what promises (if any) each individual received and what role (if any) those promises played in each individual's decision to render labor to Defendants.  Thus, individual issues overwhelmingly predominate.

3. The Tenth Circuit's decision in *Menocal v. GEO Group, Inc.*, 882 F.3d 905 (10th Cir. 2018), establishes the key factors that can enable class certification under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), and those factors are nowhere to be found in the present case.

For these reasons, and as discussed in detail below, the Motion should be denied, and this action should proceed, if at all, to the merits phase solely on behalf of the three named Plaintiffs. In support, Defendants state as follows:

## FACTUAL BACKGROUND

Plaintiffs' Complaint (Doc. 1) presents a single cause of action based on the TVPRA, specifically 18 U.S.C. § 1589, 1590, 1593A, and 1594. Compl. (Doc. 1), ¶ 85(a). For their TVPRA claim, Plaintiffs seek to certify a class based on the following definition:

> [A]ll foreign nationals who were admitted to the United States on J-1 visas under the Summer Work Travel or Trainee and Intern Program, for whom Defendant APEX was the J-1 sponsor petitioner, and for whom at least one Defendant was the de facto employer upon arrival in the United States at any time from June 15, 2008 through December 31, 2013.

Compl., ¶ 83; Mot. (Doc. 113) at 8. During this time period, Defendants operated a Montana Mike's steakhouse, a Holiday Inn Express, a Hampton Inn, and a Water Zoo. Proposed class members were employed at one or more of these businesses. Plaintiffs allege that Defendants obtained their labor through means prohibited by the TVPRA.

It is undisputed that the TVPRA requires Plaintiffs to establish that their labor (and that of the alleged class) was obtained "by means of" certain prohibited acts (e.g., serious harm, threats, abuse of the legal process, etc.). 18 U.S.C. § 1589. It is likewise undisputed that Plaintiffs' allegations under the TVPRA depend upon the concept of allegedly false

recruitment "promises." Compl. at ¶ 2 (Doc. 1) (summarizing Plaintiffs' claims as "these promises were never fulfilled"); *id.* at ¶¶ 4, 5, 46, 47, 49-51, 60-62, 66, 68, 69, 71, 97, 101. Thus, Plaintiffs must prove that "false promises" *caused* them to provide labor to Defendants. The Motion does not dispute this conclusion: "Plaintiffs must establish 'some causal connection' between the prohibited activity or activities [i.e., false promises] and the provision of labor." Mot. (Doc. 113) at 18.

In order to establish that class certification is appropriate, Plaintiffs must establish that elements central to their TVPRA false-promise claims were experienced across the entire class. Such elements include:

1. What specific promises were made to *each* alleged class member?

2. What were the terms of *each* alleged class member's written contracts, and were they uniform across all six class years and all visa types (i.e., summer work-travel versus trainee/intern)?

3. Did *any* class member rely—as Ms. Pearce and Ms. Francis claim to have relied—on oral promises different from or in addition to the written contracts *each* student signed before leaving his or her home country? If so, what were those alleged oral promises?

4. What specific actions did *any* class member take that he or she would not have taken but for the alleged oral or written promise at issue?

On their face, these elements are incapable of class-wide resolution. However, they become especially problematic upon closer examination of the proposed class.

The proposed class consists of 208 individuals from 12 different countries who came to the United States on J-1 visas over a period of roughly 5 ½ years. *Ex. 1, Class List*. To satisfy Rule 23, Plaintiffs offer affidavits from eight individuals—the three Jamaican named Plaintiffs, three other Jamaicans, and two individuals from the Dominican

Republic. Mot. at Exs. 2-9 (Docs. 114-2 through 114-9). These eight comprise less than 4% of the total would-be class and represent just two of the twelve countries at issue.

Geographically, the evidence is even more deficient. Beyond Jamaica and the Dominican Republic, the record is completely silent. For instance, Plaintiffs present no evidence whatsoever from even *one* of the 77 alleged class members who came from India, thereby ignoring 37% of the total alleged class. A striking illustration of this failure is the fact that Defendant obtained six affidavits from Indian students, all of which directly contradict each of Plaintiffs' substantive allegations. *Exs. 5-10, Affidavits*. Despite the fact that Plaintiffs bear the burden of proof, the record is silent as to China (19 individuals, 9% of the class), Turkey (14 individuals, 7% of the class), Moldova (14 individuals, 7% of the class), and Indonesia (9 individuals, 4% of the class). Plaintiffs offer no explanation of how they can represent a class that even at the most basic level looks *nothing* like them, given that Plaintiffs themselves were all Jamaican nationals.

At least eleven (11) of the proposed class members came back to the United States a second time, working for Defendants in Clinton, Oklahoma, both times. *Ex. 1, Class List*, at Nos. 14, 44, 46, 61, 69, 95, 100, 119, 128, 132, and 172. Not surprisingly, *none* of these eleven repeat participants offered affidavits in support of the Motion and *none* of these eleven come from Jamaica or the Dominican Republic. Plaintiffs are apparently asking the Court to assume that these eleven were "trafficked" both times, but they cannot explain what would possess someone to volunteer for such treatment a second time— unless, of course, their experiences were nothing like what Plaintiffs have alleged.

These hurdles are insurmountable. Between the inherently-individualized causation inquiry of the TVPRA, the fact that Plaintiffs' claims rely on allegedly false individual promises, and Plaintiffs' total lack of evidence even *attempting* to address the crucial elements of the Rule 23 analysis, no hearing is needed to determine that Plaintiffs cannot possibly carry their burden of proof. Accordingly, the Motion should be summarily denied.

## ARGUMENTS AND AUTHORITIES

### I.    Plaintiffs bear the burden of affirmatively proving, by a preponderance of the evidence, that each requirement of Rule 23 is present.

The Motion is founded upon the mistaken assertion that the allegations of the Complaint are entitled to an assumption of truth at the class certification stage. Mot. (Doc. 113) at 8-9. By selectively relying on excerpts from *Shook v. El Paso Cty.*, 386 F.3d 963 (10th Cir. 2004), Plaintiffs seek to recast the Rule 23 standard to make it lean presumptively in their favor. However, the Supreme Court has foreclosed this effort:

> Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule— that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (emphasis in original). This echoes the prior holding that "actual, not presumed, conformance with Rule 23(a) remains, however, indispensable." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

Both in the Tenth Circuit and elsewhere, courts agree that "[a] party seeking class action certification must demonstrate, *under a strict burden of proof*, that all of the requirements of 23(a) are clearly met." *Tabor v. Hilti, Inc.*, 2010 WL 11465270, at *1 (N.D. Okla. Sept. 21, 2010) (emphasis added) (quoting *Rex v. Owens ex rel. State of Okl.*, 585

F.2d 432, 435 (10th Cir. 1978)).  Earlier this year, Judge DeGiusti recited the applicable

standard and the authority underlying it as follows:

> The Court may only certify a class for settlement purposes after being
> satisfied, following "rigorous analysis," that the prerequisites of Rule 23(a)
> have been met. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting
> *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011)); *accord Shook
> v. El Paso Cty.*, 386 F.3d 963, 971 (10th Cir. 2004) (emphasizing that the
> court must "carefully apply the requirements of Rule 23"). Plaintiffs—as
> movants—bear the burden of showing, by a preponderance of the evidence,
> that the Rule 23 requirements are met. *Trevizo v. Adams*, 455 F.3d 1155,
> 1162 (10th Cir. 2006).

