## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DORRET FRANCIS; | ) | |
| ANTHONY  KENNEDY; and | ) | |
| CHRISTINE PEARCE, on behalf of | ) | |
| themselves and all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. CIV-18-583-SLP |
| | ) | |
| APEX USA, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

# O R D E R

Before the Court is Plaintiffs' Motion for Certification of a Rule 23 Class and Opening Memorandum of Law [ECF 113].  The matter is fully briefed.  *See* Defs.' Resp. [ECF 132], Pls.' Reply [ECF 138] and Defs.' Surreply [ECF 149].

Also before the Court are the following Motions: (1) Defendants' *Daubert* Motion to Exclude Reports and Opinions of Luis C. deBaca [ECF 119]; (2) Plaintiffs' Motion to Strike the Expert Report and Testimony of Greg H. Bristol and Memorandum in Support of Their Motion [ECF 130]; (3) Defendants' Motion to Strike Plaintiffs' Exhibit List [ECF 125]; (4) Plaintiffs' Cross-Motion to Strike Defendants' Exhibit List [ECF 126]; (5) Plaintiffs' Motion in Limine to Exclude Unsigned Affidavits and Supporting Memorandum of Law [ECF 128]; and (6) Defendants' Combined Motion in Limine [ECF 129].[1]

---

[1]     Citations to the parties' briefing submissions reference the Court's ECF pagination.  The Court notes that the parties have submitted certain confidential materials under seal.  The Court has not directly included any of the confidential information in this Order.  The Court, therefore, deems it unnecessary to seal this Order.

For the reasons that follow, the pending Motions are DENIED.

## I.   <u>INTRODUCTION</u>

Plaintiffs, Dorret Francis, Anthony Kennedy and Christine Pearce (Plaintiffs) are Jamaican nationals who came to the United States on J-1 visas and worked at businesses located in Clinton, Oklahoma for purposes of obtaining training in the hospitality industry. Plaintiffs bring this action on behalf of themselves and all others similarly situated. Plaintiffs allege that pursuant to the recruitment and employment practices of Defendants, they have been victims of human trafficking and seek relief under the Trafficking Victims Protection Act of 2000 (TVPA), as amended by the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA). The alleged trafficking spans a five-year time period from 2008 through 2013.

## II.   <u>BACKGROUND</u>

### A.   **Factual Background**

The following facts are taken from the Complaint and the evidence submitted by the parties in their briefing submissions on the issue of class certification.

Plaintiffs obtained their J-1 visas through participation in the Exchange Visitor Program (Program), overseen and administered by the United States Department of State (State Department). Compl. [ECF 1], ¶¶ 34-35. The Program was created to facilitate cultural exchange between nations. *See id.* ¶ 34 (citing 22 U.S.C. § 2451). The Program includes a Summer Work Travel Program "which promises college students an opportunity to work and travel in the United States during the summer break" and a Trainee and Intern Program "which promises students and recent graduates an opportunity to enhance their

skills and expertise . . . in their academic or occupational fields. *Id*. (internal quotations and bracket omitted).

The State Department designates entities as "sponsors" and the sponsors are responsible for "screening Summer Work Travel and Trainee and Intern Programs applicants; placing program participants with host employers; monitoring visitors during their stays; and vetting third parties that assist in the conduct of the programs." *Id*., ¶ 35 (citing 22 C.F.R. §§ 62.22(f)-(g); 62.32(d)-(n)).

At all times relevant to the claims alleged, Defendant APEX USA, Inc. (APEX) was designated by the State Department as a J-1 sponsor. Using Recruiters in approximately twelve different countries, Defendant APEX sponsored college students and recent graduates to work for one or more of the Defendants – entities located in the State of Oklahoma and engaged in the hospitality industry. Those entities include: Hotelmacher, LLC (a Holiday Inn Express hotel); Sontag, Inc., (a Hampton Inn hotel); Steakmacher, LLC (a Montana Mike's restaurant) and Schumacher Investments, LLC (a water park). The entities are owned and operated by Defendants Walter and Carol Schumacher.

### B.    Proposed Class

Plaintiffs move for class certification under Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs define the putative class as follows:

> [A]ll foreign nationals who were admitted to the United States on J-1 visas under the Summer Work Travel or Trainee and Intern Program, for whom Defendant Apex was the J-1 sponsor petitioner, and for whom at least one Defendant was the de facto employer upon arrival in the United States at any time from June 15, 2008 through December 31, 2013.

Compl., ¶ 83.

3

### C.    Plaintiffs' Claim

Plaintiffs' sole claim for relief arises under the TVPA which "establishes a civil cause of action for victims of prohibited trafficking activity." *Menocal v. GEO Group, Inc.*, 882 F.3d 905, 916 (10th Cir. 2018) (*Menocal II*); 18 U.S.C. § 1595(a). Plaintiffs assert a violation of the TVPA's forced labor provision which prohibits persons from:

> knowingly provid[ing] or obtain[ing] the labor or services of a person by any one of, or by any combination of, the following means –
>
> > (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> >
> > (2) by means of serious harm or threats of serious harm to that person or another person;
> >
> > (3) by means of the abuse or threatened abuse of law or legal process; or
> >
> > (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint[.]

*Id*. § 1589(a). The term "serious harm" denotes "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a *reasonable person* of the *same background* and in the *same circumstances* to [render labor] . . . to avoid incurring that harm." *Id*. § 1589(c)(2) (emphasis added).

### III.   <u>CLASS CERTIFICATION REQUIREMENTS</u>

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564

U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  To obtain class certification, the prerequisites of Rule 23(a) must be satisfied: numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. P. 23(a).  Additionally, the class must also satisfy one of the three requirements in Rule 23(b).  Here, Plaintiffs rely on Rule 23(b)(3)'s requirements of predominance and superiority.  Fed. R. Civ. P. 23(b)(3).

"The district court must undertake a rigorous analysis to satisfy itself that a putative class meets the applicable Rule 23 requirements."  *Menocal II*, 882 F.3d at 913 (internal quotations and citation omitted).  "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  *D.G. ex rel. Stricklin v. Devaugn*, 594 F.3d 1188, 1194 (10th Cir. 2010) (quoting *Shook v. El Paso Cty.*, 386 F.3d 963, 971 (10th Cir. 2004)).  The party seeking class certification must show, by a preponderance of the evidence, that the Rule 23 requirements are met.  *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).