*In re Samsung Top-load Washing Mach. Mktg., Sales Practices & Prod. Liab. Litig.*, 2020

WL 2616711, at *4 (W.D. Okla. May 22, 2020).  Judge DeGiusti's citation to *Shook*

highlights Plaintiffs' error in attempting to use that case to establish some sort of highly

deferential standard or favorable presumption under Rule 23.

"The class action is an exception to the usual rule that litigation is conducted by and

on behalf of the individual named parties only." *Dukes*, 564 U.S. at 348 (internal quotation

marks omitted).[1]  In light of this, "the party seeking certification bears the burden of

establishing that *all* requirements of Rule 23(a) have been satisfied."  *Berger v. Compaq*

---

[1] Plaintiffs argue that any doubts must be resolved in favor of class certification, citing
*Bhasker v. Kemper Cas. Ins. Co.*, 361 F. Supp. 3d 1045, 1089 (D.N.M. 2019).  *Bhasker*, in
turn, cited *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968) for this "presumption" in
favor of class certification.  However, *Esplin*'s holding was expressly limited to "the
context of the securities laws."  402 F.2d at 101.  Thus, in light of the Supreme Court's
more recent holding in *Dukes*, *Esplin* must be understood *at best* as being strictly limited
to securities claims (and possibly even as being overruled entirely).  This is confirmed by
the fact that the *Bhasker* court promptly followed the cited proposition by saying that "[i]n
ruling on a class certification motion, the Court need not accept either party's
representations, *but must independently find the relevant facts by a preponderance of the
evidence*."  *Bhasker*, 361 F. Supp. 3d at 1089 (emphasis added).  Thus, Plaintiffs'
authorities do nothing to establish a "presumption" in favor of class certification.

*Computer Corp.*, 257 F.3d 475, 481 (5th Cir. 2001) (emphasis in original); *see also Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 554 (5th Cir. 2011).

Moreover, Plaintiffs are not entitled to any deference in attempting to carry this burden, because "[e]ven in the absence of evidence to the contrary, the Court may not presume that any of the Rule's requirements are met but must hold the party seeking certification to its proof, for the Court owes a duty to ensure that the due process rights of absent putative class members are protected." *Baricuatro v. Indus. Pers. Mgmt. Servs., Inc.*, 2013 WL 6072702, at *2 (E.D. La. Nov. 18, 2018), citing *Berger*, 257 F.3d at 481-82. Thus, the fact that the Motion is premised upon a faulty understanding of the Rule 23 standard must color the entirety of the analysis that follows herein.

## II. Plaintiffs have failed to carry their strict burden of proof as to any element of the Rule 23 analysis.

The foregoing discussion establishes the true Rule 23 standard: if Plaintiffs have failed to carry their burden of affirmatively establishing, by a preponderance of the elements, even *one* of the Rule 23 elements, class certification must be denied. In reality, Plaintiffs have not carried their burden as to *any* of the Rule 23 elements.

### A. Plaintiffs have no evidence establishing numerosity under Rule 23(a)(1), either quantitatively or qualitatively.

The Motion disavows any attempt to establish the numerosity component of Rule 23(a)(1) based on numbers alone. Mot. (Doc. 113), at 9-10. This is likely because courts have questioned whether classes of similar sizes are sufficiently numerous based on numbers alone. *E.g.*, *Jaynes v. United States*, 69 Fed. Cl. 450, 454-55 (Fed. Cl. 2006) (collecting authorities and finding that a class of 258 putative members is insufficiently

numerous, because the class members had all worked in the same area and easily could be identified and located); *Indep. Sch. Dist. No. 89, Okla. Cty., Okla. v. Bolain Equip. Inc.*, 90 F.R.D. 245 (W.D. Okla. 1980) (potential class of 600 school districts all from the same state insufficient); *Aiello v. City of Wilmington, Del.*, 426 F. Supp. 1272, 1282-83 (D. Del. 1976) (250 potential class members are not so numerous as to make joinder impracticable); *Minersville Coal Co. v. Anthracite Export Ass'n*, 55 F.R.D. 426, 428 (M.D. Pa. 1971) (joinder of 330 potential class members not impracticable); *Utah v. Am. Pipe and Constr. Co.*, 49 F.R.D. 17, 21 (C.D. Cal. 1969) (joinder of 350 plaintiffs practicable).

Even beyond pure numbers, the proposed class definition improperly relies solely on the *total* number of students who worked for one or more Defendants under J-1 visas. Mot. (Doc. 113) at 10. This same approach has been rejected both in the context of allegedly fraudulent promises regarding foreign worker visas and in other contexts as well. *Castellanos v. Worldwide Distrib. Sys. USA, LLC*, 2015 WL 13862060, at *3 (E.D. Mich. Aug. 19, 2015) (numerosity requires the plaintiff to show that the defendants engaged in the same conduct with *all* visa recipients before relying on the total number of such visa recipients to demonstrate numerosity); *see also Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 486 (3d Cir. 2018) (refusing to speculate as to numerosity based solely on total number of disabled people who may visit a given restaurant, rather than the specific number of them who actually experience an ADA violation there); *Golden v. City of Columbus*, 404 F.3d 950, 966 (6th Cir. 2005) (explaining that the "absolute maximum number of plaintiffs that could be in any class action" is not probative of the number reasonably likely to have suffered harm, and finding this approach "too speculative for

purposes of the numerosity requirement"). Of particular relevance is the *Castellanos* court's conclusion that, for numerosity purposes, it could not "presume that each of the seventy-three individuals sponsored for TN visas received deceptive communications." *Castellanos*, 2015 WL 13862060 at *3.

The same defect is present here. The Motion makes no effort to demonstrate that *all* J-1 visa recipients received the same allegedly deceptive communications and experienced the same alleged departure from those promises upon arriving in the United States. Indeed, Plaintiffs could not possibly do so without examining each communication to each class member (thereby defeating commonality). Plaintiffs may not simply point to the existence of 208 J-1 visa recipients and call that a class. Numerosity requires a showing that *each* visa recipient actually shares some common experience as those alleged by the named Plaintiffs. Without such proof, the Court is unable to determine whether the class is sufficiently numerous for purposes of Rule 23(a)(1) based on numbers alone.

In an effort to avoid these *quantitative* numerosity problems, Plaintiffs instead rely exclusively on *qualitative* issues of geographic dispersion, lack of financial resources, lack of English proficiency, and unfamiliarity with the U.S. court system. Mot. (Doc. 113) at 10-11. However, the record reveals no evidence establishing any of these factors.