"Rule 23 does not set forth a mere pleading standard.  *Walmart*, 564 U.S. at 350.  Thus, "[a] party seeking class certification must affirmatively demonstrate his compliance with [Rule 23] – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Id*.  "Granting or denying class certification is a highly fact-intensive matter of practicality."  *Monreal v. Potter*, 367 F.3d 1224, 1238 (10th Cir. 2004).  The Court "is not limited to the pleadings but may probe behind the pleadings and examine the facts and evidence in the case."  *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1227-28 (10th Cir. 2013) (quotations and citation omitted).

5

IV.    **DISCUSSION**

A.    **Rule 23(a)'s Threshold Requirements**

1.    **Numerosity**

To satisfy the numerosity requirement, Plaintiffs must show that the "class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  In the Tenth Circuit, there is "no set formula" to determine numerosity and district courts have "wide latitude" in making the determination given the "fact-specific" nature of the inquiry. *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006) (rejecting approach from other jurisdictions holding that numerosity may be presumed at a certain number); *see also Colo. Cross Disability Coal. v. Abercrombie & Fitch Co*., 765 F.3d 1205, 1215 (10th Cir. 2014) ("[T]he numerosity requirement is not a question of numbers." (internal quotations and citation omitted)).

a.    **Size of Class**

The allegations of Plaintiffs' Complaint state that the class is "believed to include at least 50 to upwards of 100 individuals."  Compl. [ECF 1], ¶ 85.  In moving for class certification, however, Plaintiffs state the class is "approximately 200 J-1 visa holders" and reference a "list" produced by Defendants which Plaintiffs argue shows that "Defendants employed at least 200 foreign J-1 Workers during the class period."  Mot. 113: 9; *id*., 113:18 (citing Ex. 19 [ECF 115-9] (filed under seal)).

In response, Defendants contend Plaintiffs' reliance on the list of J-1 visa holders employed by Defendants is insufficient to demonstrate that joinder is impracticable. Defendants state that the list shows only a "total number of students who worked for one

or more Defendants under J-1 visas." Resp. 132:17.  According to Defendants, Plaintiffs "may not simply point to the existence of 208 J-1 visa recipients" but must show that "each visa recipient actually shares some common experience as those alleged by the named Plaintiffs." *Id.*, 132:18.

In reply, Plaintiffs state they can "show that every class member was subjected to the same trafficking scheme, not merely that some of the class may have been trafficked." Reply 138:11.  But Plaintiffs then leave the matter unaddressed.  *See Rex v. Owens ex rel., Okla.*, 585 F.2d 432, 436 (10th Cir. 1978) ("In class action suits there must be presented some evidence of *established*, *ascertainable* numbers constituting the class to satisfy even the most liberal interpretation of the numerosity requirement." (emphasis added)).

The Court agrees with Defendants that the class list, without more, is insufficient to show numerosity.  *Cf. Castellanos v. Worldwide Distributions Sys. USA, LLC*, No. 14-CV-12609, 2015 WL 13862060 at *3 (E.D. Mich. Aug. 19, 2015) (unpublished op.) ("Reference to the total number of individuals conceivably harmed is insufficient to prove numerosity[;] [t]he Court cannot presume that the seventy-three individuals sponsored for TN visas received deceptive communication.").  As discussed more fully in the context of the Court's Rule 23(b)(3) analysis, the persons on that list are from twelve different countries, participants in two different types of J-1 visa programs, held distinct jobs at different places of employment, and were subject to a variety of practices allegedly undertaken by Defendants.  There is no singular policy at issue to which all Plaintiffs were subjected.  *Cf. Resnick v. Amer. Dental Ass'n*, 90 F.R.D. 530, 538 (N.D. Ill. 1981) (numerosity satisfied where complaint alleged that discriminatory policy had been applied

to all female ADA employees and, therefore, female employees at all offices could properly be counted together).

### b. Other Factors

Plaintiffs point to other factors to show joinder is impracticable. Plaintiffs focus on "characteristics of the class members" "including their geographic dispersion, lack of financial resources, lack of mastery of the English language and lack of familiarity of the U.S. court system." Mot. 113:18. These factors are a proper matter of inquiry in determining whether joinder is impracticable. *See Colo. Cross*, 765 F.3d at 1215 (there are "several factors that enter into the impracticability issue" including "the nature of the action, the size of the individual claims, and the location of the members of the class or the property that is the subject matter of the dispute") *Id.* at 1215 (internal quotations and citation omitted).

In response, Defendants argue that Plaintiffs make a wholly unsupported attempt to show joinder is impracticable. As discussed below, Plaintiffs' conclusory allegations to show impracticability of joinder are insufficient to meet their Rule 23(a) burden. [2]

---

[2] In this regard, the Court notes that all three Plaintiffs are Jamaican nationals. The class list identifies a total of 44 employees from Jamaica or approximately 21% of the class. *See* Defs.' Ex. 1 [ECF 132-1:1]. Plaintiffs' evidence focuses rather extensively on the experiences of putative class members from Jamaica. Plaintiffs do not make any alternative request that the Court limit the certification to Jamaican nationals. And this may very well be purposeful. Although a class of forty-four members would not be insignificant, it is not such "an overwhelming number as to be prohibitive of joinder." *Trevizo*, 455 F.3d at 1162 (84 class members not prohibitive of joinder).

### 1.    Geographical Dispersion

First, Plaintiffs offer no evidence of their own to show where class members currently are located – including the Named Plaintiffs.  In their Reply, Plaintiffs point to evidence submitted by Defendants, arguing that  "one class member declaration . . . was notarized in Queens New York;" "two others were notarized in Alberta Canada" and a fourth declaration stated: "I would actually love to come back again to the United States." Reply 138:8 (citations omitted).    But reliance on this evidence is unpersuasive.  The evidence is contained in declarations of persons who affirmatively state that they were not underpaid, subjected to misrepresentations, intimated or afraid, or in debt as a result of their employment with Defendants.  *See* Joseph Decl. [ECF 132-5]; Amin Declr. [ECF 132-6]; Lipihande Declr. [ECF 132-8]; and Shukla Decl. [ECF 132-9].  Without some further evidentiary support, Plaintiffs cannot rely on geographical dispersion to demonstrate impracticability of joinder.