        1.    <u>Plaintiffs have no evidence—and refused to produce any in discovery—that would establish geographical dispersion.</u>

The Motion contains a single, conclusory sentence asserting that "[m]embers of the proposed class were born and raised in various foreign countries." Mot. (Doc. 113) at 10. However, there is no evidence as to where such class members are located *now*. The

feasibility of joinder obviously depends on the supposed geographical dispersion of the class *at the time of the lawsuit*. Geographic dispersion at the time of birth or childhood is completely irrelevant to determining where class members reside *now* and whether that dispersion (if any) renders joinder impracticable *now*. Based solely on Plaintiffs' dearth of evidence, all class members might *currently* reside in the same city, regardless of where they were born or grew up. It is Plaintiffs' burden to prove *current* geographic dispersion, if any exists.

Although Defendants requested this information in discovery, Plaintiffs refused to provide it. They even obtained a protective order allowing them to withhold it. *See* Order (Doc. 71). During their depositions, whenever Plaintiffs were asked a question that posed even the remotest chance of revealing where they or any other class members had been living since the conclusion of their employment with Defendants, Plaintiffs' counsel objected and instructed Plaintiffs not to answer. *Ex. 2, Kennedy Depo. (Excerpt)*, at 204:23-205:21; *Ex. 3, Pearce Depo. (Excerpt)*, at 179:4-180:7; *Ex. 4, Francis Depo. (Excerpt)*, at 7:8-9:16; 31:7-19; 78:20-79:3; 168:15-21. There is therefore no evidence available as to the current location of any proposed class member, and this is purely by Plaintiffs' choice. Given that geographic dispersion may not be presumed or merely argued, the result of Plaintiffs' litigation strategy is that they are now completely unable to carry their burden of establishing numerosity through geographic dispersion. *See Baricuatro v. Indus. Pers. Mgmt. Servs., Inc.*, 2013 WL 6072702, at *2 (E.D. La. Nov. 18, 2018), citing *Berger*, 257 F.3d at 481–82 (finding numerosity lacking where no evidence was provided as to the current location of proposed class members).

2. The Motion lacks sufficient detail as to any proposed class member's current financial resources.

Plaintiffs cite two affidavits (Mot. at Exs. 4, 8 (Docs. 114-4, 114-8)) to establish that the proposed class lacks the financial resources to bring their own actions. Mot. (Doc. 113) at 11. However, neither of these affidavits offer any support for this conclusory statement. The Court is left to speculate as to details such as monthly income, expenses, debts, or other income sources (e.g., spouse's income). Again, class certification requires *proof*, not mere *ipse dixit*. Plaintiffs cannot establish a lack of financial resources simply by reciting "I lack financial resources" with no details to back up that assertion. This aspect of numerosity cannot be proven on such conclusory evidence and may not be presumed. *See T.R. v. Sch. Dist. of Philadelphia*, 2019 WL 1745737, at *11-12 (E.D. Pa. Apr. 18, 2019) (refusing to assume, without proof, that mere assertion of limited financial resources is sufficient to render joinder impracticable under Rule 23).

3. Not one of Plaintiffs' affidavits attempts to show that any class member currently lacks proficiency in the English language.

All three named Plaintiffs were deposed in this case without an interpreter. *Ex. 2, Kennedy Depo.*, at 2; *Ex. 3, Pearce Depo.*, at 2; *Ex. 4, Francis Depo.*, at 2. All but one of the eight affidavits supporting the Motion were completed in English without an interpreter (Mot. at Exs. 2-7, 9), and none of them contain even a conclusory statement that a class member currently lacks sufficient English skills to prosecute a claim. Ms. Morel's affidavit is the only one that even mentions English skills, but all it states is that the J-1 program was presented to her *at the time she participated* (i.e., in 2010) as an opportunity to improve her English skills. Mot. at Ex. 3, at ¶¶ 4, 15 (Doc. 114-3). Ms. Morel also states that

"English proficiency" was a job requirement, meaning she clearly possessed sufficient English skills in 2010 to qualify for the job. *Id.* at ¶ 4. The record is silent as to her *current* English proficiency, and no other affidavit even addresses this subject. Plaintiffs have thus completely failed to offer evidence in support of this aspect of numerosity. *See T.R.*, 2019 WL 1745737, at *11-12 (rejecting unsupported assumption that having a different primary language somehow proves lack of English proficiency for numerosity purposes). At the class certification stage, the Court may not simply assume that a person lacks English skills solely because he or she is not originally from the United States.[2]

### 4. There is no proof of unfamiliarity with the U.S. legal system.

In asserting that class members are unfamiliar with the U.S. legal system, the Motion relies solely on two affidavits and one memorandum regarding a *single student's* continued failure to abide by the English-only policy at Montana Mike's. Mot. at Exs. 2, 8, 27 (Docs. 114-1, 114-8, 116-1). In these three documents, *not one word* purports to establish unfamiliarity with the U.S. legal system, even in conclusory fashion. In other words, these exhibits are not even *relevant* to what Plaintiffs claim they *prove*. Plaintiffs have therefore made no effort to satisfy this final component of qualitative numerosity.[3]

---

[2] Interestingly, English is the official language of Jamaica, the home country of all three named Plaintiffs, three of their witnesses, and 21% of the proposed class. *Ex. 1, Class List.*

[3] Plaintiffs cite *Rodriguez v. Carlson*, 166 F.R.D. 465, 480 (E.D. Wash. 1996) for the proposition that migrant workers' unfamiliarity with the U.S. legal system is "presumed." Mot. (Doc. 113) at 34. *Rodriguez* did not discuss this factor in the context of numerosity. Moreover, because Rodriguez predates *Dukes*, 564 U.S. 338 (2011), *Tabor*, 2010 WL 11465270, and *In re Samsung*, 2020 WL 2616711, by many years, these later decisions must eliminate any "presumption" the *Rodriguez* court may have applied.

In sum, it is not enough for Plaintiffs to merely recite labels like "geographical dispersion" or "lack of English proficiency." It is their burden to provide actual proof of each facet of this analysis. Because the class is of questionable *quantitative* numerosity, and because Plaintiffs have wholly failed to establish any *qualitative* aspects of Rule 23(a)(1), the Court should find that numerosity is lacking.

## B. Plaintiffs cannot identify a single question common across the entire class that may be resolved "in one stroke."

The language of Rule 23(a)(2) "is easy to misread," because "[a]ny competently crafted class complaint literally raises common 'questions.'" *Dukes*, 564 U.S. at 349 (internal quotations omitted). But simply pleading the existence of such questions is never automatically sufficient to satisfy commonality, because "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers *apt to drive the resolution of the litigation*." *Id.* at 350 (emphasis added) (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.Rev. 97, 132 (2009)). This means that a question only satisfies commonality if a "determination of its truth or falsity will resolve an issue that is *central to the validity of each of the claims* in one stroke." *Id.* (emphasis added).