### 2.    Identification of Class Members

Here, the identity of the class members is known.  This factor weighs against a finding that joinder is impracticable.  *Cf. Colo. Cross*, 765 F.3d at 1215 (recognizing that joinder of "*unknown* individuals is certainly impracticable" and concluding that "*identifying*, locating, and joining individuals who encounter accessibility discrimination at shopping malls in 40 states would be impracticable" (emphasis added)); *see also Primavera Familienstiftung v. Askin*, 178 F.R.D. 405, 410 (S.D. N.Y. 1998) ("Knowledge of names and existence of members . . . renders joinder practicable."); *Baricuatro v. Indus. Pers. & Mgmt. Servs., Inc*., No. 11-2777, 2013 WL 6072702 at *4 (E.D. La. Nov. 18, 2013)

(unpublished op.) (noting that putative class members, Filipino nationals, as former employees of the defendants, would be easy to identify and plaintiffs' failure to address this factor presumably was due to fact it would weigh against a finding that joinder was impracticable).

### 3. English Proficiency

Plaintiffs argue that "many of the class members do not speak English as their primary language." Mot. 113:18. Plaintiffs point to a "Certificate of Translation" accompanying the Declaration of Tania DeLeon Arias. *See id.* citing ECF 114-8:7. Plaintiffs also reference the Declaration of Sofia Jones-Gardner in which she states: "Walt posted a notice in the kitchen at the restaurant that said we were not allowed to speak in our native languages at the restaurant." *Id.*, ECF 114-2, ¶ 16. Additionally, Plaintiffs reference a memorandum issued to an individual named Akshay Diwikar dated November 21, 2008 and addressing the "English Only policy" at Montana Mike's. *See* ECF 116-1:11.

This evidence, at best, addresses whether the class members' native language is a language other than the English language. But the evidence wholly fails to address whether any class member is sufficiently proficient in the English language. Certainly, the policy does not constitute evidence of a lack of any particular class members' proficiency in the English language.

Conversely, Defendants point out that English is the official language of Jamaica, and Jamaica is the home country of: (1) the three named Plaintiffs; (2) three of the witnesses submitting affidavits in support of Plaintiffs' Motion; and (3) twenty-one percent of the

proposed class.  *See* Resp. 132:21, n. 2 (citation omitted).  Also, Defendants point out that all three named Plaintiffs were deposed in this case without an interpreter.  Resp. 132:20.

The Court further notes that some proficiency in English is required for participation in the two programs at issue.  *See* 22 C.F.R. § 62.22 (governing Visitor Programs and stating that "trainees and interns [must] have verifiable English language skills sufficient to function on a day-to-day basis in their training environment" and that an "applicant's English language proficiency [must be verified] through a recognized English language test"); 22 C.F.R. § 62.23 (governing Summer Work Travel Programs and requiring verification that participants have "proficiency in conversational English and reading comprehension").  And, the offer letters of record, including one to Plaintiff Francis, show as a requirement for employment that the applicant have a high level of English proficiency. *See, e.g*., ECF 116-6:3 ("Level of English Required" – "Excellent – high level – conversational 9-10").   Upon consideration of all of the relevant facts, the Court finds Plaintiffs fail to carry their burden with respect to this factor.

### 4.      Financial Resources of Class Members

Moreover, Plaintiffs' evidence of a "lack of financial resources" is insufficient. Plaintiffs submit declarations of five individuals who state: "I do not have the resources to bring my claims individually on my own behalf."[3]  These statements lack the requisite credibility as they are unsubstantiated by any additional averments.  *See Ellis v. J.R.'s*

---

[3]      *See* Jones Gardner Decl. ECF 114-2, ¶ 21; Soriano Decl. ECF 114-3, ¶ 20; Thomas Decl. ECF 114-4, ¶ 21; DeLeona Arias Decl. ECF 114-8, ¶  21; and Saunders Decl. ECF 114-9, ¶ 21.

*Country Stores, Inc*., 779 F.3d 1184, 1201 (10th Cir. 2015) (holding that "[a]ffidavits must contain certain indicia of reliability"). For example, the individuals do not state whether they are employed, what their annual earnings are, whether they support others, or any other information to substantiate the allegation of a current lack of financial resources.[4] Although Plaintiffs contend the Court can infer they lack financial resources based on the fact they "worked minimum wage jobs" and were "deeply in debt while in Clinton," *see* Pls.' Reply ECF 138:8-9, the Court declines to make such an inference.

Although this Court has wide latitude in making the numerosity determination and, therefore, the court may make "rational inferences" from the evidence, such inferences must be based on evidence. *See, e.g., Sunward Corp. v. Dun & Bradstreet, Inc*., 811 F.2d 511, 521 (10th Cir. 1987) ("reasonable inferences themselves must be more than mere speculation and conjecture"). Here, the inferences Plaintiffs request the Court to make, upon scrutiny, are not permissible. Thus, given the particular characteristics of the class members, the evidence of record and the totality of the circumstances, the Court finds Rule 23(a)(1)'s numerosity requirement is not satisfied.

### 2.   Commonality

"To satisfy the commonality requirement, a party seeking class certification must demonstrate 'there are questions of law or fact common to the class.'" *Menocal II*, 882 F.3d at 914 (quoting Fed. R. Civ. P. 23(a)(2)). "A finding of commonality requires only a

---

[4]     The Court notes that only one of the declarants, Khadine Thomas, states that she still owes any money that was borrowed to obtain a visa and work in the United States for Defendants. *See* Thomas Decl. ECF 144-3, ¶ 19. Thomas states that she borrowed money from her mother and still owes her $300.00. *Id*.

single question of law or fact common to the entire class." *Id*. (internal quotations and citation omitted).  A question of law or fact is common if it "depend[s] upon a common contention . . . of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*.  (internal quotation marks and citation omitted).