Moreover, "the members of a proposed class do not establish that 'their claims can productively be litigated at once,' merely by alleging a violation of the same legal provision by the same defendant." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (quoting *Dukes*, 564 U.S. at 350) (finding the district court's analysis of commonality deficient where it failed to explain how resolution of any "common" question

would be central to resolving the causes of action asserted).  Rather, some unifying factor that is consistent across the entire class—such as a uniform corporate policy or a discriminatory test for promotions, *see Gen. Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 159, n. 15 (1982) and *Menocal v. GEO Group, Inc.*, 882 F.3d 905 (10th Cir. 2018)—must be present to establish commonality.  "Claims for money damages in which *individual reliance is an element* are poor candidates for class treatment, at best. . . . [The Fifth Circuit] recently held that 'a fraud class action cannot be certified when individual reliance will be an issue.'"  *Patterson v. Mobil Oil Corp.*, 241 F.3d 417, 419 (5th Cir. 2001) (citing *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996)).

Under these authorities, not one of the supposedly "common" questions identified in the Motion is sufficient to establish commonality.  *See* Mot. (Doc. 113) at 21-23.[4]

1.  <u>Paying wages below what was stated in job offers</u>.  There is simply no way to resolve this question "in one stroke."  *Dukes*, 564 U.S. at 350.  As these job offers varied from year to year, from business to business, and from position to position, the Court would be required to compare each individual class member's job offer to the wages actually received.  Answering this question as to one class member could not possibly be extrapolated to all other class members.  Common proof is lacking as well, because (a) payroll records from one entity do not show wages paid at other entities, and (b) even if

_____

[4] In listing these alleged "common questions," Plaintiffs' Motion ignores the formatting requirements of the local rules by offering *more than two full pages* of single-spaced, unquoted, purely argumentative material.  *See* LCvR5.2(a), 7.1(e).  This was obviously done in order to *appear* to have complied with the Court's 35-page limit (Order, Doc. 112), which the Motion achieves, with no room to spare, only by violating local rules.

payroll records could somehow be combined, each individual job offer would still have to be analyzed one at a time. Moreover, at least six class members did not even experience this alleged payment of wages below what was offered. *Exs. 5-10, Affidavits*.

2. <u>Overstaffing properties</u>. To determine whether any given property was "overstaffed" at any given time, the Court would be required to examine the specific customer or guest census data for each time period in question (which would necessarily include at least 365 separate dates within each of the six class years) for each of the multiple properties in question. The census at one property has no bearing on the staffing of another property. Moreover, whether such alleged overstaffing played any role in actually causing any class member to continue providing labor or services where he or she otherwise would not have done so can only be resolved on an individual basis, taking into account the vulnerabilities and circumstances of each person. *See, e.g., David v. Signal Intern., LLC*, 2012 WL 10759668, *19-20, 22 (E.D. La. Jan. 4, 2012) (finding "a human trafficking claim premised on a violation of the forced labor statute cannot be tried on a class-wide basis" because such an analysis "must take into account the particular victim's vulnerabilities"). Further, at least six class members never experienced reduced hours due to overstaffing or any other reason. *Exs. 5-10, Affidavits*. How many other class members' experiences align with these six can only be determined on an individual basis.

3. <u>Preventing J-1s from obtaining additional work</u>. The Motion ignores the fact that obtaining a second job would only be relevant to the class members who *sought* a second job. Defendants have provided four affidavits of proposed class members who had no interest in seeking a second job. *Ex. 5, Joseph Affid.*, at ¶¶ 22; *Ex. 6, Amin Affid.*, at ¶

22; *Ex. 7, Kadbhane Affid.*, at ¶ 21; *Ex. 8, Lihipande Affid.*, at ¶ 22.  Mr. Shukla and Ms. Kolhapuray both *did* work a second job.  *Ex. 9, Shukla Affid.*, at ¶ 12; *Ex. 10, Kolhapuray Affid.*, ¶ 14.[5]  Clearly, some class members did not care about having a second job, while others worked a second job without issue.  The only way to determine which class members fit either description is a person-by-person analysis, which defeats commonality. Commonality also fails because this question requires an analysis of whether the class member was qualified for the second job they sought, whether any such jobs were actually available at the time, and whether Defendants took any action to impede any class member's success in finding a second job.

    4.    <u>Threatening class members they would be terminated and/or deported for</u> <u>"minor infractions."</u>    Plaintiffs' evidence on this point simply underscores the individualized nature of this supposed "common question."  There is no evidence of "mass warnings" or class-wide disseminations of "threats."  Rather, *individual* employees were warned or disciplined for *individual* misconduct.  Whether any particular class member continued providing labor for Defendants due solely to an alleged warning or threat necessarily depends on whether that class member ever even *heard or knew* about such alleged warnings or threats.  Each individual's knowledge and the various responses thereto will necessarily dominate this inquiry.  Each disciplinary action would also require individual analysis to determine whether a reasonable person would consider the underlying infraction "minor."  The only way this issue could be "common" is if *all*

---

[5] Plaintiffs' Exhibit 31, at page 2833, does not contain anything even remotely resembling what the Motion quotes it as saying.  That page is a uniform size measurement chart.

disciplinary action against J-1 students, regardless of the facts, is automatically considered forced labor. The language of the TVPRA leaves no room for such a rule.

5. <u>"Berating," "reprimanding," or "threatening" class members for disobeying rules</u>. Even setting aside the fact that virtually every employee in every organization will be reprimanded in some way if he or she disobeys the employer's rules, this presents yet another individualized inquiry. There is no evidence that *every* class member was reprimanded or that *every* class member disobeyed rules. Which ones were reprimanded? Which ones ever even knew of another class member's reprimand? How did any given class member react? Would not that reaction vary from one reprimand to another, from one business to another, and even from one medium (oral vs. written) to another? What about the situation of Ms. Pearce, who was fired after just a week or two but was *not* sent home to Jamaica?

6. <u>Reducing hours for "minor violations</u>." Plaintiffs cite just two examples of anything like this ever happening, and Ms. Saunders' affidavit (Mot. (Doc. 113), at Ex. 9, ¶ 12 (Doc. 114-9)) mentions nothing about *anyone's* hours being cut (she actually complains of working *too much*). There is no evidence that any other class member experienced a disciplinary cut in hours. More importantly, neither this question nor any other discipline-related question could be answered with "a single stroke," because each instance of discipline is handled differently. Similarly, no common evidence could answer this question, because any observable reduction in the hours worked by any given class member (the evidence of which would differ from one corporate employer to another) could be due to anything from employee illness to a holiday closure to a time card error to

actual discipline, and everything in between.  Only by examining each instance, analyzing whether a reduction is still within the range of hours stated in the employee's job offer, ascertaining the reasons for the reduction, and assessing whether the reduction was significant enough to satisfy the causation element of the TVPRA, could the Court answer the propriety of just one reduction *for a single employee*.  The process would have to be repeated for *each* employee.

      7.    <u>Deducting amounts owed to APEX or deducting uniform expenses from class members' paychecks</u>.  This issue can only be addressed by determining whether any amounts were actually deducted from any given class member's paycheck based on individual pay stubs.  The fact that employee A had a paycheck reduction on just one occasion or that employee B had deductions on three occasions does nothing to resolve the question of whether this ever happened to employees C, D, or E.  This is obviously a case-by-case question, not a "common" question, and Plaintiffs cannot seriously suggest that employee C—who never had a paycheck deduction and who never even knew about anyone else's paycheck deduction—was somehow subjected to "forced labor" simply because employees A or B experienced a paycheck deduction.  The materiality of such deductions would likewise vary based on the individual circumstances of each employee.