The language of Rule 23(a)(2) "is easy to misread," because "[a]ny competently crafted class complaint literally raises common 'questions.'" *Walmart*, 564 U.S. at 349. "What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common answers *apt to drive the resolution of the litigation*." *Id*. at 350 (emphasis added).  Accordingly, a question only satisfies commonality if "determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Id*. (emphasis added).

Rather than address the commonality requirement, Plaintiffs state only that: "[i]n the discussion of predominance, <u>infra</u>, Part C.1, Plaintiffs set forth more than a dozen questions of law and fact." Mot. 113:19.  And Plaintiffs conclusorily state: [t]his satisfies commonality." *Id*.

Because Plaintiffs choose not to separately address the commonality requirement, the Court declines to do so.  Instead, the Court will address commonality in the context of its predominance inquiry.  *Meyers v. Southwestern Bell Tel. Co.*, 181 F.R.D. 499, 501 (W.D. Okla. 1997) ("Rule 23(b) subsumes the commonality standard under Rule 23(a)(2)" and "[t]herefore instead of concluding that the commonality requirement has been

established by plaintiff, the Court will consider this issue within the analysis of whether common issues predominate over individual issues."); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997) (The predominance requirement is similar to but "far more demanding" than the commonality requirement of Rule 23(a)); *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 325 (5th Cir. 2008) ("Since the thresholds for commonality and typicality under Rule 23(a) are not high . . . [the court] will assume that Rule 23(a) is satisfied and turn to evaluate the parties' arguments against the more exacting demands of Rule 23(b)(3)."); *Owino v. CoreCivic, Inc*., No. 17-CV-1112 JLS, 2020 WL 1550218 at *14 (S.D. Cal. Apr. 1, 2020) (unpublished op.) ("Because Plaintiffs and Defendant have collapsed their arguments concerning the predominance of common issues under Rule 23(b)(3) with their discussion of commonality under Rule 23(a)(2), the Court discusses both commonality and predominance under the far more demanding Rule 23(b)(3) predominance analysis." (internal quotations and citations omitted)).

### 3.   Typicality

"To satisfy the typicality requirement, a party seeking class certification must demonstrate that 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" *Menocal II*, 882 F.3d at 914 (quoting Fed. R. Civ. P. 23(a)(3)). "[D]iffering fact situations of class members do not defeat typicality . . . so long as the claims of the class representative and class members are based on the same legal or remedial theory." *Id*. (quoting *Colo. Cross*, 765 F.3d at 1216).

Plaintiffs contend typicality is satisfied because "[t]he Named Plaintiffs were subjected to the same scheme by the Defendants as the other class members." Mot. 113:20.

Plaintiffs point to "false promises about possible earnings in the United States," the "struggle[e] to survive" once in the United States, "threats made by the Schumachers" and "economic and immigration-related vulnerabilities." *Id*. Plaintiffs argue that "[b]ecause the Named Plaintiffs and the class suffered a common legal injury, the Named Plaintiffs have satisfied the requirement of typicality."

Defendants respond that Plaintiffs fail to demonstrate the "more exacting" requirement of typicality. Defendants contend the named Plaintiffs are not typical of each other, much less typical of the class. Moreover, Defendants argue that "Plaintiffs' claims are not even typical of those described in the Complaint." Resp. 132:32. Defendants point to disparate allegations concerning housing, food and transportation, threats of physical violence or restraint and a lack of any evidence regarding "geographical typicality." *Id*., 132:32-33. As to the latter, Defendants point to the lack of any evidence regarding J-1 visa students from ten of the twelve countries at issue, or approximately 70% of the purposed class. *Id*., 132:33.

Plaintiffs leave these matters unaddressed in their Reply. Plaintiffs simply reiterate that "the class's claims arise from the 'same harmful practices' alleged by Plaintiffs, and Plaintiffs' claims are therefore typical." Reply 138:19.

For similar reasons addressed in the context of the Court's numerosity analysis, the Court finds Plaintiffs fail to meet their burden of showing typicality. Plaintiffs have not shown their own situations were typical of one another, much less that their situations were typical of all purported class members. *See, e.g., Sprague v. Gen. Motors Corp*., 133 F.3d 388, 399 (6th Cir. 1998) (typicality not satisfied where claims of named plaintiffs depended

on each individual's particular interactions with the employer and those interactions varied from person to person).

The Court's determination that Plaintiffs' proposed class fails to meet Rule 23(a)(1)'s numerosity requirement or Rule 23(a)(3)'s typicality requirement is dispositive. *Tabor*, 703 F.3d at 1229. However, the parties submit extensive briefing on the issue of commonality under Rule 23(a)(3) and predominance under Rule 23(b)(3). The Court, therefore, deems it prudent to further address those class requirements. As previously set forth, the Court conducts the analysis of both requirements under the more demanding standard of Rule 23(b)(3).[5]

### B. Rule 23(b)(3)[6]

#### 1. Predominance

The Rule 23(b)(3) predominance inquiry tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation, a standard "far more demanding" than the commonality requirement of Rule 23(a)(2). *Amchem Prods., Inc.*, 521 U.S. at 623-24. "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

---

[5]    The requirements of commonality, typicality and adequacy "tend to merge," *see Walmart*, 564 U.S. at 349, n. 5; *see also Colo. Cross*, 765 F.3d at 1216. Under the circumstances of this case, the Court finds Plaintiffs fail to show adequacy for substantially the same reasons discussed in the context of the findings regarding commonality/predominance and typicality.

[6]    Because the Court finds Plaintiffs fail to demonstrate predominance, it need not further address Rule 23(b)(3)'s superiority component.

Here, the parties primarily focus on 18 U.S.C. § 1589(a)(4) and whether "common facts" exist to show Defendants' alleged forced labor scheme.   Plaintiffs argue the following issues are subject to common proof and, therefore, proper for class certification:

- Defendants "obtained or provided class members' labor"[7];

- Defendants obtained class members' labor by prohibited means, i.e., a "common scheme";

- Defendants used serious harm and threats thereof to obtain class members' labor; and

- Defendants acted with the requisite scienter, i.e., Defendants knowingly procured class members' labor by prohibited means,

Mot. 113:25-43.[8]

Conversely, Defendants contend issues of causation and reliance predominate and that these are "individual issues" subject to individualized proof.  Resp. 132:35.  For example, Defendants argue that the "essence of Plaintiffs' claims is their allegedly 'reasonable reliance on promises made by Defendants.'"  *Id*. 132:38 (quoting Compl.,

---

[7]     The parties acknowledge that this issue is not in dispute.