      8.    <u>Making class members live in "substandard" housing</u>.  Would-be class members Frank Joseph, Swapnil Shukla, Nilesh Kadbhane, and Manesha Kolhapuray described the housing Defendants provided as "beautiful" (*Ex. 5, Joseph Affid.*, at ¶ 19), "comfortable and nice" (*Ex. 7, Kadbhane Affid.*, at ¶ 15), "never crowded" and something that was "enjoyed," (*Ex. 9, Shukla Affid.*, at ¶ 13),  and "really awesome" and "a dream

home" (*Ex. 10, Kolhapuray Affid.*, at ¶ 15).  Ms. Kolhapuray's glowing review of the housing is especially important because she lived with Ms. Francis (*Ex. 10, Kolhapuray Affid.*, at ¶ 16), for whom allegedly "substandard" housing was a chief complaint.  Mr. Kennedy had no complaints about the housing *he arranged for himself.  Ex. 2, Kennedy Depo.*, at 140:6-14, 150:8-17.  This evidence demonstrates that the question of whether any class member found the housing to be "substandard" is wildly subjective and will obviously vary significantly from person to person.  In addition, Plaintiffs inexplicably assert this as a "common" question for the class when it is not even "common" for the three named Plaintiffs and their own witnesses.  *See Ex. 2, Kennedy Depo.*, at 140:6-14 (testifying that he arranged *his own* housing); *Ex. 11, Morel Job Offer*, at p. 9820 (stating that housing would be in local hotels *of the employee's choosing*); *Ex. 3, Pearce Depo.*, at 62:3-14, 64:3-65:7 (after initially staying at the Trade Winds hotel, Ms. Pearce voluntarily moved to a house of her choosing with other J-1 students); *Ex. 12, Francis Job Offer* (requiring Ms. Francis to live in employer-provided housing).  Because not all class members were required to live in the housing Defendants offered, this cannot be a common, class-wide question susceptible of resolution by common proof.

9.  Informing class members that Mr. Schumacher had a gun.  Ms. Pearce saw Mr. Schumacher in his police uniform, which obviously includes a gun, but no one ever told her about Mr. Schumacher having a gun.  *Ex. 3, Pearce Depo.*, at 74:23-75:11.  Ms. Francis was never personally told by any Defendant that Mr. Schumacher had a gun.  *Ex. 4, Francis Depo.*, at 98:17-25.  Would-be class members Mr. Amin, Ms. Kolhapuray, Mr. Kadbhane, Ms. Lihipande, and Mr. Shukla have each stated they were never told that Mr.

Schumacher had a gun. *Ex. 6, Amin Affid.*, ¶ 28; *Ex. 7, Kadbhane Affid.*, at ¶ 27; *Ex. 8, Lihipande Affid.*, at ¶ 30; *Ex. 9, Shukla Affid.*, at ¶ 21; *Ex. 10, Kolhapuray Affid.*, at ¶ 27. Even assuming Defendants could somehow be held liable for what employees may have heard through the rumor mill (which is a *highly* questionable assumption), these specific instances demonstrate that whether a given class member ever heard such rumors or ever saw Mr. Schumacher in uniform are individualized inquiries that defeat commonality.[6]

10. <u>Searching for class members once they left Defendants' employment</u>. Plaintiffs' Exhibit 41 is an email from Mr. Schumacher—not to any class member but to the U.S. Department of State—describing Defendants' effort to locate a *single* J-1 student, Michael Jones, who had absconded. Mot. at Ex. 41 (Doc. 117-4). Ms. Pearce's affidavit says nothing about anyone actually searching for her or any other class member after leaving Defendants' employment. Plaintiffs have *zero* evidence of Defendants ever actually searching for proposed class members on any sort of generalized or class-wide basis. There is likewise no evidence that any class member ever heard anything about Defendants' efforts to locate Michael Jones. The Motion cannot explain how any sort of common proof could possibly exist on this subject. By its very nature, it is limited to only

---

[6] Plaintiffs' expert apparently believes that coercion can occur simply by virtue of the fact that Mr. Schumacher was a law enforcement officer. Mot. at Ex. 1, ¶¶ 67-70 (Doc. 114-1). But by his own logic, this inquiry would require an individualized examination of class members' perceptions and past experiences with law enforcement officers. It is not at all far-fetched to imagine class members feeling *safer* and *more* protected knowing (if they actually knew) that Mr. Schumacher was in law enforcement. This too defeats commonality. For a more useful perspective based on decades of on-the-ground experience investigating human trafficking and forced labor claims, see the report of Defendants' expert at Doc. 102-1.

those class members for whom Defendants ever searched, which on Plaintiff's evidence appears to be a total of *one*.

11. <u>Venture liability</u>. Whether Defendants are a "venture" for purposes of § 1589 is completely irrelevant unless the threshold issues of TVPRA liability are resolved first. As Plaintiffs admit, they must hold one Defendant liable under § 1589(a) first and *then* seek to establish venture liability. Thus, it cannot be said that the venture liability is so central that it is apt to drive the resolution of this litigation. *Dukes*, 564 U.S. at 350.

Plaintiffs' failure to identify even a single question that is truly common to the entire class demonstrates the wisdom of the Supreme Court's reasoning in *Falcon*, 457 U.S. 147, and *Dukes*, 564 U.S. 338. In both cases, the Court found commonality lacking because there was no class-wide policy or practice that would have operated in the same way on all class members. Such a unifying factor is completely absent in this case as well. The evidence cannot support a finding of commonality under Rule 23.

## C. The named Plaintiffs assert claims that are inherently unique to them and not in any way typical of the proposed class.

While the commonality and typicality analyses often overlap, this case presents factors unique to typicality that provide additional reasons for denying class certification. Typicality and commonality "proceed[] from a different perspective: the commonality inquiry focuses on what characteristics are shared among the whole class while the typicality inquiry focuses on the desired attributes of the class representative." 1 Newberg on Class Actions § 3:31 (5th ed.) ("Newberg"); *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000). "The typicality requirement is more exacting because it

requires sufficient factual and legal similarity between the class representative's claims and those of the class to ensure that the representative's interests are in fact aligned with those of the absent class members." Newberg, at § 3:31.

A helpful examination of the typicality requirement is found in *Bryant v. Southland Tube*, 294 F.R.D. 633 (N.D. Ala. 2013). The proposed class in *Bryant* consisted of all African American individuals who had been employed at Southland Tube for a specific time period. However, the court denied certification on the grounds that the claim of each individual plaintiff would require a specific fact inquiry. The court explained as follows:

> Even though the evidence indicates that all plaintiffs worked in a single location and that most, if not all, of the decisions at issue were approved by the Operations Manager, the named plaintiffs' claims of disparate treatment are primarily individual claims of alleged discrimination and do not support a finding of typicality required for a class action. Plaintiffs share the common characteristic of being African–Americans and being current and former employees of defendant. However, their allegations of discriminatory treatment are highly individualized. Plaintiffs were employed in different positions and they desired different promotions and training. Some testified that they asked their Front–Line Supervisors and Superintendents for training and promotions; some testified they did not ask for a promotion or training because defendant did not post such opportunities. Some plaintiffs had issues with job performance and/or attendance that made them unlikely candidates for promotions or merit raises. Others were promoted numerous times. Also, defendant has stated that its reasons for selecting, or not selecting, certain individuals for promotion, training, and/or merit raises are specific to the individual and not based on a policy of race discrimination.