[8]     Plaintiffs also argue that the following additional issues are subject to common proof: (1) whether Defendants used threats of abuse of the legal process to obtain class members' labor; and (2) Defendants' venture liability.  *Id*.,113:34-36, 40-43.  Plaintiffs' sole argument as to threats of abuse of the legal process is that "[t]hreats of deportation are threats of abuse of the legal process." *Id*. at 34.  But as discussed infra, the evidence regarding such threats is subject to individualized proof.   And, venture liability is an issue, though subject to common proof, that does not predominate.  *See CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014) ("[T]he predominance prong asks whether the common, aggregation-enabling, issues in the case are more prevalent or more important than the non-common, aggregation-defeating individual issues." (citation omitted)).   As Defendants argue, whether Defendants are a "venture" for purposes of § 1589(a) is at play only if liability as to any one defendant is first established.  *See* Resp. 132:30.

¶ 51).   Also, Defendants argue individualized proof predominates as to whether class members provided labor to Defendants voluntarily or were compelled to do so as a result of Defendants' unlawful conduct.  *Id.*, 132:38-39.

Plaintiffs purport to focus the inquiry on the existence of a "common scheme" and Defendants' actions in relation thereto.  But, as discussed infra, the Court finds under the circumstances of this case that the dispositive inquiry, for purposes of class certification, is the causation element of Plaintiffs' TVPA claim which the Court finds predominates and is not subject to proof by means of class-wide inferences.

The Court begins with a discussion of *Menocal II*, a case in which the Tenth Circuit examined whether class certification of claims brought under the TVPA was proper.[9]  In *Menocal*, immigration detainees housed in a private contract detention facility brought a putative class action to challenge the facility's *mandatory* Housing Unit Sanitation Policy (Sanitation Policy).  All detainees were subject to the Sanitation Policy.  If a detainee failed to comply with the terms of the Sanitation Policy, he or she faced a range of possible sanctions.[10]

In the context of addressing Rule 23(b)(3)'s predominance requirement, the court held that causation is an element of a TVPA claim.  *Menocal II*, 882 F.3d at 918 ("Although

---

[9]     Indeed, both parties largely frame the class certification issues before the Court in the context of *Menocal* and the manner in which the issues were framed in that case – particularly with respect to issues of causation.

[10]     Those sanctions included "(1) the initiation of criminal proceedings, (2) disciplinary segregation – or solitary confinement – up to 72 hours, (3) loss of commissary, (4) loss of job, (5) restriction to housing unit, (6) reprimand, or (7) warning."  *Id.* at 911.

the statute does not use the word 'cause,' to show a § 1589 violation, plaintiffs must prove that an unlawful means of coercion caused them to render labor."). The Tenth Circuit declined to decide whether a plaintiff may use a "reasonable person" standard to make the causation showing or whether "a plaintiff must show that the unlawful means *in fact* caused the labor." *Id*. (emphasis added). But, even assuming the latter showing is required, i.e., the unlawful means in fact caused the labor, the Tenth Circuit held that TVPA causation may be proved by class-wide inference *in certain circumstances*, where the TVPA claim is "susceptible to generalized proof." *Id*.[11]

In reaching this holding, the court first addressed whether an individual class member could establish causation based on circumstantial evidence. The court answered this question affirmatively, finding the following circumstantial evidence could establish that the Sanitation Policy caused the detainee to work: "(1) the detainee received notice of the Sanitation Policy's terms, including the possible sanctions for refusing to clean; and (2) the detainee performed housing unit cleaning work for GEO when assigned to do so." *Id*. at 919-20.

The court then addressed whether class-wide proof of causation was possible. The court found such proof was possible because "class allegations [we]re based on a *single*, common scheme" and, therefore, "class members share[d] the relevant circumstantial evidence in common." *Id*. at 920. The court emphasized that the class members alleged

---

[11]    In *Menocal*, the district court observed that "[t]he element that labor be obtained "by means of" the defendant's improper coercion is central to the parties' dispute." *Menocal v. GEO Grp., Inc.,* 320 F.R.D. 258, 264 (D. Colo. 2017) (*Menocal I*). Here, too, the parties largely focus on this element of the TVPA claims.

that GEO coerced their labor through a "*uniform* policy." *Id*. (emphasis in original). *See also id*. at 921 ("The permissibility of a class-wide inference depends on whether the class members' claims are 'solvable with a uniform piece of circumstantial evidence' or instead 'involve significant individualized or idiosyncratic elements.'" (citing CGC *Holding Co., LLC*, 773 F.3d at 1092)). Accordingly, the Sanitation Policy "provide[d] the 'glue' that h[eld] together the class members' reasons for performing housing unit cleaning duties assigned by GEO." *Id*. (quoting *Walmart*, 564 U.S. at 352).

In the context of a claim under the TVPA, other courts have reached similar conclusions, allowing certification of a class where the claim arises from "standardized policies." *See, e.g., Owino*, 2020 WL 1550218 at *18. Notably, in *Owino*, it was the combination of a uniform sanitation policy (requiring labor) and a uniform disciplinary policy (setting forth sanctions for failure to comply with the sanitation policy) that led the court to conclude that plaintiffs had established predominance under Rule 23(b)(3). *Id*. at *22, ("The Court therefore concludes that, for purposes of class certification, Plaintiffs sufficiently have established that Defendant instituted *uniform* sanitation and disciplinary policies that were applied class-wide and, taken together, may have coerced detainees under threat of discipline into performing cleaning duties beyond those permitted by ICE.") (emphasis added).

### a.    Policy and/or Practice

In this case, there is no singular or standardized policy or practice at issue. Instead, Plaintiffs' allegations of a "common scheme" relate to a myriad of actions spanning a

continuum of time during the course of their respective relationships with one or more of the Defendants.