*Bryant*, 294 F.R.D. at 648.

In the present case, the named Plaintiffs' claims are not even typical of each other, much less each of the proposed class members they seek to represent. For instance, Ms. Francis complains that her housing was overcrowded (*Ex. 4, Francis Depo.*, at 130:13-19), while Ms. Pearce complains that the housing provided was a hotel room (not a house) in

which she could not cook (*Ex. 3, Pearce Depo.*, at 202:19-203:18). By contrast, Mr. Kennedy has no housing complaints, as he knew it would be his responsibility to both arrange and pay for his own housing (*Ex. 2, Kennedy Depo.*, at 140:6-14), which he did without trouble after he arrived (*id.* at 150:8-17). Ms. Francis' and Ms. Pearce's claims of housing problems are clearly not typical of Mr. Kennedy's, who had no such problems. Even as between Ms. Francis and Ms. Pearce there is no typicality, because their two claims are based on very different allegations. Most importantly, the only way the Court could determine which class members' claims are similar to those of Ms. Pearce, which are similar to those of Ms. Francis, which are similar to those of Mr. Kennedy, and which are similar to *none of the above* would be to examine each situation individually.

In addition, Plaintiffs' claims are not even typical of those described in the Complaint. Contrary to Plaintiffs' allegations that they and the proposed class were uniformly promised food and transportation (Compl. (Doc. 1) at ¶ 2), all three Plaintiffs understood that these costs were their responsibility (or at least had documentation showing that was the case). *Ex. 2, Kennedy Depo.*, at pp. 261:12-262:2; *Ex. 3, Pearce Depo.*, at pp. 36:16-37:8; 204:3-7 (stating Ms. Pearce's expectation of cooking her own food); *Ex 4, Francis Depo.*, at 55:6-10; 57:12-16; 138:24-139:13. Given that the Complaint alleges that "Plaintiffs and putative class members were promised . . . food [and] transportation" (Compl. (Doc. 1) at ¶ 2), how can any of the named Plaintiffs be typical of the purported class when *none* of the three have any complaints on these issues? Similarly, none of the named Plaintiffs personally experienced any threats of physical violence or restraint. *Ex. 2, Kennedy Depo.*, at 248:18-250:19, 251:7-12; 252:5-11, 22-25; 257:25-258:12; *Ex. 3,*

*Pearce Depo.*, at pp. 105:16-109:6, 148:4-6; *Ex. 4, Francis Depo.*, 118:6-9.  Thus, the named Plaintiffs cannot have claims typical of class members (if any exist) who supposedly experienced a "threat of implied physical harm."  Compl. ¶ 97; *see also id.*, ¶¶ 78, 98.

As discussed above, geographical typicality is lacking as well.  Plaintiffs have no evidence from any J-1 students from Albania, the Czech Republic, China, Ghana, India, Indonesia, Moldova, Peru, the Philippines, or Turkey—ten (10) of the twelve (12) countries in which students were supposedly trafficked, or roughly 70% of the proposed class.  *Ex. 1, Class List*.  This is crucial, because Jamaican students obviously dealt with Jamaican recruiters, Chinese students with Chinese recruiters, etc.  Yet, no evidence exists as to what might have been a typical experience in *any* of these ten (10) other nations.  This evidentiary failure is thrown into sharp focus by the affidavits Defendants have produced (*Exs. 5-10*), which tell a vastly different story of what at least six students from India experienced.  Despite the fact that these Indian students squarely disagree with every substantive allegation in the Complaint, Plaintiffs still assert that their own claims are "typical" of these six individuals whose situations are diametrically opposed to those of Plaintiffs.  This is precisely the sort of personal, factually-nuanced situation that defeated a finding of typicality in *Bryant*.  The same result is warranted here.

The evidence demonstrates that this proposed class is full of truly personalized and unique experiences, and the Court will be required to conduct separate inquiries for each one.  In light of the evidence Defendants have produced (*Ex. 5-10*) and the fatal evidentiary failures by Plaintiffs, there is simply no way to prove, by a preponderance of the evidence, that Plaintiffs' claims are typical of the class.  Therefore, the Motion should be denied.

**D.** **Plaintiffs cannot adequately represent a class where at least six conflicts of interest are clearly present.**

"It is axiomatic that a plaintiff cannot maintain a class action when his interests are antagonistic to, or in conflict with, the interests of the persons he would seek to represent." *Albertson's, Inc. v. Amalgamated Sugar Co.*, 503 F.2d 459, 463–64 (10th Cir. 1974) (citing *Hansberry v. Lee*, 311 U.S. 32 (1940); *Schy v. Susquehanna Corp.*, 419 F.2d 1112 (7th Cir. 1970); 7 Wright and Miller, Federal Practice and Procedure § 1768. This requirement "must be stringently applied." *Id.*

The Motion ignores the fact that there are at least six proposed class members who have gone on record as flatly opposed to the claims Plaintiffs have asserted in this case. *Ex. 5-10, Affidavits.* As the parties with the burden of proof, it is incumbent upon Plaintiffs to demonstrate how they will be able to prosecute this action on behalf of six (and likely more) individuals whose interests are clearly not aligned with the interests Plaintiffs claim to be pursuing in this case. While the three named Plaintiffs may be willing to take whatever they can get from Defendants, it is clear that at least six Indian students truly enjoyed their time in the United States, had close personal relationships with the Schumachers, and would even come back again now if they could. *Ex. 5-10, Affidavits.* For instance, would Mr. Joseph want to sue—or have Plaintiffs sue on his behalf—the people he regards as his "second parents" who have "really, really taken care of me"? *Ex. 5 – Joseph Affid.*, at ¶ 32. The Motion simply ignores all such countervailing evidence.

**E.** **There are no common questions, meaning no common issues are available to predominate over individual issues.**

Much like commonality, predominance "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, —— U.S. —— –, 136 S.Ct. 1036, 1045 (2016). The two are so related that commonality is often seen as "subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement" of predominance. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609 (1997). In assessing predominance, the court must "*characterize* the issues in the case as common or not, and then *weigh* which issues predominate." *Menocal v. GEO Group, Inc.*, 882 F.3d 905, 915 (10th Cir. 2018) (emphasis in original) (quoting *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014).

Given that no question can be "characterized" as common, there is nothing for the Court to "weigh" for purposes of predominance. Without commonality, predominance necessarily fails as well. Nowhere is this more clearly demonstrated than in the six class member affidavits Defendants have obtained (*Exs. 5-10*), each of which flatly contradicts every allegation on which Plaintiffs base their claims. This contradictory evidence from *within the proposed class* establishes that individual issues will certainly predominate.