First, Plaintiffs point to their purported reliance on false statements made at: (1) the recruitment stage; and (2) the offer-letter stage. Plaintiffs contend they borrowed money from family members in reliance upon these false statements, obtained their J-1 visas, and became employed by one or more Defendants. According to Plaintiffs, during the recruitment process, the same false statements were made to all class members. Plaintiffs assert these representations and the offer letters were "formulaic." Mot. 113:29.

The record before the Court includes a total of three offer letters. *See* ECF 115-2: 2-5 (Internship Offer 2008 – Hampton Inn/Montana Mike's); ECF 116-6: 3-6 (Intern Offer 2008/Montana Mike's Steakhouse);[12] and ECF 133:3-6 (Job Placement 2011/Hampton Inn). Although the offer letters appear to utilize a standardized "form," the terms included in the letters are not necessarily uniform. For example, all three offers include different rates of pay and hours per week – terms central to Plaintiffs' claims. Given the variances in the three offer letters, the Court deems this extremely limited sampling provides an insufficient basis upon which to determine any uniform or standardized terms exist.[13]

---

[12]     This offer, made to Plaintiff Francis, appears twice in the record. *See also* ECF 133: 9-12 (Intern Offer 2008/Montana Mike's).

[13]     The sampling does not include an offer from the years 2009, 2010, 2012 and 2013. Thus, there is no evidence to show the form remained the same during all these years. The record also fails to disclose whether the same forms were used for persons enrolled in the summer work-travel program and the trainee/intern program.

Second, Plaintiffs point to Defendants' "common practices" during the course of their employment that made Plaintiffs feel compelled to work.  These practices include:

(1)     Paying wages below what was stated in the J-1 workers' offers of employment (a matter addressed supra);

(2)     Overstaffing their properties so that workers were not working full time and could not make a viable wage on piece-rate or tip-dependent work;

(3)     Preventing workers from obtaining additional work at non-Defendant employers;

(4)     Threatening class members that they would [be] terminated or deported for minor infractions at work, or for complaining about work conditions;

(5)     Berating and reprimanding class members for 'disobeying rules';

(6)     Threatening class members that they would lose scheduled work and/or pay for minor infractions at work;

(7)     Reducing class members' hours for minor violations;

(8)     Managing debts owed by the class members, by deducting amounts owed for APEX program fees from their wages;

(9)     Reducing class members' wages by charging them for uniforms and other expenses, and deducting these expenses from employees' paychecks, resulting in class members having little or no money;

(10)     Dictating or coercing class members' [sic] to live [in] substandard housing;

(11)     Threatening class members that they could not leave, or would face severe immigration consequences for seeking to leave before their scheduled end date;

(12)    Informing class members and other foreign workers that Walt Schumacher had a gun and was a sheriff to threaten members, and policing plaintiffs while they were not at work; and

(13)    Searching for class members once they had left or escaped Defendants' employ.

Mot. 113:29-30.

In contrast to *Menocal's* singular policy with a singular disciplinary sanction, the scheme at issue in this case involves a wide array of representations and/or practices to which any particular employee may or may not have been subjected or compelled to work. A class-wide inference, therefore, is impermissible.   *Menocal II*, 882 F.3d at 922 (recognizing that had defendant "presented evidence that could rebut the Plaintiffs' common inference of causation on an individualized basis, we and the district court might have concluded that individual issues would predominate at trial" (quotations and alterations omitted)).[14]

Although Plaintiffs argue that many policies can be shown through common documents, "such as payroll records showing amounts earned and deductions taken for business expenses," "receipts documenting standard charges" or "sheets tracking debts," *see* Mot. 113: 32, those purported policies do not equate to a class-wide inference that all

---

[14]    Here, Defendants have submitted evidence to show individual issues would predominate. But Plaintiffs own evidence bears this out and is markedly different from the evidence the *Menocal* court relied upon to permit a common inference of causation.

employees felt compelled to work.  Instead, the materiality of the deductions would vary based on the individual circumstances of each employee.

Plaintiffs extensively point to financial harm arising from loans Plaintiffs obtained from friends and family members to cover fees associated with their enrollment in the J-1 program.  Pointedly, these loans were not obligations owed to Defendants and thus could not demonstrate grounds upon which Defendants could compel continued employment.

Even more nuanced is the evidence regarding threats of harm.  The fact that a particular employee was threatened with termination and/or deportation consequences does not create a class-wide inference that all employees were subject to similar threats or felt compelled to work as a result of any such threats.[15]  This case involves facts quite distinct from those in which a class-wide inference has been permitted.  For instance, in *Paguirigan v. Prompt Nursing Emp't Agency LLC*, No. 17-CV-1302 (NG)(JO), 2018 WL 4347799 at *3 (E.D.N.Y. Sept. 12, 2018) (unpublished op.), "[a]ll of the nurses had signed employment contracts requiring them to pay a $25,000 contract termination fee if they left their employment before the end of a three-year term."  The defendant threatened employees with enforcement of the termination fee provision to compel continued employment.  The

---

[15]     For example, Plaintiffs submit documents directed at particular employees regarding sanctions for work infractions – such as arriving late, taking sick leave or speaking in the employee's native language – or, insubordination – such as arguing about hostess seating.  Those sanctions include a "threat" of "being sent home" as a consequence of termination, reducing work hours or lowering wage rates.  *See* Pls.' Ex. 34 [ECF 116-8:11, J1-002653]; Ex. 27 [ECF 116-1:853, J1-000853]; Ex. 16 [ECF115-6:37, J1-001537]; Ex. 35 [ECF 116-9:15, J1-002605]; Ex. 18 [ECF 115-8:13, J1-003028].   Defendants also submit a few examples of documents distributed on a wider basis.  For example, one document is a memo addressed to "all servers" admonishing that that they were not to discuss seating matters with the hosts or hostesses and a failure to abide by the policy could result in termination and being "sent home."  *See* Pls.' Ex. 16 [ECF 115-6:42, J1-001542].