The most obvious individual issue that will predominate in this case is that of causation or reliance. The Motion attempts to side-step a reliance requirement arguing that the phrase "by means of" does not, by itself, create a reliance requirement under the TVPRA. Mot. (Doc. 113) at 19. Plaintiffs cite to *Neder v. United States*, 527 U.S. 1 (1999),

*United States v. Kalu*, 791 F.3d 1194 (10th Cir. 2015), and *United States v. Stewart*, 872 F.2d 957 (10th Cir. 1989), in an attempt to establish that "what matters is the Defendants' intention; not whether that scheme successfully caused any class member to believe they would suffer serious harm"—in other words, that causal reliance is not an element of a false promise TVPRA claim. However, none of these cases actually dealt with the TVPRA. Moreover, as shown below, Plaintiffs' theory runs afoul of both the TVPRA itself and even Plaintiffs' own allegations.

             1.     <u>Causation is absolutely necessary under the TVPRA.</u>

The forced labor statute on which Plaintiffs rely, 18 U.S.C. § 1589, only applies to a defendant who "provides or obtains the labor or services of a person." Simply stated, no actual labor means no possible liability. Here, given that labor was obtained from every class member in this case, the question necessarily becomes through what *means* Defendants obtained it. Under § 1589(a)(2)-(4), prohibited "means" include[7]:

> (2) *by means of* serious harm or threats of serious harm to that person or another person;
>
> (3) *by means of* the abuse or threatened abuse of law or legal process; or
>
> (4) *by means of* any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

(Emphasis added.) The concept of causation is plainly inherent in each of these "means."

Subparts (2) and (4) both depend on "serious harm." "Serious harm" must be "sufficiently serious . . . to *compel* a reasonable person . . . *to perform or to continue*

---

[7] Plaintiffs do not invoke 18 U.S.C. § 1589(a)(1). *See* Mot. (Doc. 113) at 18.

*performing labor or services*[.]" 18 U.S.C. § 1589(c)(2) (emphasis added). Causation is unmistakably central to the notion of serious harm, because if an action fails to "compel" labor, it is obviously not sufficiently serious.[8] As to subpart (3), Section 1589(c) defines "abuse or threatened abuse of law or legal process" as using the legal process "in order to exert pressure on another person to *cause* that person to take some action or refrain from taking some action." (Emphasis added.) Hence, the TVPRA clearly requires Plaintiffs to prove that the alleged conduct—i.e., supposedly false promises—actually *caused* or *compelled* them to do what they otherwise would not have done: provide their labor.

Several courts have found that causation is an unavoidably central issue under the TVPRA. *United States v. Kalu*, 791 F.3d 1194, 1211-12 (10th Cir. 2015) (affirming a § 1589 jury instruction that asked whether, "*as a result* of Mr. Kalu's use of the unlawful means described above, the person named in the count continued to provide labor or services where, if Mr. Kalu had not resorted to those unlawful means, the person would have declined to perform additional labor or services") (emphasis added); *see also David*, 2012 WL 10759668, at *19 ("[F]orced labor turns on whether the victim rendered labor *because of* the verboten physical force or legal coercion.") (emphasis added). Thus, under

---

[8] The reasonable person standard in § 1589(c)(2) must not be misread. Such a standard provides useful guidance where conduct that *undeniably occurred* (e.g., pointing a gun at someone) actually prompted the recipient's action or response (e.g., fearing bodily harm). The standard asks whether a reasonable person would have responded in the same way the recipient did. The present case inverts this question: given that the *response* undeniably occurred (i.e., providing labor), what conduct prompted it? The record contains at least six examples of class members providing labor as a result of perfectly legitimate, non-coercive means (*Ex. 5-10*). Plaintiffs, by contrast, claim they labored only as a result of unlawful means (i.e., unfulfilled promises). That disparity *within the class* is precisely what defeats both commonality and predominance (and, thus, class certification).

the language of the TVPRA, if Defendants did not *cause* a given class member to *actually* provide labor, then no forced labor occurred (and no liability exists) as to that individual.

      2.    <u>Plaintiffs' claims of false promises embody the inescapably individualized concept of reliance on those promises.</u>

The essence of Plaintiffs' claim is their allegedly "reasonable reliance on promises made by Defendants." Compl. (Doc. 1) at ¶ 51. When applied to allegedly false recruitment promises, the TVPRA's causation requirements clearly embody the principle of reliance. A mere promise can have no "causal connection" to a class member's provision of labor unless he or she *relied* on it. For instance, if a class member came to work for Defendants solely to see the United States and to obtain experience in an American steakhouse like Montana Mike's, such that this class member would still have decided to come to America even for an *unpaid* J-1 internship, then that person obviously did not rely on any allegedly false promise about wage rates or structures.[9] That promise could not be considered the "means" by which Defendants obtained that class member's labor if he or she would have done exactly what he or she did (i.e., provide labor) regardless of whether the promise was true or false. The all-important *reliance* element would be lacking.

Again, it is undisputed that the class members provided labor to Defendants. This necessarily leads to an inquiry of whether they did so voluntarily or as a result of some

---

[9] Such a motivation is not merely hypothetical. Indeed, the express purposes of the J-1 Trainee/Intern Program are (a) job training; (b) cultural exchange; and (c) bridging the gap between formal education and practical work experience. 22 C.F.R. § 62.22(b)(1)-(2). By law, it is *not* primarily a money-making job for students. *Id.* at (b)(1)(ii). Similarly, the purposes of the Summer Work-Travel Program are (a) cultural exchange; and (b) "to help defray a *portion* of [students'] expenses"—not to make a profit. 22 C.F.R. § 62.32(b).

unlawful conduct by Defendants. That, in turn, leads to an inquiry of what specific conduct, promises, and situations each class member actually experienced, because their labor obviously could not have been "compelled" by means of conduct they never personally experienced or became aware of. Each individual's situation must be analyzed, because "one cannot determine whether the defendant's actions coerced or forced the victim to provide labor without looking to the specific victim involved." *David*, 2012 WL 10759668, at \*19. As these inherently individualized inquiries will clearly predominate in this case, class certification must be denied.

### III. The *Menocal* decision illustrates why class certification is inappropriate under the facts of the present case.

*Menocal v. GEO Group, Inc.*, 882 F.3d 905 (10th Cir. 2018) appears to be the Tenth Circuit's only class certification decision under the TVPRA. A careful analysis of *Menocal* and its holding is fatal to Plaintiffs' Motion. The *Menocal* plaintiffs sought to certify a class for TVPRA claims that included all detainees at defendant GEO's private contract immigration detention facility.[10] *Menocal*, 882 F.3d at 910. GEO's facility had a mandatory Sanitation Policy that required all detainees, without exception, to clean the housing unit common areas. *Id.* at 910-11. This policy included a system of disciplinary sanctions for detainees who refused to participate in the cleaning program. *Id.* at 911. One possible sanction was solitary confinement for up to 72 hours. *Id.* The class challenged the mandatory Sanitation Policy as a violation of the TVPRA's forced labor provisions. *Id.*

---

[10] *Menocal* also involved a class to be certified for unjust enrichment purposes, but that aspect is not relevant here, as Plaintiffs' only claim arises under the TVPRA.