24

court found common issues of law and fact capable of class-wide resolution where those issues centered upon the termination fee – a provision included as part of the defendant's "standard contract." *Id*. at *5. No such uniform threat exists in this case. For instance, Plaintiffs have not submitted evidence of any standardized terms governing any payment obligations.

### b.    Reasonable Person Standard

Additionally, even assuming the more lenient "reasonable person" standard applies to the issue of causation, as advocated by Plaintiffs and as left unresolved by the Tenth Circuit in *Menocal*, here there is no "*uniform* reasonable person." *Compare Rosas v. Sarbanand Farms*. LLC, 329 F.R.D. 671, 690 (W.D. Wash. 2018) (members of purported class shared "many salient characteristics, including they [were] Mexican nationals, were employed under the same H-2A contracts, worked under the same conditions, and were subjected to the same threats" such that "a uniform reasonable person standard [could] be applied" to determine whether the defendants' implied threats that class members would be sent back to Mexico if they did not meet production standards violated the TVPA) *with Panwar v. Access Therapies, Inc*., No. 1:12-CV-00619-TWP-TAB, 2015 WL 329013 at *6 (S.D. Ind. Jan. 22, 2015) (unpublished op.) (finding it inappropriate to apply "reasonable person standard" to TVPA putative class where "the employees were recruited from various countries, the terms of the contracts were different, the promissory note amounts were different, employees did not all work in the same state, and they did not have the same working conditions."); *see also Menocal I*, 320 F.R.D. at 266 (distinguishing *Panwar* because the putative class members in *Menocal* "were all subject to a universal policy

under uniform conditions"). Consequently, individualized proof persists with respect to the causation analysis.

To show "serious harm," consideration must be given to "all the surrounding circumstances" to determine whether a "reasonable person of the *same* background and in the *same* circumstances" would be compelled to continue to provide labor. *See* 18 U.S.C. § 1589(c)(2) (emphasis added). Unlike *Menocal*, where all putative class members were detainees of a private prison contractor and subject to a written Sanitation Policy that applied to all those members, here there are too many variables at play to permit a class-wide inference.[16]

As Defendants have shown, the putative class members are:

- from twelve different countries;[17]

---

[16] As the district court stated in *Menocal I*, "[g]iven the climate in which [the putative class members] were detained" an inference of causation would be appropriate. *Id*. at 267; *see also id*. ("The circumstances here – namely the class members' detainment, the imposition of a uniform policy, and the numerous other questions common to the class – certainly make it beneficial to permit such an inference."); *id*. at 265 ("The nature of detention is unique in that it allows the detainer to almost fully control the experience of the detainee"). Conversely, here, the employees were not detained – a compelling and distinguishing factor – and, as the Court has underscored, no uniform policy governs the analysis.

[17] *See* J-1 Class List [ECF 132-1]. This list identifies putative class members from the following countries: Albania, Czech Republic, China, Dominican Republic, Ghana, India, Indonesia, Jamaica, Moldova, Peru, Philippines and Turkey. Although the majority of the employees identified are from India (77 employees or 37%), Plaintiffs have submitted no evidence related to these particular employees. As previously set forth, Plaintiffs' evidence is focused almost exclusively on employees from Jamaica (44 employees or 21%) with some evidence also focused on employees from the Dominican Republic (18 employees or 8%). Even then, Plaintiffs submit only eight affidavits in total – six affidavits of employees from Jamaica (the three named Plaintiffs and three other Jamaicans, and two affidavits of employees from the Dominican Republic. *See* Pls.' Exs. 2-9 [ECF 114-2 through 114-9].

- • employed by at least four different companies;

- • employed in different lines of work with different criteria governing the performance of that work;

- • may or may not have sought additional employment by other employers while in Clinton, Oklahoma;

- • may or may not have been subject to threats, which themselves were varied in context, nature and degree; and

- • may or may not have been financially compelled to keep working.[18]

And, as Defendants note, at least eleven of the proposed class members came back to the United States to work for Defendants a second time in Clinton, Oklahoma.[19]

Plaintiffs' proof focuses primarily on persons recruited from Jamaica and the Dominican Republic. Plaintiffs submit virtually no evidence that persons from any of the other ten countries were subject to similar practices identified by Plaintiffs as part of the

---

[18] For example, Plaintiffs argue that in Jamaica, "the minimum wage in 2010 for a 40-hour work week was roughly $32 USD." Mot. 113:11. According to Plaintiffs, these J-1 workers were "forced to empty their savings and borrow large sums of money from family, friends and/or banks." *Id*. But Plaintiffs fail to address circumstances of persons from other countries. And Plaintiffs otherwise ask the Court to assume J-1 employees "who worked for Defendants were of limited financial means such that the amounts they would have owed under their individual promissory notes constituted a threat of 'serious harm' sufficient to maintain a TVPA action . . . ." *Panwar*, 2015 WL 329013 at *6. As in *Panwar*, here "it would not be appropriate to apply a 'reasonable person' standard to determine whether the Defendants' varying actions constituted a threat of harm for each proposed class member." *Id*. Moreover, Defendants submit evidence to show other putative class members did not share the same financial circumstances as those of the Plaintiffs.

[19] *See* J-1 Class List, Employee Nos. 14, 44, 46, 61, 69, 95, 100, 119, 128, 132 and 172.

27

Defendants' alleged scheme.[20]  Conversely, Defendants submit evidence to show that at least six students from India did not share these same experiences.  *See* Defs.' Exs. 5-10 [ECF 132-5 through 132-10].

Finally, the Complaint addresses two distinct Programs: (1) the Exchange Visitor Program, *see* 22 C.F.R. § 62.22 and the Summer Work Travel Program, *see* 22 C.F.R. § 62.32.  *See* Compl., ¶¶ 34, 82-83.  These distinct programs create further differences amongst the putative class members.

For example, the Exchange Visitor Program provides "training and internship programs" for various "occupational categories" including "Hospitality and Tourism."  22 C.F.R. § 62.22(c)(2)(vi).  The sponsor must ensure that "[t]rainees and interns have *sufficient finances to support themselves for their entire stay in the United States, including housing and living expenses*."  *Id*., § 62.22(e)(2) (emphasis added).  "[T]he maximum duration of an internship program" or for training programs "in the occupational category of Hospitality and Tourism" is "*12 months*."  *Id*., § 62.22(k) (emphasis added).