**A.** **The uniform Sanitation Policy in *Menocal* was the glue that held the class together, and nothing even remotely comparable is present in this case.**

In evaluating whether the proposed TVPRA class satisfied Rule 23's commonality requirement, the Tenth Circuit identified the following "common" questions: (1) whether the Sanitation Policy constituted an improper means of coercion; (2) whether GEO knowingly obtained detainees labor using the Sanitation Policy; and (3) whether a civic duty exception applied. *Id.* at 916. It is immediately apparent from the face of these questions that the Sanitation Policy was the "glue" that held the class allegations together. *See Dukes*, 564 U.S. at 352. The Sanitation Policy was applied to *all* detainees, so there could be no question as to whether a given class member actually experienced its effects. To be detained at GEO's facility necessarily meant being subjected to the Sanitation Policy. In finding that commonality was satisfied, the Tenth Circuit openly acknowledged this reality: "[b]ecause all members of the [TVPRA] class *base their claims on the Sanitation Policy*, we agree with the district court that the answers to these questions would 'resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Menocal*, 882 F.3d at 916 (emphasis added) (quoting *Dukes*, 564 U.S. at 350).

Here, Plaintiffs can point to no uniform, class-uniting question that is in any way similar to the Sanitation Policy that was the "glue" in *Menocal*. No formal policy existed to which the entire class was universally subjected. Plaintiffs may try to rely on the "English only" policy at Montana Mike's as an example, but this immediately fails because (a) there is no allegation that this policy, by itself, was sufficient to compel any class member's labor; and (b) there is no evidence of a similar policy in place at the Hampton

Inn, the Holiday Inn Express, or the Water Zoo. To illustrate further, some class members obtained second jobs (e.g., *Ex. 9, Shukla Affid.*, ¶ 12), some never sought a second job (e.g., *Ex. 6, Amin Affid.*, ¶ 22; *Ex. 8, Lihipande Affid.*, ¶ 22), and some obtained and then lost a second job (e.g., *Ex. 4, Francis Depo.*, at 17:16-24). Some loved their housing (e.g., *Ex. 10, Kolhapuray Affid.*, ¶ 15), while others arranged their own housing (e.g., *Ex. 2, Kennedy Depo.*, at 140:6-14), while still others felt the housing was overcrowded (e.g., *Ex. 4, Francis Depo.*, at 58:5-23). Translating these factual distinctions into the facts of *Menocal* would be akin to some class members having been exempted from the Sanitation Policy, making them clearly unable to "base their claims on" such a policy. *Menocal*, 882 F.3d at 916. Thus, the unifying facts establishing commonality in *Menocal* are absent here.

### B. This case lacks the common, circumstantial evidence that allowed the *Menocal* class to prove causation.

The Tenth Circuit allowed the *Menocal* plaintiffs to attempt to prove causation through an inference "that the Sanitation Policy caused the detainee to work." *Id.* at 919. The common, circumstantial evidence that would allow them to prove that inference was (1) the fact that the detainee undisputedly received notice of the Sanitation Policy and attendant sanctions for violations; and (2) the fact that the detainee performed the cleaning work. *Id.* at 919-20. Here again, the Tenth Circuit expressly held that "the Sanitation Policy provides the 'glue' that holds together the class members' reasons for performing housing unit cleaning duties assigned by GEO." *Id.* at 920 (citing *Dukes*, 564 U.S. at 352). Crucial to the Court's conclusion that common issues would predominate was the fact that "GEO does not allege and there is nothing in the record to show that detainees who are not

on the daily list [of rotating workers under the Sanitation Policy] still chose to perform the additional duties or that detainees work autonomously." *Id.* at 921.

This case presents the exact opposite. ***First***, Defendants have demonstrated that at least six proposed class members were *not* exposed to any false promises. *Exs. 5-10, Affidavits.* These six individuals received exactly what they were promised, and there is no way to determine how many other class members received exactly what *they* were promised without examining each one individually. In *Menocal*'s terms, these six (and likely many more) were exempt from the Sanitation Policy. Where GEO admitted that the Sanitation Policy uniformly succeeded in procuring detainees' cleaning work, Defendants here have instead produced clear and compelling evidence of a *lack* of such uniformity.

***Second***, while it was undisputed that each detainee in *Menocal* received notice of the Sanitation Policy, there is no evidence here to suggest either that all class members received the same promises (regardless of falsity) or that all class members ever became aware of any other class member's alleged problems. Rather, each class member necessarily had his or her own *unique* conversations during recruitment, which would be like each *Menocal* detainee receiving his or her own *unique* Sanitation Policy. Similarly, each class member necessarily became aware of different things during his or her time in Clinton, and it is purely speculative to assume that one class member's situation ever became known to a class member at a different Defendant business or in a different class year. The only way to determine whether a given J-1 student's *personal* conversations with recruiters, the *personal* promises he or she received, or the facts of which he or she *personally* became aware actually compelled that student's labor would be to examine each

such conversation or situation individually.  Or, using the *Menocal* analogy, the only way to determine whether a given detainee's *personal* Sanitation Policy compelled his or her labor would be to examine each such policy and detainee individually.  The total lack of variety in *Menocal*'s Sanitation Policy starkly contrasts with the absolutely *inevitable* variety of the individual promises made (or not made) in this case.

      *Menocal* provides a clear example of what this case is not.  GEO could only offer *hypothetical* variations or individualized issues.  By contrast, Defendants have provided six affidavits showing *actual* differences in experiences that flatly contradict Plaintiffs' allegations.  *Menocal*'s primary causal force—the universally-applied Sanitation Policy— is completely lacking in this case.  Thus, the *Menocal* decision clearly illustrates that this case bears none of the unifying facts that would warrant class certification for purposes of the inherently-individualized TVPRA analysis.

## CONCLUSION

      There is simply no escaping the fact that promises operate on a person-by-person basis.  Reliance is individual.  Perhaps most importantly, the proposed class members experienced such widely varying—and even completely opposite—situations and conditions that any attempt to address them "in one stroke" is doomed from the start.  For these reasons, the Motion should be denied due to Plaintiffs' failure to carry their burden of proving each requirement of Rule 23 by a preponderance of the evidence.

Respectfully submitted,

/s/ *C. Eric Shephard*
C. Eric Shephard, OBA No. 22299
A. Wayne Billings, OBA No. 31483
FELLERS, SNIDER, BLANKENSHIP,
BAILEY & TIPPENS, P.C.
100 N. Broadway Ave., Suite 1700
Oklahoma City, OK 73102
Telephone:   (405) 232-0621
Facsimile:   (405) 239-7659
Email:      EShephard@FellersSnider.com
            WBillings@FellersSnider.com
**Attorneys for Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2020, I filed the attached document with the Clerk of Court. Based on the records currently on file in this case, the Clerk of Court will transmit a Notice of Electronic Filing to those registered participants of the Electronic Case Filing System.

/s/ *C. Eric Shephard*
C. Eric Shephard

#76981/851443