Conversely, the Summer Work Travel Program provides "foreign college and university students with opportunities to . . . work in jobs that require minimal training and are seasonal or temporary in order to *earn funds to help defray a portion of their expenses*."

---

[20]     The Complaint alleges that multiple recruiters worked on Plaintiffs' behalf in each of the countries.  *See, e.g*., Compl., ¶ 23 ("Defendants employed . . . recruiters in Europe, Asia, and the Caribbean").  Yet, Plaintiffs do not direct the Court to evidence to show a singular, standardized recruitment process utilized by these recruiters or a singular, standardized offer letter used by every recruiter.  *Cf. Owino*, 2020 WL 1550218 at *18 (noting the defendant's concession that "its facilities use template policies and procedures" and that use of such policies and procedures was mandatory at all facilities was sufficient to show typicality of TVPA claims).

22 C.F.R. § 62.32(b) (emphasis added).  "Summer Work Travel participants are authorized to participate in the Exchange Visitor Program for up to *four months . . . .*"  *Id*. § 62.32(c) (emphasis added).

The differences in the earnings requirements and the duration requirements create further individualized issues in this case. The "sufficiently serious" nature of the psychological or financial harm suffered by these individuals would necessarily be impacted by the differing characteristics of the respective programs.

In sum, the predominance inquiry under Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  Here, the requisite cohesiveness is lacking.

## V.   <u>CONCLUSION</u>

For the reasons set forth, Plaintiffs' Motion for Class Certification [ECF 113] is DENIED.

IT IS FURTHER ORDERED that: (1) Defendants' *Daubert* Motion to Exclude Reports and Opinions of Luis C. deBaca [ECF 119]; and (2) Plaintiffs' Motion to Strike the Expert Report and Testimony of Greg H. Bristol and Memorandum in Support of Their Motion [ECF 130] are DENIED.[21]

---

[21]    The Court has reviewed the expert opinions of Mr. Bristol and Mr. deBaca in light of the governing standards.  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The Court finds the experts have sufficient experience in the field of human trafficking to qualify as experts with regard to the matters at issue.  The Court further finds the experts have submitted their opinions based upon that experience and the opinions, therefore, are reliable.  The Court notes that in large part, the opinions purport to explain, distinguish and/or analogize various

IT IS FURTHER ORDERED that the remaining Motions are DENIED:

(1)     Defendants' Motion to Strike Plaintiffs' Exhibit List [ECF 125]; Plaintiffs' Cross-Motion to Strike Defendants' Exhibit List [ECF 126]; and Defendants' Combined Motion in Limine [ECF 129];[22] and

(2)     Plaintiffs' Motion in Limine to Exclude Unsigned Affidavits and Supporting Memorandum of Law [ECF 128].[23]

---

court decisions addressing TVPA claims – in the context of both civil and criminal proceedings – based on the experts' experience and qualifications. The Court is certainly capable of conducting its own review of relevant legal authority and determining its applicability to the facts and issues presented. Nonetheless, the Court finds the opinions have limited relevance to the extent they are minimally helpful to the determination of the class certification issues before the Court. Therefore, the Court will not exclude the opinion of either expert. The Court's ruling is expressly limited to the class certification stage of these proceedings and is not intended to extend to the merits phase of this litigation. Finally, the Court finds appropriate here, the observation of another judge in this judicial district deeming *Daubert* challenges to class certification expert witnesses as "a good example of overlitigation" of the matter "on both sides." *Miller v. Farmers Ins. Group*, No. CIV-10-466-F, 2012 WL 8017244 at *7 n. 5 (W.D. Okla. Mar. 22, 2012) (unpublished op.). "At some point, the parties and their counsel have to have some confidence in the ability of a trial judge, in a non-jury matter, to separate the wheat from the chaff as the testimony comes in, especially when the issues to be resolved are like the issues presented in th[is] class certification motion[]." *Id.*

[22]     The Court deems the briefing submissions adequate on the issue of class certification. In addition to the allegations of the Complaint, the Court has meticulously examined the substantial evidentiary materials submitted by the parties. Those evidentiary materials were obtained, in part, during the course of significant discovery permitted on the class certification issue. The Court, therefore, deems an evidentiary hearing unnecessary. Given the extensive record and the completeness of the parties' briefing, an evidentiary hearing would not add much to the Court's analysis. *See, e.g., Hershey v. ExxonMobil Oil Corp.*, No. 07-1300-JTM, 2011 WL 1234883 at *14 (D. Kan. Mar. 31, 2011) (unpublished op.) ("[E]videntiary hearings are not required in all cases of requested class certification.").

[23]     Plaintiffs move to exclude from the Court's consideration on the issue of class certification affidavits of the following persons: (1) Manesha Kolhapuray; (2) Nilesh Kadbhane; and (3) Soniya Lipihande. Specifically, Plaintiffs ask the Court to exclude these affidavits "at the class certification hearing" because the affidavits are "unsigned."

In response, Defendants demonstrate that they have secured signatures as to the affidavits of Nilesh Kadbhane and Soniya Lipihande and have filed signed affidavits in support of their Response to Plaintiffs' Motion to Certify Class. Thus, as to these two affidavits, Defendants

IT IS SO ORDERED this 30th day of September, 2021.

SCOTT L. PALK
UNITED STATES DISTRICT JUDGE

---

contend Plaintiffs' Motion is moot.  Defendants further submit email correspondence with
Manesha Kolhapuray pursuant to which Manesha states that the affidavit is true and correct.
Defendants represent that all three affiants are available should the Court conduct a class
certification hearing.  Plaintiffs did not file a reply to address any of these matters.
       The Court finds the authenticity of the affidavits is not in serious dispute and that Plaintiffs
have failed to demonstrate any prejudice arising from the Court's consideration of the same.  To
that end, the Court finds the information contained in the affidavits is substantially similar to the
other affidavits submitted by Defendants and, therefore, the Court's decision is not impacted in
any meaningful way by Plaintiffs' challenge to these additional affidavits on grounds they are
unsigned.